**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SOUTHCROSS HOLDINGS LP, *et al.*,[1] | § | Case No. 16-20111 (___) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**DECLARATION OF JASON FEINTUCH IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND CERTAIN FIRST DAY MOTIONS**

I, Jason Feintuch, hereby declare under penalty of perjury as follows:

1.      I am a senior vice president with Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), a financial advisory and investment banking firm.  Houlihan Lokey has been engaged as an investment banker to Southcross Holdings LP ("Holdings") and certain of its affiliates as debtors and debtors in possession (collectively, the "Debtors") since October 2016.  I have over a decade of investment banking and restructuring experience, including providing investment banking expertise and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings.

2.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Southcross Holdings LP (7700); Frio LaSalle GP, LLC (9882); Frio LaSalle Pipeline, LP (9792); Southcross Holdings Borrower GP LLC (6790); Southcross Holdings Borrower LP (6880); Southcross Holdings GP LLC (2020); Southcross Holdings Guarantor GP LLC (6523); Southcross Holdings Guarantor LP (6622); TexStar Midstream GP, LLC (7001); TexStar Midstream Services, LP (7100); TexStar Midstream T/U GP, LLC (3754); and TexStar Midstream Utility, LP (3706).  The location of the Debtors' service address is: 1717 Main Street, Dallas, Texas, 75201.

commencement of these chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the DIP Motion (as defined below).

3.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of Houlihan Lokey working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their businesses.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

**Introduction**

4.      As the Court is no doubt aware, the oil and gas industry has experienced a cataclysmic shift in market conditions over the course of the past 18 months.  The result has been dozens of bankruptcy filings by oil and gas industry companies.  Unfortunately, many of these companies are mired in protracted, contentious chapter 11 proceedings as market conditions have continued to deteriorate.  The Debtors are poised to be an exception.  Against this extraordinarily challenging market backdrop, the Debtors have managed to achieve global consensus—spanning every level of their capital structure—in support of a prepackaged chapter 11 restructuring that will result in a massive deleveraging of the Debtors' balance sheet and leave general unsecured creditors unimpaired.  The transactions contemplated by the Plan (as defined below) are a series of hard-fought, integrated agreements between sophisticated parties.  The cornerstone of this restructuring is a $170 million new money equity infusion from certain of Holdings' prepetition equity sponsors.  The support of Holdings' equity sponsors has been unwavering and any

alternative transactions that does not include their support would be significantly less valuable to the Debtors' enterprise.  In exchange for this significant new capital infusion, the Debtors' secured term lenders have agreed to exchange the vast majority of their debt for a portion of the new equity in the reorganized Debtors.  The transactions contemplated by the Plan will position the Debtors to weather the industry storm and maximize value for stakeholders enterprise wide.  And, despite an often contentious negotiation process, the Plan enjoys the support of 100 percent of the parties in each voting class as of the filing of these chapter 11 cases.

5.      But for the Debtors to capture the full benefit of the RSA and Plan, time is of the essence.  The Debtors and their non-Debtor affiliates (collectively, "Southcross") form two halves of a broader, interconnected enterprise.  The Debtors' most valuable assets are their approximately 60 percent limited partner ownership interest in non-Debtor Southcross Energy Partners, L.P. (the "MLP"), a publicly-traded master limited partnership listed on the New York Stock Exchange (NYSE: SXE) and their 100 percent ownership interest in non-Debtor Southcross Energy Partners GP, LLC (the "MLP GP," and together with the MLP and their subsidiaries, the "MLP Entities"), which is the MLP's general partner (which in turn owns a 2 percent interest in the MLP).

6.      The Transactions contemplated by the RSA and Plan will preserve the value of the MLP Entities as a going concern, but *only* so long as they are consummated expediently.  As described in section III of this Declaration, to ensure that the MLP can deliver an unqualified audit report by April 15, 2016, the Debtors need the Court to allow certain forms of relief on an emergency basis *and* enter an order shortening notice for confirmation of the Plan and approval of the disclosure statement so that the Debtors can confirm and consummate the Plan *before* the MLP's audit report is due on April 15, 2016.  Failure to grant such relief will cause a default

under the terms of the MLP Entities' funded debt obligations, which would exacerbate the current enterprise-wide liquidity crisis, and could result in a chapter 11 filing of the MLP Entities.  Such a result would wipe out the value of the Debtors' most significant asset—a loss that would ultimately be borne by the Southcross enterprise's creditors and equity holders—and most likely unwind all of the efforts expended to date to build universal support for the Debtors' restructuring.

*      *      *      *      *

7.      As of the Petition Date, the Debtors were liable for approximately $616 million in funded debt obligations, which amount includes approximately $50 million outstanding under a senior secured asset-based revolving facility (the "Holdings Revolver") and approximately $566 outstanding under a senior secured term loan facility (the "Holdings Term Loan," and together with the Holdings Revolver, the "Holdings Credit Facility").

8.      In the fall of 2014, oil prices plummeted due to global oversupply and have yet to recover.  Simultaneously, the natural gas market, which experienced continued growth in domestic production and unseasonably mild weather, sustained a marked decline in natural gas prices which may persist for the foreseeable future.  In response, upstream producers across the United States, have significantly pared back new drilling activity.  This trend has significantly reduced production volumes in the upstream sector, leading to much less transportation and processing activity in the midstream sector.  The current operating conditions and attendant enterprise-wide liquidity challenges have made servicing the Debtors' funded debt and preferred equity obligations unsustainable.  Additionally, as described in greater detail in the *Declaration of Jeffery J. Stegenga in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "Stegenga Declaration") filed contemporaneously herewith, due to the interconnected nature

4

of the Debtors' and the MLP Entities' businesses, the Debtors ran up an approximately $49.2 million intercompany balance in favor of the MLP Entities that they have been unable to fund, thus jeopardized the MLP Entities' liquidity profile.

