## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SOUTHCROSS HOLDINGS LP, *et al.*,[1] | § | Case No. 16-20111 (___) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## EMERGENCY MOTION OF
## SOUTHCROSS HOLDINGS LP, *ET AL.*, FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
## POSTPETITION SECURED FINANCING, (II) GRANTING LIENS AND
## PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
## (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING
## ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.  THE DEBTORS ARE REQUESTING SUCH RELIEF BY MARCH 29, 2016.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Southcross Holdings LP (7700); Frio LaSalle GP, LLC (9882); Frio LaSalle Pipeline, LP (9792); Southcross Holdings Borrower GP LLC (6790); Southcross Holdings Borrower LP (6880); Southcross Holdings GP LLC (2020); Southcross Holdings Guarantor GP LLC (6523); Southcross Holdings Guarantor LP (6622); TexStar Midstream GP, LLC (7001); TexStar Midstream Services, LP (7100); TexStar Midstream T/U GP, LLC (3754); and TexStar Midstream Utility, LP (3706).  The location of the Debtors' service address is: 1717 Main Street, Dallas, Texas, 75201.

Southcross Holdings LP and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] respectfully submit this motion (this "Motion") for the relief set forth herein.  In support of this Motion, the Debtors submit the *Declaration of Charles H. Cremens, Disinterested Board Member of Southcross Holdings GP LLC, In Support of the Emergency Motion of Southcross Holdings LP, et al., for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV)  Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, attached hereto as **Exhibit B** (the "Cremens Declaration"), and the First Day Declarations.  In further support of this Motion, the Debtors respectfully state the following:

### Relief Requested

1.     The Debtors request that the Court, pending entry of the Final DIP Order, enter the Interim DIP Order to:

      a.     authorize the Debtors to obtain the DIP Facility consisting of approximately $85 million of senior secured financing in the form of a non-amortizing senior secured term loan facility, with $32 million available on an interim basis, subject to and pursuant to the terms and conditions set forth in the Interim DIP Order and the DIP Credit Agreement;

---

[2]     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jeffery J. Stegenga in Support of Chapter 11 Petitions and First Day Motions* (the "Stegenga Declaration") and the *Declaration of Jason Feintuch in Support of the Chapter 11 Petitions and Certain First Day Motions* (the "Feintuch Declaration" and, together with the Stegenga Declaration, the "First Day Declarations"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on March 27, 2016 (the "Petition Date").  Capitalized terms used, but not otherwise defined in this Motion shall have the meanings set forth to them in the First Day Declarations, the meanings ascribed to such terms further below in this Motion, or in the Interim DIP Order, as applicable.

KE 39220475

b.      authorize the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

c.      authorize the Debtors to (a) use Cash Collateral (as defined in the Interim DIP Order) to the extent required herein, and (b) provide adequate protection, solely to the extent provided herein, to the Prepetition Secured Parties, on account of the Debtors' use of Cash Collateral and any other Prepetition Collateral and solely to the extent of any diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral as of the Petition Date as a result of such use of Cash Collateral and any other Prepetition Collateral and the Debtors' incurrence of the obligations under the DIP Credit Agreement;

d.      subject to entry of the Final DIP Order, authorize the Debtors to grant liens to the DIP Lenders on the proceeds of the Avoidance Actions;

e.      subject to entry of the Final DIP Order, waive the Debtors' right to surcharge against the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

f.      subject to entry of the Final DIP Order, waive the right to assert an "equities of the case" claim against the Prepetition Secured Parties pursuant to section 552 of the Bankruptcy Code;

g.      schedule the Final Hearing to consider entry of the Final DIP Order authorizing the borrowings under, and the Debtors' entry into, the DIP Loan Documents on a final basis; and

h.      modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders.

## **Preliminary Statement**

2.      The Debtors require immediate access to liquidity to preserve the value of their estates for the benefit of all parties in interest. Without access to the debtor-in-possession financing contemplated by the Restructuring Support Agreement and Plan, the Debtors are projected to run out of cash in a matter of days, and would be unable to continue operating as a going concern (which likely would jeopardize the MLP Entities' continued viability). Specifically, as set forth in the First Day Declarations, the Debtors' interests in the MLP Entities are their most valuable asset. If the Debtors are unable to make themselves current on their

3

obligations to the MLP Entities and make required payments on account of accrued intercompany balances and an equity contribution agreement in sufficient time to permit the MLP Entities to remain in compliance with their own funded indebtedness, the MLP Entities could be jeopardized to the detriment of the Debtors, their bankruptcy estates, and, ultimately, their stakeholders.

3.     Recognizing the need for additional liquidity, the Debtors secured $85 million in postpetition debtor-in-possession financing prior to the commencement of these chapter 11 cases. The proposed DIP Facility consists of an $85 million new money multi-draw term loan, provided by the Debtors' equity sponsors (the "Sponsors").  The DIP Facility is secured by a first priority priming lien that is junior only to the Revolving Obligations under the Prepetition Credit Agreement, permitted liens under the Prepetition Credit Agreement, and the Carve Out.

4.     The Debtors require up to $32 million of postpetition financing during the interim period.  Among other things, the proceeds from the DIP Facility, together with anticipated cash flow from operations, will be used to procure goods and services integral to the Debtors' ongoing business operations, fund certain operational expenses, make necessary cure and intercompany balance payments to the MLP Entities, allow the Debtors to maintain favorable relationships with their vendors and customers, and satisfy working capital needs in the ordinary course of their business.