9.    As a result, the Debtors engaged their primary equity holders, a steering committee of the lenders under the Holdings Term Loan, a steering committee of the lenders under the Holdings Revolver, and their administrative agents regarding various restructuring alternatives—both out-of-court and in-court—to strengthen the Debtors' balance sheet, provide near-term liquidity support enterprise-wide, and create a sustainable capital structure to position the Debtors for long-term success.

10.    After extensive, hard-fought negotiations, the Debtors, certain lenders holding approximately 95 percent of the loans arising under the Holdings Revolver, certain lenders holding approximately 68 percent of the loans arising under Holdings Term Loan, holders of 100 percent of Holdings Class B (*i.e.*, preferred) units, and holders of 100 percent of Holdings' Class A (*i.e.*, common) units reached a global agreement for a consensual, balance-sheet restructuring. The terms of the agreement are memorialized in the restructuring support agreement, dated as of March 21, 2016, attached to this Declaration as **Exhibit B** (the "RSA") and the prepackaged chapter 11 plan of reorganization attached as **Exhibit 1** to the RSA (the "Plan"). The transactions contemplated by the RSA and Plan will deleverage the Debtors by nearly 80 percent, provide immediate liquidity through a $170 million new money investment (which amount includes $85 million in debtor-in-possession financing), facilitate a much needed capital contribution to the MLP Entities, and minimize the time and expense associated with the restructuring. Under the terms of the Plan, the Debtors' funded debt obligations will be reduced

from approximately $616 million to $133 million and outstanding Class B units will be canceled, thus eliminating approximately $700 million of funded debt and preferred equity obligations.

11.     In exchange for this much-needed equity infusion and other compromises contained in the Plan, certain of Holdings' equity sponsors will receive 66.66 percent of the new equity in the reorganized Debtors and the lenders under the Holdings Term Loan will receive the remaining 33.34 percent of the new equity in the reorganized Debtors.  Holders of the remaining claims against and interests in the Debtors are either unimpaired under the Plan (general unsecured creditors), receiving a 100 percent recovery under the Plan (the lenders under the Holdings Revolver), or have unanimously accepted their treatment under the Plan (holders of Holdings' Class A and Class B units).

12.     The Plan contemplates a global settlement of all disputes among the Debtors' various stakeholders, including resolution of certain alleged claims against Holdings' equity sponsors.  Significantly, the Disinterested Directors (as defined below)—which were advised by separate counsel—undertook an independent review of the transactions contemplated by and potential claims released pursuant to the RSA and Plan.   Following such review, the Disinterested Directors determined that the RSA and Plan are the best available, value maximizing restructuring alternative.  Without the new money equity investment contemplated by the RSA and Plan, the Debtors are projected to run out of cash in a matter of days, and would be unable to continue operating as a going concern (which likely would jeopardize the MLP Entities' continued viability).

13.     Notably, the MLP Entities are *not* debtors in these chapter 11 cases.  As such, the restructuring transactions contemplated by the RSA and Plan will not directly affect the MLP's public unitholders or any obligations owed by the MLP Entities to third parties.

6

14.     As of the Petition Date, the Debtors have received unanimous support for the Plan, with all three classes entitled to vote under the terms of the Plan voting to accept the Plan. Pursuant to their prepetition solicitation process, the Debtors have received votes in favor of the Plan from:  (a) approximately 70.7 percent of the lenders under the Holdings Term Loan, holding approximately 83.1 percent of the loans arising thereunder; (b) approximately 66.7 percent of the lenders under the Holdings Revolver, holding approximately 95 percent of the loans arising thereunder; and (c) 100 percent of the holders of Holdings' Class B preferred units (the "Class B Unitholders").  Across all classes entitled to vote on the Plan, not a single voting entity has voted to reject the Plan.  The Plan solicitation period will expire shortly after the Petition Date, at 4:00 p.m. prevailing Eastern Time on March 28, 2016.

15.     To familiarize the Court with the circumstances leading to these chapter 11 cases and the Debtors' Proposed DIP Financing (as defined below), I have organized this declaration as follows:  Part I describes the events leading to the commencement of these chapter 11 cases and Southcross's prepetition restructuring efforts.  Part II describes the RSA and Plan.  Part III described the Debtors' proposed timeline for these chapter 11 cases.  Part IV describes the Proposed DIP Financing.  Further information regarding the Debtors' businesses, corporate history, interconnectedness with the MLP Entities, and prepetition capital structure is set forth in the Stegenga Declaration.

## I.     The Circumstances Leading to These Chapter 11 Cases.

### A.     The Market Decline.

16.     Southcross's business recently has come under significant pressure from macroeconomic forces beyond its control.  Demonstrating just how closely Southcross's fortunes are tied to commodities prices, the unit price of the MLP's publicly-traded common units has fallen from more than $22 per unit on August 4, 2014, the date of the Merger, to approximately

7

$1.26 per unit as of the Petition Date—a decline of nearly 94 percent, as depicted in the following chart:



Crude Oil   Natural Gas   Holdings Term Loan   MLP Common Units

17.   Rig counts, an indicator of the level of new upstream drilling activity, are down nationwide nearly 60 percent over the past year.  The Debtors—and Southcross generally—are highly dependent on production activity the Eagle Ford shale in South Texas (the "Eagle Ford"). While the Eagle Ford has traditionally been considered one of the more attractive Shale plays, its upstream producers have been uniformly hit hard by the recent market malaise.  With oil prices currently at approximately $40 per barrel, it has become uneconomic to drill new wells in the Eagle Ford.