5.     As discussed below and in the First Day Declarations, the Debtors believe that the DIP Facility represents the best source of appropriately-sized financing available to the Debtors under the circumstances.  The DIP Facility is an essential component of the broader restructuring transaction contemplated by the Debtors' prepackaged chapter 11 plan of reorganization (the "Plan"), which enjoys the support of 100 percent of the parties in each voting class as of the

4

filing of these chapter 11 cases.  Moreover, and as discussed more fully below and in the Feintuch Declaration, substantially all the Debtors' assets are encumbered by liens arising under their prepetition credit facilities, and, therefore the Debtors do not believe third-party debtor-in-possession financing would be reasonably available.  Accordingly, the proposed DIP Facility provides the best path forward under the circumstances to address the Debtors' immediate liquidity needs, and they respectfully request that the Court approve the entry of the Interim DIP Order and the Final DIP Order.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

6.      By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order,"[3] and together with the Interim DIP Order, the "DIP Orders"):  (a) authorizing the Debtors to obtain senior secured postpetition financing as set forth in that certain Secured Superpriority Debtor In Possession Credit, Guarantee and Security Agreement, annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "DIP Credit Agreement" and, together with all agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with the DIP Orders, the "DIP Loan Documents") among Southcross Holdings Borrower LP (the "DIP Borrower" or the "Borrower"), the Guarantors, Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the DIP Lenders; (b) granting liens and providing superpriority claims with respect to such postpetition financing; (c) authorizing the Debtors to use Cash Collateral; (d) approving the form of adequate protection to be provided to certain prepetition lenders; (e) modifying the automatic

---

[3]     The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

stay in accordance with the DIP Orders; (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (g) granting related relief.

7.       The provisions of the DIP Loan Documents and the Interim DIP Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain under the circumstances.  Most importantly, the Debtors have an urgent need for the liquidity provided by the DIP Facility, and are required to make equity cure payments to the MLP, potentially as soon as March 30, 2016.  Approval of the DIP Facility will ensure the Debtors are able to maintain their operations, pursue and achieve a successful restructuring, and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors request that the Court enter the Interim DIP Order and Final DIP Order approving the DIP Facility.

8.       The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[4]

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Southcross Holdings Borrower LP.<br><br>*See* DIP Credit Agreement Preamble; Interim DIP Order Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Southcross Holdings GP, LLC, Southcross Holdings LP, Southcross Holdings Borrower GP, LLC, Southcross Holdings Guarantor LP, Southcross Holdings Guarantor GP, LLC, Southcross Holdings Borrower, LP, TexStar Midstream GP LLC, TexStar Midstream Services LP, TexStar Midstream T/U GP, LLC, TexStar Midstream Utility, LP, Frio LaSalle GP, LLC, and Frio LaSalle Pipeline, LP, and any other Subsidiary Guarantor that becomes a party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Art. I.; Interim DIP Order Preamble. |

---

4    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim DIP Order, as applicable.

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **DIP Financing Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | EIG BBTS Holdings, LLC and TW BBTS Aggregator LP.<br><br>*See* DIP Credit Agreement, Art. I. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Facility will mature on the earliest of (such earliest date, the "<u>Maturity Date</u>"):<br><br>(a)  the date that is six (6) months after the Petition Date (the "<u>Stated Maturity Date</u>");<br><br>(b)  45 days after entry by the Court of the Interim DIP Order approving the DIP Facility, if the Final DIP Order has not been entered by the Court prior to the expiration of such 45-day period;<br><br>(c)  the effective date of a plan of reorganization or liquidation in any of the chapter 11 cases;<br><br>(d)  the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise;<br><br>(e)  without the prior written consent of the Required Lenders, the date of filing or express written support by the DIP Borrower of a plan of reorganization that does not provide for indefeasible payment in full in cash of all DIP Facility obligations except as contemplated by the Restructuring Support Agreement; or<br><br>(f)  the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding extensions of credit, in each case, under the DIP Facility in accordance with the terms of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Art. I. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | A non-amortizing senior secured term loan facility (the "<u>DIP Facility</u>") with a maximum principal availability of $85.0 million (the "<u>Total Aggregate Commitment</u>") to be funded in two borrowings as follows:  (a) up to $32 million made not later than two business days following the entry of the Interim DIP Order (the "<u>Initial Borrowing</u>"), and (b) the remainder of the Total Aggregate Commitment (the "<u>Second Borrowing</u>") made not later than two business days following the entry of the Final DIP Order, in each case, subject to the terms and conditions described in this Motion and in the DIP Loan Documents referred to below and in accordance with the then-applicable Approved Budget (other than with respect to professional fees), taking into account authorized variances.<br><br>*See* DIP Credit Agreement, § 2.01. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | ***Conditions to Initial Borrowing***:<br><br>The DIP Loan Documents contain conditions precedent to the Initial Borrowing under the DIP Facility customarily found in loan agreements for similar sponsor-backed debtor in possession financings and other conditions deemed by the DIP Lenders to be appropriate to the specific transaction, and in any event, including:<br><br>(a)  the preparation, authorization, execution, and delivery of the DIP Loan |