18.   As described in the Stegenga Declaration, approximately 44 percent of Southcross's customer contracts do not contain minimum throughput provisions, and instead contain, at most, acreage dedications.  Since there is no requirement that the producer extract a minimum volume of hydrocarbons under an acreage dedication, Southcross does not gain

8

anything if the upstream E&P companies are not producing.  Given the recent low-drilling-activity environment, Southcross has felt the sagging volumes especially hard where it has only acreage dedications in place.  Specifically, the Debtors' Lancaster Gathering System (as defined in the Stegenga Declaration) is connected to 18 upstream producers, but none have made minimum volume commitments.  Over the course of the past year, the number of active drilling rigs connected to the Lancaster Gathering System has decreased from approximately 16 to two.  While existing wells sustained volume throughput in the short term, these wells will taper off over time.  Less volume gathered at the Lancaster Gathering System means less volume compressed, treated, processed, and fractionated enterprise-wide and decreases revenues across the Southcross enterprise.

19.    The timing of this historic market malaise could not have been worse for Southcross.  As described in the Stegenga Declaration, in August 2014, Southcross initiated a costly process to expand the MLP Entities' asset base and maximize cash distributions to MLP unitholders. Over the course of the past eighteen months, the Debtors spent more than $50 million connecting and integrating the Legacy Southcross and Legacy TexStar (each as defined in the Stegenga Declaration) assets and more than $100 million to bring the Robstown Fractionator (as Defined in the Stegenga Declaration) online.  While the cash crunch has hit the Debtors the hardest, given the interconnected nature of Southcross's businesses, the MLP Entities have also felt the pain.

**B.     The August 2015 Equity Commitment Letter and October 2015 Capital Call.**

20.    Southcross began exploring alternatives to address its capital structure and liquidity needs in mid-2015.  Over the course of June, July, and August 2015, Southcross engaged its prepetition equity sponsors—affiliates of EIG BBTS Holdings LLC ("EIG"), TW BBTS Aggregator LP ("Tailwater"), and Southcross Energy LLC (together with EIG and

Tailwater, the "Sponsors")—in discussions regarding an equity infusion.  On August 13, 2015, Holdings and certain affiliates of the Sponsors executed a commitment letter (the "August Equity Commitment Letter")[2] pursuant to which such Sponsor affiliates agreed to provide Southcross with an equity infusion of up to $175 million to pursue growth opportunities, so long as certain conditions were met.  Under the terms of the Equity Commitment Letter, the $175 million total commitment was to be split between Holdings ($125 million) and the MLP ($50 million).  Under the clear terms of the August Equity Commitment Letter, two of the three Sponsor affiliates that are parties to the August Equity Commitment Letter must agree to fund amounts contemplated by the August Equity Commitment Letter for any obligation to be created.  Holdings does not have that level of agreement—two Sponsors never agreed to fund amounts under the August Equity Commitment Letter.  Accordingly, no amounts can be funded under the August Equity Commitment Letter.

21.    In October 2015, Southcross, and especially the Debtors, began to face mounting liquidity pressures.  To address its liquidity needs, on October 5, 2015, Holdings' management team elected to issue a capital call for $20 million pursuant to section 4.1(b) of the Holdings Limited Partnership Agreement (the "Holdings LPA").   No party funded on account of the capital call.

22.    Recognizing that the requisite conditions for an equity infusion as contemplated in the August Equity Commitment Letter may not be met and, in any event, may not be enough

---

[2]    In connection with the yearly audit of Holdings Borrower, on March 3, 2015, and April 30, 2015, the Sponsors sent letters to the Debtors' auditor, Deloitte & Touche LLP, suggesting that Holdings Borrower may require additional liquidity support during the twelve months following the audit opinion date to ensure compliance with financial covenants under the Holdings Credit Facility (the "Spring Equity Commitment Letters" and, together with the August Equity Commitment Letter, the "Equity Commitment Letters").  In the Spring Equity Commitment Letters, the Sponsors indicated their intent to provide up to $53 million for an "Additional Equity Contribution" as needed to ensure compliance with the Holdings Credit Facility financial covenants.

to resolve Southcross's liquidity constraints, in October 2015, Southcross retained Houlihan Lokey as its financial advisor to engage with Southcross's broader group of stakeholders and aid in Southcross's exploration of strategic alternatives.

      **C.**     **The Restructuring Negotiations.**

     23.    With a financial advisor in place, between October and December 2015, the Debtors diligently pursued strategic alternatives, engaging Sponsors EIG and Tailwater in extensive discussions regarding the terms of a new capital investment in Holdings. In addition, the Debtors' management team and advisors solicited restructuring proposals from all of the Debtors' other key stakeholders, including the Class B Unitholders and lenders under the Holdings Credit Facility.

     24.    In December 2015, EIG and Tailwater made an initial proposal regarding a new capital investment in Holdings, to which the lenders under the Holdings Term Loan made an initial counterproposal. However, the initial negotiations stalled as conditions in the oil and gas industry continued to deteriorate. None of the Debtors' other key stakeholders made a proposal during this time period. In late December, Southcross engaged Kirkland & Ellis LLP as legal counsel to advise on strategic alternatives for addressing the Debtors' capital structure and liquidity needs.

     25.    Also in late December 2015, the Debtors' management team and advisors re-engaged in discussions with EIG, Tailwater, and certain of the lenders under the Holdings Term Loan regarding a temporary waiver and amendment to the Holdings Credit Facility along with incremental financing to avoid a freefall bankruptcy filing. The Holdings LPA, however, on its face, requires the consent of a majority of the Class B Unitholders prior to Holdings' incurring certain new debt obligations (the "Class B Consent Right"). The Holdings LPA purports to extend the Class B Consent Right to all of the Debtors and the MLP GP. The

Debtors substantially negotiated a temporary waiver and amendment to the Holdings Credit Facility from the lenders under the Holdings Term Loan and $20 million in secured incremental financing from EIG and Tailwater and approached the Class B Unitholders to seek their consent in late December 2015.