7

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Documents with respect to the DIP Facility; <br><br> (b) the DIP Agent shall have received a fully executed copy of the Fee Letter.  The DIP Agent and the DIP Lenders shall have received all fees and other amounts due and payable under the DIP Loan Documents; <br><br> (c) the Interim DIP Order (i) shall have been entered on the docket of the Court prior to the Closing Date and not later than five (5) business days after the Petition Date, (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Required Lenders and (iii) shall provide for valid and perfected liens in favor of the DIP Lenders on the DIP Collateral; <br><br> (d) the DIP Agent shall have received a copy of the Initial Approved Budget; <br><br> (e) the DIP Agent shall have received a copy of the Restructuring Support Agreement, duly executed by each party thereto and such agreement shall be in full force and effect on the Closing Date; <br><br> (f) orders approving the Debtors' "first day" motions shall have been entered on the Closing Date (including a cash management order) and shall be reasonably satisfactory to the DIP Agent and the DIP Lenders; and <br><br> (g) the DIP Agent shall have received a Borrowing Request within the time period required under the DIP Credit Agreement. <br><br> ***Conditions to Second Borrowing***: <br><br> The DIP Loan Documents contain conditions precedent to the Second Borrowing under the DIP Facility customarily found in loan agreements, including: <br><br> (a) no default shall exist under the DIP Loan Documents; <br><br> (b) the representations and warranties of the DIP Borrower and each Guarantor under the DIP Loan Documents shall be true and correct in all material respects after giving effect to such funding; <br><br> (c) the making of the loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; and <br><br> (d) with respect to the Second Borrowing, the Final DIP Order shall have been entered by the Court and such Final DIP Order shall be satisfactory to the DIP Agent and the DIP Lenders in their sole discretion, and at the time of the extension of the Second Borrowing, the Final DIP Order shall be in full force and effect, and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the written consent of the DIP Agent and the Required Lenders. <br><br> *See* DIP Credit Agreement, §§ 4.01, 4.02. |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Loans under the DIP Facility will bear interest at a rate of 10.00% *per annum*, payable in kind on monthly basis by adding accrued interest to the principal balance of the loans funded under the DIP Facility.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.<br><br>At any time when (i) an Event of Default under the DIP Facility has occurred and is continuing or (ii) after a default in the payment of the Funding Fee when due and payable, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the rate of 12.00% per annum.<br><br>*See* DIP Credit Agreement § 2.06. |
| **Use of DIP Facility and Cash Collateral**<br>**Bankruptcy Rule**<br>4001(b)(l)(B)(ii) | The proceeds of the Initial Borrowing shall be used by the DIP Borrower on or after the Closing Date to (i) pay certain costs, fees and expenses related to the chapter 11 cases, (ii) make payments pursuant to any interim or final order entered by the Court pursuant to any "first day" motions permitting the payment by the Debtors of any prepetition amounts then due and owing (the "First Day Orders"), *provided, that*, the form and substance of such First Day Orders (other than the DIP Orders) shall be acceptable to the Required Lenders in their reasonable discretion and the form and substance of the DIP Orders shall be acceptable to the Required Lenders in their sole and absolute discretion, (iii) make the payments in respect of the Adequate Protection Obligations, and (iv) to fund the working capital needs, including capital expenditure needs, of the Debtors from the Closing Date until entry of the Final DIP Order, including payment of outstanding payables to the MLP and any MLP Equity Cure; *provided, further*, that, in each case such payments, other than payments with respect to professional fees, shall be made in accordance with the Initial Approved Budget, taking into account authorized variances.<br><br>From and after entry of the Final DIP Order, the proceeds of the DIP Facility shall be used by the DIP Borrower to (i) pay certain costs, fees and expenses related to the chapter 11 cases, (ii) fund working capital needs, including capital expenditure needs, of the Debtors during the chapter 11 cases (including, if applicable, any Adequate Protection Obligations) and (iii) make payments pursuant to the Final DIP Order or any other order of the Court for the payment of any other prepetition amounts then due and owing; *provided, that* in each case such payments, other than payments with respect to professional fees, shall be made in accordance with the Approved Budget, taking into account authorized variances.<br><br>*See* DIP Credit Agreement § 5.08. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(l)(B)(i) | The Prepetition Secured Parties, DIP Agent, and DIP Lenders.<br>*See* Interim DIP Order, Preamble. |
| **Fees**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Each DIP Lender shall receive a funding fee of 2.00% of the aggregate principal amounts of the Commitments under the DIP Facility at any time, payable on the Maturity Date.<br><br>The DIP Agent shall receive administration fees consisting of:<br><br>(a) a one-time acceptance fee of $5,000, payable on the Closing Date;<br><br>(b) an annual administration fee of $30,000, due and payable annually in advance, with the first payment due on the Closing Date;<br><br>(c) extraordinary administration fees that may be charged in connection with |

9

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | services of the DIP Agent outside the scope of the services set forth in the Fee Letter, including services in connection with document amendments, forbearances, waivers, extraordinary collateral release, substitutions under the DIP Loan Documents, or participation in a committee formed in connection with a restructuring under the DIP Loan Documents, in the amount of $225 per hour for associates and $450 per hour for account managers; and<br><br>(d) a funds distribution fee billed at the rate of $1,500 for 1 to 10 wires, $3,000 for 10 to 20 wires, and so on, payable on the Closing Date.<br><br>*See* DIP Credit Agreement § 2.05; Fee Letter, Schedule I. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from loans under the DIP Facility is subject to a customary budget (the "Approved Budget"), attached to the Interim DIP Order as **Exhibit 2**.<br><br>*See* DIP Credit Agreement Art. 5, 6; Interim DIP Order, Art. 2. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement requires compliance with certain reporting covenants that are usual and customary for sponsor-backed debtor-in-possession financings, including, without limitation, that the Debtors shall provide to the DIP Lenders and Prepetition Term Loan Lenders:  (i) monthly consolidated financial statements of the DIP Borrower and its subsidiaries, including balance sheet, income statement and cash flow statement as soon as available and in any event within 45 days after the end of each month; (ii) quarterly consolidated financial statements of the DIP Borrower and such subsidiaries within 60 days of the end of each fiscal quarter; (iii) promptly after they become available, copies of all periodic and other reports, proxy statements and other materials filed by the DIP Borrower or any of such subsidiaries with the Securities and Exchange Commission or any national securities exchange or distributed to shareholders; and (iv) rolling 13-week cash flow projections in form reasonably acceptable to the Required Lenders and the Required Prepetition Term Lenders by the third business day of the first and third calendar week of each month.<br><br>The DIP Loan Documents contain additional reporting requirements substantially similar to those in the Prepetition Secured Debt Documents, with such other additional reporting requirements as are customary in loan agreements for similar sponsor-backed debtor-in-possession financing or are deemed by the DIP Lenders to be appropriate to the specific transaction.<br><br>*See* DIP Credit Agreement § 5.01. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall not allow the aggregate disbursements made by the Debtors during the applicable budget period to be greater than 125% of the aggregate disbursements set forth for the Debtors in the Approved Budget for such budget period*; provided*, *however*, that to the extent that disbursements for any budget period shall be less than the maximum amount set forth above, the difference between the maximum amount and such actual disbursements shall, in addition, be available for disbursements in any succeeding budget period on a cumulative aggregate basis; *provided*, *further*, that the Approved Budget for any such succeeding budget period may consider the amount of carry-over available for disbursements in such budget period for the sole purpose of determining whether any unpaid expenses from the prior budget period should be included in the Approved Budget for any such succeeding budget period.<br><br>*See* DIP Credit Agreement § 6.20. |

KE 39220475

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The DIP Borrower shall comply with the following chapter 11 milestones (the "Milestones"): |

The DIP Borrower shall comply with the following chapter 11 milestones (the "Milestones"):

1. on or before the date that is 5 days after the Closing Date, the Debtors shall have commenced solicitation of a chapter 11 plan pursuant to the Restructuring Support Agreement;