26.     On December 30, 2015, however, the Class B Unitholder ECP informed the Debtors that fundamental elements of the secured incremental financing were not acceptable to the Class B Unitholders.  Instead, ECP suggested, on behalf of the Class B Unitholders, that the Debtors seek to compel performance under the August Equity Commitment Letter.

27.     While the Debtors and the Board took the Class B Unitholders' contentions seriously, the Board determined, in consultation with the Debtors' management team and advisors and in light of continued deterioration in the commodities markets, that exploring consensual solutions with the Sponsors was the better near-term alternative.  On January 3, 2016, the Debtors informed the Class B Unitholders, among other things, that the Sponsors "have taken the position that the conditions precedent to the funding obligations contained in the August 2015 equity commitment letter have not yet been met."  On January 11, 2016 and February 9 and 17, 2016, the Board received additional letters from Class B Unitholders, essentially reiterating their position regarding the August Equity Commitment Letter.

28.     Meanwhile, because the $20 million incremental secured financing was not acceptable to the Class B Unitholders, Southcross began to explore alternative means of securing incremental financing.  In early January 2016, the MLP Entities negotiated the terms of certain senior unsecured payment-in-kind notes (the "MLP PIK Notes") to be issued by the MLP Entities to certain funds managed by EIG and Tailwater with an aggregate principal amount of $14 million.  None of the Debtors have guaranteed or are otherwise liable for the obligations

arising under the MLP PIK Notes. Because the MLP Entities issued the MLP PIK Notes directly, the issuance did not trigger the Class B Consent Right. On January 5, 2016, the Conflicts Committee considered and approved the terms of the MLP PIK Notes and the MLP Entities executed the requisite documentation on January 7, 2016, which stabilized Southcross's short-term liquidity.

29.     The Debtors simultaneously negotiated and entered into a temporary waiver and amendment agreement with the requisite lenders under the Holdings Term Loan (the "Holdings Waiver"), which the Board approved on January 7, 2016. Under the terms of the Holdings Waiver:

- certain lenders under the Holdings Term Loan agreed to waive potential and/or anticipated events of default under the Holdings Credit Facility;

- the Holdings Credit Facility was amended to require additional financial reporting; and

- the Holdings Credit Facility was amended to effectively shut off Holdings' ability to incur additional debt and consummate certain other transactions.

In mid-February 2016, the Holdings Waiver was extended to March 14, 2016. The $14 million received on account of the MLP PIK Notes and the breathing spell provided by the Holdings Waiver gave the Debtors the necessary runway to continue to explore consensual restructuring alternatives with its stakeholders.

30.     On January 19, 2016, Holdings GP added two disinterested directors (the "Disinterested Directors") to the Board to aid the Board in its evaluation of various strategic alternatives. On February 10, 2016, the Disinterested Directors retained Kramer Levin Naftalis & Frankel LLP as their independent legal advisor.

31.     During the additional time afforded by the Holdings Waiver and the MLP PIK Notes, Southcross re-engaged with all of its stakeholders in search of a value-maximizing

transaction that would deleverage the company while also raising much needed incremental liquidity.  Over the course of the past 12 weeks the Debtors engaged in substantial arms'-length, good faith negotiations with EIG and Tailwater and the lenders under the Holdings Term Loan, the culmination of which is the RSA, the Plan, and the Proposed DIP Financing (as defined below).

32.     Specifically, between January 11, 2016 and February 2, 2016, EIG, Tailwater, and an ad hoc group representing the majority of the lenders under the Holdings Term Loan (the "Ad Hoc Lender Group") each made a number of formal restructuring proposals predicated on a new money investment from EIG and Tailwater, including:

- EIG and Tailwater's initial proposal provided for a $150 million equity investment at a $325 million transaction value and a 75 percent (EIG and Tailwater) to 25 percent (Holdings Term Loan lenders) new equity split;

- the Ad Hoc Lender Group's initial proposal provided for a $175 million equity investment at a $468 million transaction value (approximately $150 million less than the Debtors' funded debt obligations) and a 51 percent (EIG and Tailwater) to 49 percent (Holdings Term Loan lenders) new equity split; and

- the parties ultimately agreed to a $170 million equity investment at a $380 million transaction value and a 66.6 percent (EIG and Tailwater) to 33.4 percent (Holdings Term Loan lenders) new equity split.

The Debtors, EIG, Tailwater, and the Ad Hoc Lender Group negotiated a restructuring term sheet based on the foregoing general economic terms.  The parties also negotiated a debtor-in-possession financing term sheet, an equity term sheet, and the terms of the RSA and Plan. Meanwhile, the Debtors, EIG, and Tailwater continued to engage the Class B Unitholders in good faith, arms'-length negotiations regarding a consensual resolution of their issues. Ultimately, in late March 2016, the Debtors were able to finalize the terms of the RSA, the Plan, and the Proposed DIP Financing.

33.     Contemporaneously, certain affiliates of the Sponsors and the Class B Unitholders entered into a confidential settlement agreement and related inter-Sponsor agreement pursuant to which, among other things, the Class B Unitholders and such affiliates of the Sponsors provided each other with mutual releases.  The Class B Unitholders also agreed to become parties to the RSA and support the Plan (including the releases provided thereunder) pursuant to which they will receive $100,000 on account of their Holdings Class B Interests.  As an integral component of the overall compromise, the Plan contains broad, mutual releases by and among the Debtors, the Sponsors, the Class B Unitholders, the Ad Hoc Lender Group, and the Revolving Lenders, among others, including with respect to the Equity Commitment Letters.