2. on or before the date that is 45 days after entry of the Interim DIP Order, the Final DIP Order on a final basis, in form and substance satisfactory to the Required Lenders in their sole discretion and in form and substance approved by the DIP Agent (such approval of the DIP Agent not to be unreasonably withheld, conditioned or delayed) shall have been entered by the Court;

3. on or before the date that is 90 days (or 120 days if the Parties (as defined in the Restructuring Support Agreement) are continuing in good faith to move toward the consummation of the Restructuring (as defined in the Restructuring Support Agreement)) after the Petition Date, (i) the Debtors shall have filed the Plan and related disclosure statement in form and content acceptable to the DIP Agent and the Required Lenders and (ii) the hearing with respect to confirmation of the Plan shall have been commenced;

4. on or before the date that is 130 days (or 160 days if the Parties (as defined in the Restructuring Support Agreement) are continuing in good faith to move toward the consummation of the Restructuring (as defined in the Restructuring Support Agreement)) after the Petition Date, the Court shall have entered an order confirming the Plan; and

5. on or before 150 days (or 180 days if the Parties (as defined in the Restructuring Support Agreement) are continuing in good faith to move toward the consummation of the Restructuring (as defined in the Restructuring Support Agreement)) after the Petition Date, the Plan shall become effective.

*See* DIP Credit Agreement, Art. I, § 5.15.

Notwithstanding the above, Milestone 5 shall not be extended beyond the Stated Maturity Date.

*See* DIP Credit Agreement, Art. I.

| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i) | Subject and subordinate to the Carve Out and the Non-Primed Excepted Liens, to secure the DIP Obligations, and as more fully set forth in the DIP Loan Documents, the DIP Agent is granted for the benefit of itself and the DIP Lenders: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority lien on, and security interest in, all present and after-acquired real and personal property of the Debtors, wherever located, not subject to valid, perfected and unavoidable liens in existence as of the Petition Date or valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted under section 546(b) of the Bankruptcy Code; (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable junior lien on, and security interest in, all present and after acquired real and personal property of the Debtors, wherever located, with such liens under (ii) junior only to (x) liens that secure the Revolving |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Exposure (as defined in the Prepetition Credit Agreement), or any other Obligation (as defined in the Prepetition Credit Agreement) owed to any Revolving Lender (as defined in the Prepetition Credit Agreement) or the Prepetition Agent (the obligations in this clause (x) being the "Revolving Obligations"), and (y) valid, perfected and unavoidable liens or security interests in existence on the Petition Date or liens or security interests in existence on the Petition Date that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the liens under clause (x) and (y) hereof, collectively, the "Non-Primed Excepted Liens"); and (iii) pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority senior priming lien (subject to any Non-Primed Excepted Liens) on, and security interest in, all present and after acquired real and personal property of the Debtors, wherever located, that is subject to the Prepetition Liens solely to the extent such Prepetition Liens secure the Term Loans (as defined in the Prepetition Credit Agreement). The liens and security interests identified in the preceding clauses (i)-(iii) are referred to as the "DIP Liens" and the collateral to which such DIP Liens attach is referred to as the "DIP Collateral."  Subject to entry of the Final DIP Order, the DIP Collateral shall include the proceeds of causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds of any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (the "Avoidance Actions").

The DIP Liens shall be effective immediately upon the entry of the Interim DIP Order and, other than with respect to the Carve Out and the Non-Primed Excepted Liens, shall not: (i) at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise; (ii) be subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any Debtor or its estate under Section 551 of the Bankruptcy Code, (B) any lien or security interest of any lessor or landlord under any agreement or applicable state law to the extent any such lien has been waived in favor of the Prepetition Agent, (C) except where the DIP Loan Documents expressly allow a post-petition lien to have priority over the DIP Liens with the consent of the DIP Agent, any post-petition liens granted by any Debtor to other persons or entities or otherwise arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (D) any intercompany or affiliate liens or security interests of the Debtors; (iii) be subordinated to or made *pari passu* with any other lien or security interest under Section 363 or 364 of the Bankruptcy Code or otherwise; or (iv) be subject to Sections 510, 549 or 550 of the Bankruptcy Code.  In no event shall any person or entity who pays (or, through the extension of credit to any Debtor, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or priorities granted to or in favor of, or conferred upon, any DIP Lender by the terms of any DIP Loan Documents or the Interim DIP Order unless such person or entity contemporaneously causes payment in full of all the Prepetition Debt.

Subject to paragraph 9 of the Interim DIP Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtor's Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, collectively, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552, 726, 1113, or 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code, whether or not such expenses or claims may |

KE 39220475

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code shall be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof, including, without limitation, any proceeds or property recovered in connection with the pursuit of any Avoidance Actions.  The DIP Superpriority Claim granted in paragraph 10 of the Interim DIP Order shall be subject and subordinate in priority of payment only to the Carve Out and, until the Discharge of Revolving Obligations, the 507(b) Claim.  Except as otherwise provided in paragraph 9 and paragraph 12 of the Interim DIP Order, the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases.  Except as set forth in the Interim DIP Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case. <br><br> Notwithstanding anything else contained in the Interim DIP Order or the DIP Loan Documents, in the event that any DIP Lender breaches its obligation either to (i) make the Equity Contribution under the Restructuring Support Agreement, or (ii) provide loans in accordance with the terms of the DIP Loan Documents, in each case after all the conditions precedent to such funding have been satisfied and as determined by a court of competent jurisdiction in a final non-appealable judgment, the obligations owed solely to such breaching DIP Lender under the DIP Facility shall (A) no longer be secured by a priming lien on the Prepetition Collateral and instead shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected lien on all Prepetition Collateral that is junior only to the liens securing the Term Loans (as defined in the Prepetition Credit Agreement) and the Non-Primed Excepted Liens, (B) no longer be entitled to a DIP Superpriority Claim, with respect to amounts owing to such breaching DIP Lender on account of any Loans (as defined in the DIP Credit Agreement) funded under the DIP Facility, having superpriority over the 507(b) Claim, and which DIP Superpriority Claim instead shall be classified as a prepetition secured claim, and (C) shall be subordinated in right of payment to the Prepetition First Lien Obligations; *provided*, *however*, that nothing in paragraph 9 of the Interim DIP Order shall alter in any way the priority of the Carve-Out; *provided*, *further*, that the obligations owed to any non-breaching DIP Lender under the DIP Facility shall be unaffected by paragraph 9 of the Interim DIP Order. <br><br> All liens authorized and granted pursuant to the Interim DIP Order or the Final DIP Order entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.  The DIP Lenders, or the DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices or take any other acts as may be desirable under state law in order to reflect the perfection and priority of the DIP Lenders' claims described in the Interim DIP Order. <br><br> *See* Interim DIP Order ¶¶ 9, 10. |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) | The sum of:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any creditors' committee appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (together with the Debtor Professionals, the |