**D.     Disinterested Director and Board Approval of the RSA and Plan.**

34.     In the weeks since their appointment, the Disinterested Directors have played a key role in the restructuring negotiations and the analysis of the RSA, Plan, and related matters. The Disinterested Directors have met on several occasions and, with the help of their independent legal counsel, have conducted substantial diligence and analysis in respect of the RSA and the Plan since their appointment.  For example, the Disinterested Directors carefully considered the merits of the Class B Unitholder's assertions *vis-à-vis* the August Equity Commitment Letter, together with other matters such as collectability, foreseeable creditor recoveries, and Southcross's near-term liquidity requirements, specifically comparing the costs and benefit of litigating such claims related to the August Equity Commitment Letter versus proceeding with the consensual path contemplated by the RSA.

35.     As set forth in greater detail in the Declaration of Charles H. Cremens in support of the Proposed DIP Financing, at the conclusion of their independent investigation, the Disinterested Directors ultimately determined that any claims against the Sponsors—under the Equity Commitment Letters or otherwise—are not likely to succeed, assigning a low value, if

15

any, to such claims.  Accordingly, the Disinterested Directors concluded that the Debtors' entry into the RSA and the transactions contemplated under the Plan maximize value for the benefit of all parties in interest and recommended that the Board authorize a balance-sheet restructuring on the terms set forth therein.

36.     From January 1, 2016 to March 21, 2016, the full Board met 13 times to review and consider restructuring transactions that would maximize value for all of the Debtors' stakeholders.  On March 16, 2016, the full Board met to receive a comprehensive presentation from the Debtors' advisors regarding the RSA and to determine whether to authorize the Debtors' entry into the RSA and launch of the Plan solicitation process in accordance with the prepackaged bankruptcy process contemplated by the RSA.  This presentation was the culmination of an extensive analysis and investigation by the Debtors, their management team and advisors, and the Board into potential claims against the Sponsors and various restructuring alternatives.  Like the Disinterested Directors, the Debtors management team and advisors recommended entry into the RSA and the best available, value-maximizing restructuring alternative.  The full Board ultimately followed suit, unanimously voting to authorize the Debtors' entry to the RSA and launch of the Plan solicitation process.  On March 21, 2016, the Debtors and their stakeholders party to the RSA formally executed the RSA.

37.     Also on March 21, 2016, the Debtors launched their solicitation of Plan acceptances by transmitting a disclosure statement and ancillary documents to all classes entitled to vote on the Plan—*i.e.*, all lenders under the Holdings Credit Facility and the Class B Unitholders.  The Plan solicitation process will conclude shortly after the Debtors' chapter 11 filings, at 4:00 p.m. prevailing Eastern Time on March 28, 2016.  Over the course of the solicitation process, the Debtors have received votes in favor of the Plan from:

(a) approximately 70.7 percent of the lenders under the Holdings Term Loan, holding approximately 83.1 percent of the loans arising thereunder; (b) approximately 66.7 percent of the lenders under the Holdings Revolver, holding approximately 95 percent of the loans arising thereunder; and (c) 100 percent of the Class B Unitholders.  Across all classes entitled to vote on the Plan, 100 percent of the entities voting have voted to accept the Plan—not a single voting entity has voted to reject the Plan.

38.     On March 27, 2016, the full Board met once more and authorized the Debtors' chapter 11 filings and the Debtors commenced these chapter 11 cases on the same date.

**II.     The RSA and Plan.**

39.     The cornerstone of the Plan and RSA is a $170 million new money equity investment from affiliates of EIG and Tailwater, $85 million of which will come in the form of debtor-in-possession financing (the "Proposed DIP Financing") and the balance of which will come in the form of cash on the Plan's effective date.  In exchange for its effective date cash contribution, EIG and Tailwater will receive 33.33 percent of the new equity in the reorganized Debtors (the "New Equity") and $8 million in unsecured notes to be issued by the reorganized Debtors. Significantly, under the terms of the Proposed DIP Financing, EIG and Tailwater have agreed to the Debtors' payment of intercompany amounts owed to MLP, which will provide much needed liquidity to the MLP Entities and likely avoid the need for an enterprise-wide chapter 11 filing.

40.     Significantly, the Debtors anticipate that general unsecured creditors, including vendors and trade creditors, will be paid in full, in cash, or otherwise rendered unimpaired. Generally, the RSA and Plan contemplate the following recoveries to holders of claims against and interests in the Debtors:

- payment in full of all administrative and priority claims in cash at emergence;

- conversion of the Proposed DIP Financing obligations to 33.33 percent of the New Equity;

- reinstatement of all intercompany arrangements with the MLP Entities;

- holders of claims arising under the Holdings Revolver will receive their pro rata share of the loans arising under a new $50 million term loan A credit facility;

- holders of claims arising under the Holdings Term Loan will receive their pro rata share of approximately 33.34 percent of the New Equity and the loans arising under a new $75 million term loan B credit facility;

- holders of general unsecured claims will receive a recovery of 100 percent, to be paid in cash, or otherwise provided such treatment as to render their claims unimpaired;

- the Class B Unitholders will receive their pro rata share of $100,000; and

- all existing common equity interests in Holdings and Holdings GP will be canceled.

41. Consummation of the restructuring contemplated by the RSA and Plan will result in the equitization of approximately 80 percent of the Debtors' funded debt obligations and elimination of all preferred equity obligations. In addition, all amounts owing under the Proposed DIP Financing will be equitized at emergence.