KE 39220475

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
|  | "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the DIP Facility (on a pro rata basis based on the then outstanding Commitments), in an amount equal to the then unpaid amounts of the Professional Fees (any such amounts actually advanced shall constitute DIP Obligations) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for loans under the DIP Facility (on a pro rata basis based on the then outstanding Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Obligations).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent delivers a Carve Out Trigger Notice to the DIP Lenders, notwithstanding the existence of a Default (as defined in the DIP Loan Documents) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for loans under the DIP Facility or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) and (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, second, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, then, prior to the Discharge of Revolving Obligations, to pay the Prepetition Agent for the benefit of the Revolving Lenders, and third, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the obligations under the DIP Facility have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to satisfy the remaining obligations to the Prepetition Secured Lenders in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, second, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, then, prior to the Discharge of Revolving |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Obligations, to pay the Prepetition Agent for the benefit of the Revolving Lenders, and third, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the obligations under the DIP Facility have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to satisfy the remaining obligations to the Prepetition Secured Lenders in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, the Interim DIP Order, or the Final DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents. <br><br> Further, notwithstanding anything to the contrary in the DIP Loan Documents or the Interim DIP Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Obligations or increase or reduce the obligations under the DIP Facility, (ii) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim DIP Order or in the DIP Facility or in the Prepetition Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and any 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the obligations under the DIP Facility or the obligations under the Prepetition Credit Agreement. <br><br> Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Professional Fees shall not reduce the Carve Out. <br><br> Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the obligations under the DIP Facility secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the Interim DIP Order, the Final DIP Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law. <br><br> *See* Interim DIP Order ¶ 13. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) | Subject to entry of the Final DIP Order, except to the extent of the Carve Out, the Interim and Final DIP Order shall include provisions prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral. <br><br> *See* Interim DIP Order ¶ 19. |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) | Subject to entry of the Final DIP Order, neither any Debtor nor any other person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Prepetition Agent or the Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral. <br><br> *See* Interim DIP Order ¶ 21. |

15

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br> **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) | Subject to Paragraph 15 of the Interim DIP Order, the Debtors make certain customary admissions and stipulations with respect to the aggregate amount of the prepetition debt and the extent, validity, enforceability, and priority of the liens and security interests securing the obligations under the Prepetition Facility. <br><br> Subject to Paragraph 15 of the Interim DIP Order, the Debtors make certain admissions and stipulations with respect to the DIP Lenders, specifically, that the Debtors have no valid claims or causes of action against the DIP Lenders or their respective affiliates in their respective capacities as such. <br><br> The binding effect of the extent, validity, enforceability, and priority of the liens and security interests securing the obligations under the Prepetition Facility and the DIP Facility are subject to a challenge period (the "Challenge Period") of the later of (i) with respect to the creditors' committee, if any, 60 calendar days from date of the formation of such creditors' committee and (ii) 75 calendar days following the date of entry of the Interim DIP Order. <br><br> *See* Interim DIP Order, Preamble, ¶ 15. <br><br> For the avoidance of doubt, to the extent the Plan is confirmed before the expiration of the Challenge Period, the Debtor releases contemplated in the Plan shall control, including with respect to the Debtors' stipulations and releases contained in the Interim DIP Order. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject in all respects to the Carve Out and the DIP Liens, as adequate protection and solely to the extent of any postpetition diminution in the value, if any, of the Prepetition Secured Parties' interest in the Prepetition Collateral, the Prepetition Agent and the Prepetition Secured Lenders are granted: <br><br> 1. valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon the DIP Collateral, effective and perfected upon the date of the Interim DIP Order; *provided, however*, that the Adequate Protection Liens shall be senior to the DIP Liens to the extent they secure any diminution in the value of the Prepetition Collateral resulting in the impairment of the Revolving Obligations; and <br><br> 2. a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code, which superpriority claim shall, until the Discharge of Revolving Obligations, be senior to the DIP Superpriority Claim and, following the Discharge of Revolving Obligations, be immediately junior to the DIP Superpriority Claim. <br><br> The Debtors shall pay in cash all reasonable and documented out-of-pocket fees and expenses of (x) (i) the Prepetition Secured Lenders and the Prepetition Agent and (ii) the DIP Lenders and the DIP Agent, in each case, that have accrued as of the Petition Date, including, without limitation, the reasonable and documented out-of-pocket fees and expenses for such parties' applicable counsel, local counsel or financial advisor, and (y) the fees and expenses described in (x) to the extent such fees and expenses arise postpetition. <br><br> The Debtors shall make cash payments in an amount equal to the regularly scheduled interest and letter of credit fees at the non-default interest rate payable on the Revolving Exposure under the Prepetition Credit Agreement, on the date and in the manner provided in the Prepetition Credit Agreement. <br><br> *See* Interim DIP Order ¶ 11. |
| **Events of Default** <br> Bankruptcy Rule | The DIP Credit Agreement contains events of default that are usual and customary for |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| 4001(c)(l)(B) | debtor-in-possession financings, including, without limitation:<br><br>1. failure to pay principal, interest or fees when due;<br><br>2. noncompliance with covenants or breaches in any material respect of representations and warranties, in either case, under the DIP Loan Documents;<br><br>3. failure to satisfy or stay execution of judgments in excess of $10 million;<br><br>4. the existence of certain employee benefit or environmental liabilities that could reasonably be expected to have a material adverse effect;<br><br>5. impairment of the DIP Loan Documents or the liens granted pursuant thereto;<br><br>6. change of ownership or control other than as a result of the transactions contemplated by the Restructuring Support Agreement;<br><br>7. dismissal of the chapter 11 cases or conversion of the chapter 11 cases into cases under chapter 7 of the Bankruptcy Code;<br><br>8. a trustee, receiver, or examiner with enlarged powers relating to the operation of the business of any Debtor shall have been appointed in one or more of the chapter 11 cases;<br><br>9. entry of an order granting relief from the automatic stay so as to allow a third party to proceed against the DIP Collateral to pursue a claim in excess of $10 million;<br><br>10. entry of an order granting any super-priority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility (other than as set forth in the DIP Loan Documents or Interim DIP Order);<br><br>11. entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization with respect to any Debtor other than a plan of reorganization permitted under the Restructuring Support Agreement;<br><br>12. entry of an order staying, reversing, vacating or otherwise modifying, without the prior consent of the Required Lenders, the Interim DIP Order or the Final DIP Order and such order is not stayed or reversed within 5 business days after entry thereof;<br><br>13. payment of or granting adequate protection with respect to pre-petition debt (other than as approved by the Required Lenders and the Court or as otherwise contemplated by the DIP Loan Documents);<br><br>14. entry of an order denying or terminating use of cash collateral by the Debtors;<br><br>15. failure to comply with any of the Milestones; and<br><br>16. termination of the Restructuring Support Agreement.<br><br>*See* DIP Credit Agreement § 8.01. |