**III.     The Proposed Timeline.**

42. The RSA and Proposed DIP Financing require the Debtors to move forward with the restructuring contemplated by the RSA and Plan as expeditiously as possible. The support of the signatories to the RSA is contingent upon, among other things, the Debtors meeting the following restructuring milestones:

- the Debtors commence solicitation of the Plan within 5 days of the RSA effective date;

- the Debtors commence chapter 11 cases on or before March 28, 2016;

18

- the Court enters a final order approving the Proposed DIP Financing within 45 days of the entry of the order approving the Proposed DIP Financing on an interim basis;

- the hearing with respect to confirmation of the Plan commences within 90 days of the Petition Date;

- the Court enters an order confirming the Plan within 130 days of the Petition Date; and

- the effective date of the Plan occurs within 150 days of the Petition Date.

The failure to satisfy any of the foregoing milestones may result in a termination event under the RSA and/or, potentially, a default or event of default under the Proposed DIP Financing.

43.     While the RSA and Proposed DIP Financing set forth the outside dates by which the Debtors must achieve certain case milestones, circumstances warrant a more expedited proceeding.  As described in detail above, the Debtors' success depends in large part on the success of the MLP Entities.  Accordingly, it is in the Debtors' and their stakeholders' best interests to take all reasonable steps to maintain the MLP Entities' value as a going concern.  The MLP, and certain of its direct and indirect subsidiaries as guarantors, are liable for approximately $642 million in funded debt obligations, including:  (a) a $200 million senior secured asset-based revolving credit facility (the "MLP Revolver"), under which approximately $185 million is currently outstanding; (b) a $450 million senior secured term loan credit facility (the "MLP Term Loan," and together with the MLP Revolver, the "MLP Credit Facilities") under which $443 million is currently outstanding; and (c) $14 million outstanding under the MLP PIK Notes. Under the terms of the MLP Credit Facilities, interest and amortization payments will come due by March 31, 2016.

44.     Further, under the terms of the MLP Revolver, the MLP Entities must maintain compliance with certain financial covenants.  If the MLP Entities are unable to maintain such compliance as of the end of each fiscal quarter, the MLP may exercise certain "Equity Cure

Rights" under the terms of the MLP Revolver to cure any financial covenant-related default. Pursuant to the MLP's Equity Cure Rights, it may, as is relevant here, cause the Sponsors or their affiliates (*i.e.*, the Debtors) to purchase MLP common units (and the MLP may sell such common units) in an amount sufficient to bring the MLP Entities in compliance with the MLP Revolver financial covenants.  In light of the current turmoil in the oil and gas industry, it should come as little surprise that the MLP must exercise its Equity Cure Rights to maintain compliance with the MLP Revolver financial covenants.  Accordingly, on March 17, 2016, the MLP and Holdings entered into that certain Equity Cure Contribution Agreement (the "Contribution Agreement"), under which Holdings agreed to purchase, and the MLP agreed to sell, up to $50 million worth of MLP common units, on the terms set forth in the Contribution Agreement, to bring the MLP Entities in compliance with the MLP Revolver financial covenants.  Holdings' obligations under the Contribution Agreement will come due as early as March 30, 2016.

45.     Finally, under the terms of the MLP Credit Facilities, the MLP Entities must deliver an unqualified—*i.e.*, "clean"—audit report in connection with their annual audited financial statements by no later than April 15, 2016.  If the Debtors are unable to confirm and consummate the Plan in sufficient time to permit the MLP Entities to obtain an unqualified audit report by April 15, 2016, the MLP Entities' will be in default under the terms of the MLP Credit Facilities, a result that is to the detriment of the Debtors, their bankruptcy estates, and, ultimately, all stakeholders in these chapter 11 cases.

46.     Broadly speaking, the ultimate goal of the restructuring contemplated by the RSA and Plan is to maximize the value of the entire Southcross enterprise, which hinges in large part on preserving the value of the MLP Entities as a going concern.  If the MLP Entities are unable to comply with their obligations under the MLP Credit Facilities this entire exercise will be put

in jeopardy—the MLP Entities will likely be forced into bankruptcy themselves, destroying value for stakeholders enterprise wide.  The Debtors and their stakeholders worked for months prepetition to achieve the global consensus embodied in the RSA and Plan in an effort to avoid such a result.  Accordingly, as set forth below and in pleadings filed contemporaneously herewith, the Debtors respectfully request that the Court grant certain relief related to the Proposed DIP Financing and First Day Motions, including payment of intercompany amounts owed by the Debtors to the MLP Entities and assumption of and performance under the Contribution Agreement, *and* enter an order confirming the Plan ***prior to April 15, 2016***.  As set forth with the Scheduling Motion[3] filed contemporaneously herewith, the Debtors propose that a hearing with respect to confirmation of the Plan take place on April 11, 2016.  While the Debtors acknowledge that their request for such an expedited schedule is not ordinary, the Debtors respectfully submit that the facts and circumstances presented in these cases justify and support such a unique request.

47.    The Debtors and their stakeholders are poised to achieve a truly extraordinary result, especially in light of the challenging market backdrop.  The Debtors' ability to achieve a global consensus among its stakeholders in favor of this result represents a significant achievement.  Given the overwhelming consensus in favor of the Plan, the fact that general unsecured creditors will be paid in full, and the sophistication of the Debtors' stakeholders that are not party to the RSA[4] (or otherwise being paid in full), delaying Plan confirmation longer

---

3    *See Emergency Motion of Southcross Holdings LP, et al., for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Confirmation Hearing Notice, (v) Directing that a Meeting of Creditors not be Convened, and (VI) Shortening the Notice Requirements Related Thereto* (the "Scheduling Motion").