KE 39220475

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is modified pursuant to the Interim DIP Order to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order and the DIP Loan Documents. *See* Interim DIP Order Preamble. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted in the Interim DIP Order without the necessity of filing or recording any financing without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the DIP Agent, DIP Lenders, or Prepetition Secured Parties. *See* Interim DIP Order ¶¶ 11, 22. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Borrower shall indemnify and hold harmless the DIP Agent, each DIP Lender, each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable and documented out-of-pocket fees and disbursements of counsel and financial advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, or any operation of any business by any Debtor, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's or its officers', directors', employees' and representatives' gross negligence, bad faith or willful misconduct or disputes solely between or among Indemnified Parties.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the DIP Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated in the DIP Credit Agreement are consummated. *See* DIP Credit Agreement § 10.03. Furthermore, the Prepetition Agent shall be indemnified by the Debtors and shall have its costs and expenses reimbursed by the Debtors for any actions it takes with respect to the Prepetition Term Lender Approval Notices (as defined in the DIP Credit Agreement) under the DIP Credit Agreement to the same extent and subject to the same limitations it would be pursuant to Section 10.03 of the Prepetition Credit Agreement if the DIP Credit Agreement was a Loan Document (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement. *See* Interim DIP Order ¶ 2. |
| **Liens on Avoidance Actions** | Subject to entry of the Final DIP Order, the DIP Collateral shall include the proceeds of causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds of any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law. *See* Interim DIP Order ¶ 8. |

KE 39220475

## Statement Regarding Significant Provisions

9.    The Interim DIP Order contains certain of the provisions (the "Significant Provisions")[5] identified on Exhibit B to the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached as **Exhibit C**.

10.    The Interim DIP Order:  (a) binds the estate or any parties in interest with respect to the validity, perfection, or amount of a secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor (subject to certain challenge rights); (b) waives the Debtors' rights under section 506(c) of the Bankruptcy Code; (c) grants the DIP Lenders liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code; and (d) grants administrative adequate protection claims.  In addition, the DIP Credit Agreement imposes certain chapter 11 milestones in accordance with the Restructuring Support Agreement.  The explanation for the inclusion of the foregoing Significant Provisions, as required by rule 4(C)(vi) of the Complex Case Procedures, which is made applicable by Local Bankruptcy Rule 1075-1, is that such Significant Provisions were necessary to obtain the Prepetition Secured Parties' consent to the use of cash collateral under the Interim DIP Order and grant of liens under the DIP Loan Documents.  The DIP Loan Documents are a critical piece of the overall restructuring agreement that was reached among the Debtors, the Sponsors, the

---

[5]    Significant Provisions refer to those provisions that:  (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

Prepetition Secured Parties, and other parties in interest, and substantially facilitate the consensual restructuring to be effectuated through the Debtors' Plan.

11.     In addition, in the Interim DIP Order, the Debtors make certain stipulations and admissions regarding the Sponsors.  Specifically, the Debtors have made certain stipulations consistent with the conclusions and recommendations presented to the Debtors' board of directors by the Debtors' Disinterested Directors (as defined in the Disclosure Statement).  *See* Cremens Decl. ¶ 9.  For the avoidance of doubt, the agreements, statements, and stipulations provided in section E(x) of the Interim DIP Order shall not be binding on any parties other than the Debtors, their predecessors, successors, and assigns.

12.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim DIP Order should be approved.

## Jurisdiction and Venue

13.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures").

**The Debtors' Prepetition Capital Structure and Need for Liquidity**

16.     As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $616 million arising under a credit facility entered into by the Borrower and guaranteed by certain of the Debtors.[6]  As of the Petition Date, the Debtors' funded debt obligations are summarized as follows:

| Facility | Subfacility | Maturity | Balance |
|---|---|---|---|
| Southcross Holdings Facility | Revolving Facility | August 2019 | $50 million |
| | Term Facility | August 2021 | $566 million |
| | | **Total** | $616 million |

17.     The primary components of the Debtors' consolidated funded debt obligations are described in greater detail as follows:

**I.      The Southcross Holdings Facility.**

18.     The Borrower, and the Holdings Guarantors, as guarantors, are party to that certain Credit Agreement, dated as of August 4, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Prepetition Credit Agreement"), by and between the Borrower, the Holdings Guarantors, UBS AG, Stamford Branch, as administrative agent, and the lenders party thereto.  As amended, the Prepetition Credit Agreement provides the Debtors with (a) a senior secured asset-based revolving credit facility (the "Prepetition Revolving Facility"), with a maximum borrowing availability in the amount of $50 million and (b) a senior secured term loan facility (the "Prepetition Term Loan Facility") in aggregate principal amount of $575 million, subject to the terms and conditions set forth therein (collectively, the "Prepetition Facility").  The Prepetition Revolving Facility matures in August 2019 and bears