4    The loans arising under the Holdings Credit Facility are exclusively held by large, institutional investors.

than is absolutely necessarily will serve little purpose.  Indeed, taking into account the foregoing

considerations, any process-related benefit derived from delaying Plan confirmation beyond the

Debtors' proposed timeframe would be greatly outweighed by the danger of jeopardizing the

MLP Entities' ability to comply with its audit obligations—and thus the value of the entire

Southcross enterprise.  The restructuring contemplated by the RSA and the Plan preserves the

Debtors' value as a going concern, preserves the value of the Debtors' ownership interest in the

MLP, and ultimately inures to the benefit of all stakeholders, whether at the level of the Debtors

or the MLP Entities.

**IV.    Relief Sought in the Emergency Motion of Southcross Holdings LP,** *et al.***, for Entry
of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition
Secured Financing, (II) Granting Liens and Providing Superpriority Administrative
Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting
Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
Hearing, and (VII) Granting Related Relief (the "DIP Motion").**

48.    Pursuant to the DIP Motion, the Debtors seek approval of the Proposed DIP

Financing and the consensual use of cash collateral.[5]  Since Houlihan Lokey's engagement in

October 2015, I have worked closely with the Debtors' management team and other advisors

with respect to the Debtors' restructuring and has become well-acquainted with the Debtors'

capital structure, liquidity needs, and business operations.  For the reasons set forth below, I

believe that the process to obtain debtor-in-possession financing produced the best financing

option available and that the terms of the Proposed DIP Financing are reasonable and

appropriate.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion

---

[5]    The material terms of the DIP Facility are set forth in detail in the DIP Motion.  For the avoidance of doubt, any
description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP
Loan Documents (as defined in the DIP Motion).

should be approved.  Further support for the relief requested in the DIP Motion is set forth in the Stegenga Declaration.

### A.     Marketing Process For the Proposed DIP Financing.

49.     The Debtors require substantial financing on an immediate basis.  As of the Petition Date, the Debtors' total cash balance is approximately $750,000 and they do not have readily available sources of additional capital.  Without additional financing, the Debtors lack sufficient funds to operate their business enterprise and make necessary payments to the MLP Entities.  In addition, Houlihan Lokey determined that the availability of, and options for, postpetition financing would be restricted by the Debtors' existing capital structure, long-term liquidity needs, projected cash losses, and the current state of the oil and gas commodity markets and such markets' impact on cash flows and asset values.  Given that the Debtors' midstream operations are reliant on a robust oil and gas market, the Debtors have encountered significant headwinds in light of depressed oil and gas commodities prices.

50.     In light of the foregoing, and the fact that substantially all of the Debtors' material assets are asserted by the Debtors' secured lenders to be encumbered under their existing capital structure, Houlihan Lokey concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  Beginning in mid-November 2015, Houlihan Lokey, the Debtors' management, and the Debtors' other advisors initiated discussions with certain lenders under the Holdings Term Loan, and expanded such discussions to include the lenders under the Holdings Revolver.  Early in this process, the parties contemplated a potential out-of-court restructuring where the Sponsors would contribute new additional capital. As commodities prices continued their fall and the overall oil and gas market deteriorated in early December 2015, the parties recognized that a chapter 11 filing would be necessary to

achieve a more comprehensive restructuring, and commenced discussions to determine what such a chapter 11 filing would look like, including the structure of a potential financing package.

51.     In early January 2016, discussions between the Debtors' management, certain lenders under the Holdings Term Loan, and the Sponsors began to coalesce around a consensual restructuring framework that would include a debtor-in-possession financing package.  In light of the foregoing, Houlihan Lokey launched a formal and robust marketing process designed to canvas the market and identify the best possible solution to the Debtors' unique financing needs. Houlihan Lokey began the marketing process by reviewing its contacts, consulting with the Debtors and their other advisors, and reaching out to seven potential sources of debtor-in-possession financing, including hedge funds, third-party lenders, and financial institutions.  Of the potential sources initially contacted, four signed non-disclosure agreements and were provided with customary diligence information regarding the Debtors and their financials and businesses.  Over a period of roughly three weeks, the Debtors and their advisors engaged in follow-up diligence calls and subsequent informational requests with the parties that signed non-disclosure agreements.  Ultimately, only one party made a highly conditional, "best efforts" alternative debtor-in-possession financing proposal that was priced well above market (the "Alternative Proposal"), and which would have imposed significant fees without the upside that the Proposed DIP Financing offers.

52.     In light of the tepid response from customary financing sources and given the Sponsors' willingness to engage in continued discussions regarding a consensual restructuring, including debtor-in-possession financing, the Debtors also sought financing proposals from the Sponsors.  As a result of these negotiations, the Sponsors submitted a term sheet outlining the terms and conditions for the provision of debtor-in-possession financing to the Debtors.  Over

the course of several weeks, the Debtors and their advisors engaged in intensive negotiations with the Sponsors and additional third-party financing sources to obtain the best terms each was willing to offer.  The negotiations were arm's-length at all times and were characterized by hard bargaining by all interested parties.  Working with the Debtors' management team and its advisors, Houlihan Lokey analyzed the details of the competing proposals and discussed them thoroughly with the Debtors' management and other advisors, making observations and recommendations concerning the strengths and weaknesses of each proposal**.**  Ultimately, the Debtors chose the Proposed DIP Financing because it was the best financing available to meet the Debtors' needs.

53.     As the direct result of these discussions, the Proposed DIP Financing contemplates postpetition financing in the form of a senior secured, multi-draw term loan in the principal amount of up to $85 million.  Further, the Proposed DIP Financing will provide the Debtors with access to the use of cash collateral on a consensual basis.  Based on the foregoing and current market conditions, it is my belief that the Proposed DIP Financing represents the best option available to address the Debtors' immediate liquidity needs, and that the terms and conditions of the Proposed DIP Financing are reasonable and appropriate under the circumstances, especially when considering the willingness of the lenders under the Proposed DIP Financing to equitize their claims on account of the Proposed DIP Financing, which will further facilitate the Debtors' restructuring.