---

[6]     Debtors Southcross Holdings GP LLC, Southcross Holdings Guarantor GP LLC, and Southcross Holdings LP are not guarantors under the Prepetition Facility.  Frio LaSalle GP, LLC, Frio LaSalle Pipeline, LP, Southcross Holdings Borrower GP LLC, Southcross Holdings Guarantor LP, TexStar Midstream GP, LLC, TexStar Midstream Services, LP, TexStar Midstream T/U GP, LLC, and TexStar Midstream Utility, LP are guarantors under the Prepetition Facility (collectively, the "Holdings Guarantors").

interest at a rate per annum at the London Interbank Offered Rate ("LIBOR"), with a LIBOR floor of 1.0 percent, plus an incremental margin of 2.25 percent to 2.5 percent, or an alternate base rate plus an incremental margin of 1.25 percent to 1.5 percent.  The Prepetition Term Loan Facility matures in August 2021 and bears interest at a rate per annum at LIBOR, with a LIBOR floor of 1.0 percent, plus an incremental margin of 5 percent or an alternate base rate plus an incremental margin of 4 percent.  As of the Petition Date, $50 million remains outstanding under the Prepetition Revolving Facility, and $566 million remains outstanding under the Prepetition Term Loan Facility, for an aggregate total of $616 million outstanding under the Prepetition Facility.

19.     Obligations arising under the Prepetition Facility are secured by liens on substantially all of the Borrower's assets and those of the Holdings Guarantors.  Neither the MLP nor any MLP Entities are liable for obligations arising under the Prepetition Facility.  Prepetition Term Loan Facility principal is payable in approximately $1.5 million quarterly installments, with a balloon payment of substantially all Prepetition Term Loan Facility obligations due and payable on maturity.  All amounts owing under the Prepetition Revolving Facility are due and payable on maturity.

## II.     The Holdings Class B Preferred Units.

20.     On November 4, 2014, Southcross Holdings LP ("Holdings LP") entered into a unit purchase agreement with two private investors, GE Energy Financial Services ("GEFS") and Energy Capital Partners (together with GEFS, the "Class B Unitholders"), under which Holdings LP issued approximately 160,000 Mandatorily Redeemable Class B Units (the "Class B Units") in exchange for $160 million and a commitment from the Class B Holders to purchase 50,000 more Class B Units for $50 million within 18 months.  On March 19, 2015, Holdings LP issued the remaining 50,000 Class B Units to the Class B Unitholders in return for

$50 million.  The Class B Units are mandatorily redeemable on December 31, 2024 (at the face value of $210 million plus accrued but unpaid distributions) or callable by Holdings LP after three years (at face value plus accrued but unpaid distributions).  The Class B Units have no voting rights but have quarterly distribution rights and are senior in priority to Holdings LP's other equity securities for purposes of liquidation and distribution.

## III.    The Debtors Have an Immediate Need for Cash.

21.    The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases, make required payments to the MLP Entities, and to preserve the value of their estates for the benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance is approximately $750,000, which is insufficient to operate their enterprise and continue paying their debts as they come due.  Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to satisfy trade payables incurred in the ordinary course of business, preserve and maximize the value of their estates, and administer these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. *See* Stegenga Decl. ¶ 42.

## IV.    Alternative Sources of Financing Are Not Readily Available.

22.    The Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. However, the Debtors do not have a variety of sources of financing readily available. A significant portion of the Debtors' existing gathering, fractionation, and delivery systems and their interests in the MLP are encumbered under their existing capital structure, which, along with the Debtors' long-term liquidity needs, projected cash losses, and the current state of the oil and gas commodity markets and its impact on cash flows and asset values, restricts the

availability of, and options for, postpetition financing.  *See* Feintuch Decl. ¶ 50.  As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.

23.     Prior to the commencement of these chapter 11 cases, Houlihan Lokey Capital Inc. ("Houlihan Lokey"), the Debtors' investment banker, reached out to seven potential sources of financing (outside of the Debtors' prepetition lenders and sponsor group) that routinely provide debtor-in-possession financing to gauge their interest in providing such financing. *See* Feintuch Decl. ¶ 51.  Of this group, only four parties executed confidentiality agreements and no additional parties were negotiating such agreements as of the time of this filing.  Over a period of roughly three weeks, the Debtors and their advisors engaged in follow-up diligence calls and subsequent informational requests with the parties that signed non-disclosure agreements.  Ultimately, only one party made a highly conditional, alternative DIP financing proposal that was priced well above market, which would have imposed significant fees without the upside that the current DIP Facility offers.  Feintuch Decl. ¶ 51.

24.     In light of the tepid response from customary financing sources and given the Sponsors' willingness to engage in continued discussions regarding a consensual restructuring, including postpetition financing, the Debtors also sought financing proposals from the Sponsors. As a result of these negotiations, the Sponsors submitted a term sheet outlining the terms and conditions for the provision of postpetition financing to the Debtors.  Over the course of several weeks, the Debtors and their advisors engaged in intensive negotiations with the Sponsors and additional third-party financing sources to obtain the best terms each was willing to offer.  The negotiations were arm's-length at all times and were characterized by hard bargaining by all interested parties.  Working with the Debtors' management team and its advisors, Houlihan

Lokey analyzed the details of the competing proposals and discussed them thoroughly with the Debtors' management and other advisors, making observations and recommendations concerning the strengths and weaknesses of each proposal.  Ultimately, the Debtors chose the DIP Facility because it was the best financing available to meet the Debtors' needs.  *See* Feintuch Decl. ¶ 52.

25.     With any third-party proposal, the Debtors would have incurred the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed DIP Facility offered by the DIP Lenders allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.  The DIP Facility is the product of extensive good-faith, arm's-length negotiations with the DIP Lenders and is an essential component of a broader restructuring transaction contemplated by the Restructuring Support Agreement, which was itself heavily negotiated among the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Sponsors.  Accordingly, the Debtors believe that the DIP Facility is in the best interests of their estates and all parties in interests, and should be approved.

## Basis for Relief

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents.**

**A.     Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

26.     The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain

KE 39220475

such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

28.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

29.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following a hard-fought, arms'-length process and careful evaluation of alternatives.  Specifically, and given the Debtors' nearly-exhausted cash reserves, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their proposed restructuring.  Further, the Debtors' ability to manage their relationships with their trade counterparties and the MLP Entities is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.  The Debtors negotiated the DIP Credit Agreement and other DIP Loan Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as it is a reasonable exercise of the Debtors' business judgment.