54.     The Proposed DIP Financing is the product of extensive good-faith, arm's-length negotiations and is an essential component of a broader restructuring transaction contemplated by the RSA, which was itself heavily negotiated among the Debtors, the Sponsors, the lenders under the Holdings Credit Facility, and the Class B Unitholders.  As a result, I do not believe that

alternative sources of financing with terms as favorable as those of the Proposed DIP Financing are readily available to the Debtors.  Moreover, the Proposed DIP Financing converts to equity upon emergence and is attached to the RSA, which enables the Debtors to emerge from chapter 11 on an expedited bases, with a substantially deleveraged capital structure.

55.    The Proposed DIP Financing will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized and value is maximized, and will enable the Debtors to make required cure and intercompany balance payments to the MLP Entities.  Obtaining debtor-in-possession financing with the support of a supermajority of the holders of the Debtors' funded debt will facilitate the Debtors' restructuring and the maintenance of their interests in the MLP Entities.  Accordingly, I believe that the Proposed DIP Financing is in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the DIP Motion and as set forth in the proposed interim order approving the DIP Motion.

**B.    The Debtors Are Unable to Obtain Unsecured Credit.**

56.    I understand that if a debtor is unable to obtain unsecured credit, a debtor may obtain credit that is secured by an administrative expense claim having priority over any or all administrative expenses specified in section 503(b) or 507(b) of the Bankruptcy Code.  No party that we spoke to as part of the marketing process, and indeed no party we are aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  Indeed, no party other than the DIP Lenders was willing to provide postpetition financing on anything other than a first-priority "priming" basis with respect to all of the Debtors' assets, subject to the Revolving Obligations.  Thus, I believe that providing the DIP Lenders with a superpriority administrative claim and first priority priming liens, subject only to the liens and claims securing the Holdings Revolver, is reasonable and appropriate here as it will

allow the Debtors to obtain the critical financing they need to fund their operations and preserve their assets.

57.     In connection with the Proposed DIP Financing, the lenders thereunder will receive priority claims and priming liens on substantially all of the Debtors' assets, which claims and liens will be senior to the claims arising under the Prepetition Term Loan Facility.  The claims arising under the Holdings Revolver, however, will remain secured by first priority liens and claims against substantially all of the Debtors' assets, and such claims and liens will be senior to those granted on account of the Proposed DIP Financing.  Notably, third-party financing sources providing junior secured debtor-in-possession financing generally require higher fees and expenses to accommodate the increased risk due to their junior priority.  With respect to the Proposed DIP Financing, however, the attendant fees and expenses are both lower on a market basis and lower in practice given that they will be equitized under the RSA.  Thus, the Debtors benefit substantially from the Proposed DIP Financing's unique structure, and will not expend much-needed capital on fees that would otherwise be common for financings of this priority and size.  Accordingly, I believe that the Proposed DIP Financing's structure is appropriate in light of the Debtors' financing needs and substantially facilitates the comprehensive restructuring contemplated by the RSA.

**C.      The Fees in Connection with the DIP Facility Are Reasonable.**

58.     I understand that the Debtors have agreed, subject to Court approval, to pay certain fees in connection with the Proposed DIP Financing.  Specifically, I understand that the Debtors have agreed to pay:

        a.      Certain administration fees in accordance with the Fee Letter (the "DIP Administration Fees"), including

            (iv)     a one-time acceptance fee of $5,000, payable on the closing date;

      (v)     an annual administration fee of $30,000, due and payable annually in advance, with the first payment due on the closing date;

      (vi)    extraordinary administration fees that may be charged in connection with services of the agent under the Proposed DIP Financing (the "DIP Agent") outside the scope of the services set forth in the fee letter, including services in connection with document amendments, forbearances, waivers, extraordinary collateral release, substitutions under the Proposed DIP Financing, or participation in a committee formed in connection with a restructuring under the Proposed DIP Financing, in the amount of $225 per hour for associates and $450 per hour for account managers; and

      (vii)   a funds distribution fee billed at the rate of $1,500 for 1 to 10 wires, $3,000 for 10 to 20 wires, and so on, payable on the closing date.

   b.     A funding fee to each lender under the Proposed DIP Financing of 2.00% of the aggregate principal amounts of the commitments under the Proposed DIP Financing at any time, payable on the Maturity Date (the "Funding Fee" and, together with the DIP Administration Fee, the "DIP Fees").

59.    I believe that the fees to be paid under the Proposed DIP Financing are reasonable, particularly in light of these chapter 11 cases. More specifically, the Funding Fee will equitize to new common equity of the reorganized Debtors provided that the transactions contemplated by the RSA are consummated. Thus, so long as the Debtors' proposed restructuring is implemented, they will not be required to contribute cash on account of any Funding Fees under the Proposed DIP Financing. In addition, the administration fees under the Proposed DIP Financing fee letter are relatively minor in comparison to the Debtors' overall capital structure, as the DIP Agent is proposed to receive a $5,000 acceptance fee, a $30,000 annual administration fee, and variable fees for wire transfers, ranging from $1,500 to $3,000, depending on the aggregate total of wire transfers. These fees are reasonable in light of the hundreds of millions of dollars of indebtedness that is contemplated to be restructured

consensually in accordance with the RSA.   Accordingly, I believe that the DIP Fees are reasonable and within market practice for debtor-in-possession financings of this size and type.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  March 28, 2016

*/s/ Jason Feintuch*
Jason Feintuch
Senior Vice President
Houlihan Lokey Capital, Inc.

*Proposed Investment Banker to the Debtors*