B.     **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

30.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide first priority "priming" liens on all collateral that secures obligations under the Prepetition Credit Agreement (the "Prepetition Collateral") solely to the extent such Prepetition Collateral secures the obligations arising under the Prepetition Term Loan Facility, and the DIP Liens will be immediately junior to the liens securing the Revolving Obligations.

31.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re*

27

*Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.   Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

    32.    As described above and as set forth in the First Day Declarations, the Debtors are in need of an immediate capital infusion, yet current market conditions present historic challenges, and a significant portion of the Debtors' existing assets are asserted to be encumbered under their existing capital structure.   *See* Feintuch Decl. ¶ 50; Stegenga Decl. ¶ 39. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders or sponsors.   Indeed, when the Debtors reached out to potential third-party sources of financing, few parties executed confidentiality agreements and those parties indicated their reluctance to enter into terms comparable to those provided in the DIP Facility.   *See* Feintuch Decl. ¶ 51. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, or cover the projected costs of these chapter 11 cases.   *See* Stegenga Decl. ¶¶ 42, 43.   Absent the DIP Facility, which will allow the Debtors to make required payments to the MLP Entities and meet their working capital needs during these

chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

33.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate, as is providing liens on the Debtors' unencumbered property and junior liens on the property that is asserted to be securing the Prepetition Revolving Facility.

34.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were

adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Lenders have consented or (b) the Prepetition Secured Lenders' interests in collateral are adequately protected.

35.     Here, more than two-thirds in amount of the Prepetition Secured Parties have consented to the DIP Orders and the Prepetition Secured Parties are receiving adequate protection of the Prepetition Collateral under the DIP Orders.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

36.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure.  A significant portion of the Debtors' assets are encumbered under their existing capital structure.  *See* Feintuch Decl. ¶ 50.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of their prepackaged plan of reorganization.  *See* Feintuch Decl. ¶ 55; Stegenga Decl. ¶ 44.  Therefore, in addition to evidence to be introduced at the hearing on the Interim DIP Order, if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

38.     Section 363 of the Bankruptcy Code generally governs the use of estate property.  Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.  In addition, section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J.

June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

39.     As described more fully above, and as set forth in the Interim DIP Order, the Debtors propose to provide the Prepetition Secured Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Prepetition Collateral resulting from the use, sale, or lease of such collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"), including:  payment of professional fees, replacement liens, the 507(b) Claim, and cash payment of interest at the non-default contract rate to the Prepetition Agent for the benefit of the Revolving Lenders.

40.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Lenders from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Lenders are appropriate.   Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and the Debtors' estates.

KE 39220475

### III.   The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Loan Documents.

41.   Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

> a.   a funding fee of 2.00% of the aggregate principal amounts of the loans funded under the DIP Facility at any time, payable on the Maturity Date to the DIP Agent; and

> b.   certain administration fees, including a $5,000 acceptance fee and $30,000 annual administration fee, which fees will be payable in accordance with the Fee Letter.

42.   As set forth in the Feintuch Declaration, the Debtors believe that the fees to be paid under the DIP Facility are reasonable, particularly in light of these chapter 11 cases.  More specifically, the funding fee will equitize to new common equity of the reorganized Debtors provided that the transactions contemplated by the Restructuring Support Agreement are implemented.  Thus, so long as the Debtors' proposed restructuring is consummated, they will not be required to contribute cash on account of any funding fees under the DIP Facility.  In addition, the administration fees under the Fee Letter are relatively small in comparison to the Debtors' overall capital structure, as the DIP Agent is proposed to receive a $5,000 acceptance fee, a $30,000 annual administration fee, and variable fees for wire transfers, ranging from $1,500 to $3,000, depending on the aggregate total of wire transfers.  These fees are reasonable in light of the hundreds of millions of dollars of indebtedness that is contemplated to be restructured consensually in accordance with the Restructuring Support Agreement and the Plan. Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with the DIP Facility.

**IV.     The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).**

43.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

44.     As explained herein and in the Feintuch Declaration, the DIP Loan Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arms'-length, good-faith negotiations between the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to the DIP Agent, the DIP Lenders, or any other party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Obligations and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent and the DIP Lenders are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

45.      The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order.  The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order.  Finally, the proposed Interim DIP Order provides that the automatic stay shall be vacated and modified to the extent necessary to permit the parties to the Restructuring Support Agreement to take any steps necessary to effectuate the termination of the Restructuring Support Agreement in accordance with the terms thereof.

46.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (modifying automatic stay as necessary to effectuate the terms of the order); *In re ATP Oil and Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

47.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

48.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive the Initial Borrowing under the DIP Facility.  The Debtors require the Initial Borrowing prior to the Final Hearing and entry of the Final DIP Order to continue operating, make required payments to the MLP Entities, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  *See* Stegenga Decl. ¶¶ 41, 42.

### Request for Final Hearing

49.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Emergency Consideration

50.    In accordance with Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which

36

empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Here, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

51.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

52.    The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) UBS AG, Stamford Branch, as administrative and collateral agent under the Prepetition Credit Agreement and counsel thereto; (d) counsel to the ad hoc group of holders of term loan claims under the Prepetition Credit Agreement; (e) counsel to the holders of certain claims under the Prepetition Credit Agreement; (f) the holders of Class A units of Holdings LP and counsel thereto; (g) the holders of Class B units of Holdings LP and counsel thereto; (h) Southcross Energy Partners GP, LLC and counsel thereto; (i) Southcross Energy Partners, L.P., and counsel thereto; (j) the agent for the proposed

KE 39220475

debtor-in-possession financing facility and counsel thereto; (k) the United States Attorney's Office for the Southern District of Texas; (l) the Internal Revenue Service; (m) the Environmental Protection Agency; (n) the office of the attorneys general for the states in which the Debtors operate; (o) the Securities and Exchange Commission; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  March 28, 2016

/s/ *Zack A. Clement*

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond
Houston, Texas 77025
Telephone:     (832) 274-7629
Email:            zack.clement@icloud.com

 - and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* admission pending)
Chad J. Husnick (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            james.sprayregen@kirkland.com
                     anup.sathy@kirkland.com
                     chad.husnick@kirkland.com
                     emily.geier@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on March 28, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Zack A. Clement*
One of Counsel