**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE [DISTRICT OF DELAWARE / SOUTHERN DISTRICT OF
TEXAS - CORPUS CHRISTI DIVISION]**[1]

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHCROSS HOLDINGS LP, *et al.*,[2] | ) | Case No. 16-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* admission pending)
Chad J. Husnick (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                anup.sathy@kirkland.com
                chad.husnick@kirkland.com
                emily.geier@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: March 21, 2016

---

[1] The Debtors are still considering venue.

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Southcross Holdings LP (7700); Frio LaSalle GP, LLC (9882); Frio LaSalle Pipeline, LP (9792); Southcross Holdings Borrower GP LLC (6790); Southcross Holdings Borrower LP (6880); Southcross Holdings GP LLC (2020); Southcross Holdings Guarantor GP LLC (6523); Southcross Holdings Guarantor LP (6622); TexStar Midstream GP, LLC (7001); TexStar Midstream Services, LP (7100); TexStar Midstream T/U GP, LLC (3754); and TexStar Midstream Utility, LP (3706). The location of the Debtors' service address is: 1717 Main Street, Dallas, Texas, 75201.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**

**DISCLOSURE STATEMENT, DATED MARCH 21, 2016**

**SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**SOUTHCROSS HOLDINGS LP, *ET AL.* PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | REVOLVING FACILITY CLAIMS |
| CLASS 4 | TERM LOAN FACILITY CLAIMS |
| CLASS 9 | HOLDINGS CLASS B INTERESTS |

**IF YOU ARE IN CLASSES 3, 4, OR 9, YOU ARE RECEIVING THIS DOCUMENT AND THE**
**ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

---

**DELIVERY OF BALLOTS**

**BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING**
**DEADLINE, WHICH IS 4:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 28, 2016, VIA THE**
**ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE**

**OR**

**AT THE FOLLOWING ADDRESSES:**

**<u>VIA FIRST-CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:</u>**

**SCH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING**
**777 THIRD AVENUE, 12TH FLOOR**
**NEW YORK, NY 10017**

**OR**

**<u>VIA E-MAIL TO:</u>**

**TABULATION@EPIQSYSTEMS.COM (REFERENCE "SCH" IN THE SUBJECT LINE AND**
**ATTACH A SCANNED PDF OF THE FULLY EXECUTED BALLOT)**

**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT**

**BALLOTS RECEIVED VIA FACSIMILE WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE**
**CALL THE DEBTORS' RESTRUCTURING HOTLINE AT:**

**+1 (646) 282-2500 (ask for Solicitation Group)**

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Debtors' Joint Prepackaged Chapter 11 Plan* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), which the Debtors are seeking to have confirmed by the Bankruptcy Court.[3]  A copy of the Plan is attached hereto as <u>Exhibit A</u>.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims and Interests for purposes of soliciting votes to accept or reject the Plan.

The Plan is supported by the Debtors, holders of approximately 95 percent of the Revolving Facility Claims, holders of approximately 68 percent of the Term Loan Facility Claims, holders of 100 percent of the Holdings Class B Interests, and holders of 100 percent of the Holdings Interests.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement (including the Risk Factors described in Article VI hereof) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims and Interests in Classes 3, 4, and 9 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**<u>RECOMMENDATION BY THE DEBTORS</u>**

EACH OF THE DEBTORS' BOARDS OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' RESTRUCTURING OBJECTIVES.  THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>MARCH 28, 2016, AT 4:00 P.M. (PREVAILING EASTERN TIME)</u>.

---

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain holders of Term Loan Facility Claims of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of Reorganized Holdco Interests under the Plan. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934 (as amended, the "Securities Exchange Act") and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All holders of Claims and Interests entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims and Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with their advisors, has prepared the financial projections attached hereto as **Exhibit B** and described in this Disclosure Statement. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to holders of Claims and Interests against or Interests in, the Debtors or any other party in interest. Please refer to ARTICLE VI of this Disclosure Statement, entitled "Certain Factors To Be Considered" for a discussion of certain risk factors that holders of Claims and Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan or the Solicitation to give any information or to make any representation or statement

regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein.  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................................1

**ARTICLE I THE PLAN** .......................................................................................................................2
    1.1       Discharge of Claims and Interests.................................................................................2
    1.2       New Capital Structure....................................................................................................3
    1.3       Unclassified Claims .......................................................................................................5
    1.4       Classified Claims and Interests .....................................................................................6
    1.5       Certain Intercompany Claims ......................................................................................12
    1.6       Liquidation Analysis ...................................................................................................12
    1.7       Valuation Analysis ......................................................................................................12
    1.8       Financial Information and Projections .........................................................................12

**ARTICLE II VOTING PROCEDURES AND REQUIREMENTS** ...................................................13
    2.1       Class Entitled to Vote on the Plan................................................................................13
    2.2       Votes Required for Acceptance by a Class ...................................................................13
    2.3       Certain Factors to Be Considered Prior to Voting .......................................................13
    2.4       Classes Not Entitled To Vote on the Plan ....................................................................14
    2.5       Solicitation Procedures ................................................................................................14
    2.6       Voting Procedures........................................................................................................15

**ARTICLE III BUSINESS DESCRIPTIONS** .....................................................................................16
    3.1       Corporate History and Organizational Structure .........................................................16
    3.2       The Debtors' Business Operations................................................................................18
    3.3       The Debtors' Key Assets and Intercompany Relationships .........................................19
    3.4       Directors and Officers .................................................................................................21
    3.5       Prepetition Credit Facility ...........................................................................................22

**ARTICLE IV EVENTS LEADING TO THE CHAPTER 11 CASES** ................................................23
    4.1       Plummeting Oil Prices Force Upstream Producers to Slow Production .........................23
    4.2       The Debtors' Capital Expenditures to Expand Their Business ....................................23
    4.3       The Debtors' Efforts to Address Liquidity Issues .......................................................24

**ARTICLE V OTHER KEY ASPECTS OF THE PLAN** ...................................................................30
    5.1       Distributions.................................................................................................................30
    5.2       Restructuring Transactions...........................................................................................32
    5.3       Management Incentive Plan ..........................................................................................33
    5.4       Treatment of Executory Contracts and Unexpired Leases ...........................................33
    5.5       Release, Injunction, and Related Provisions ................................................................34
    5.6       Protection Against Discriminatory Treatment ..............................................................37
    5.7       Indemnification ............................................................................................................37
    5.8       Recoupment .................................................................................................................37
    5.9       Release of Liens ..........................................................................................................37
    5.10      Reimbursement or Contribution ..................................................................................38
    5.11      Indemnification of Holders of Holdings Interests .......................................................38
    5.12      Incentive Plans and Employee and Retiree Benefits ....................................................38
    5.13      Vesting of Assets in the Reorganized Debtors .............................................................38
    5.14      Cancellation of Notes, Instruments, Certificates, and Other Documents......................38
    5.15      Reorganized Holdco Organizational Documents .........................................................39
    5.16      Modification of Plan ....................................................................................................39
    5.17      Effect of Confirmation on Modifications .....................................................................40
    5.18      Withdrawal of Plan ......................................................................................................40
    5.19      Reservation of Rights ..................................................................................................40
    5.20      Plan Supplement Exhibits ............................................................................................40
    5.21      Conditions Precedent to the Effective Date .................................................................40

5.22   Waiver of Conditions Precedent ................................................................................ 42
5.23   Effect of Non-Occurrence of Conditions to Consummation ........................................ 42

**ARTICLE VI CERTAIN FACTORS TO BE CONSIDERED** ..................................................... **42**
6.1   General ...................................................................................................................... 42
6.2   Risks Relating to the Plan and Other Bankruptcy Law Considerations ..................... 42
6.3   Risks Relating to the Transaction ............................................................................. 47
6.4   Risks Relating to Reorganized Holdco Interests ...................................................... 49
6.5   Risks Relating to the Debtors' Business ................................................................... 50
6.6   Certain Tax Implications of the Chapter 11 Cases ................................................... 53
6.7   Disclosure Statement Disclaimer ............................................................................. 53

**ARTICLE VII CONFIRMATION PROCEDURES** ..................................................................... **55**
7.1   The Confirmation Hearing ........................................................................................ 55
7.2   Confirmation Standards ............................................................................................ 56
7.3   Best Interests Test / Liquidation Analysis ................................................................ 57
7.4   Feasibility ................................................................................................................. 57
7.5   Confirmation Without Acceptance by All Impaired Classes ...................................... 57
7.6   Alternatives to Confirmation and Consummation of the Plan .................................... 58

**ARTICLE VIII IMPORTANT SECURITIES LAW DISCLOSURE** ............................................. **58**
8.1   Plan Securities ......................................................................................................... 58
8.2   Issuance and Resale of Plan Securities Under the Plan ........................................... 58

**ARTICLE IX CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ............................. **60**
9.1   Introduction .............................................................................................................. 60
9.2   Certain U.S. Federal Income Tax Consequences to the Debtors .............................. 61
9.3   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests .................................................................................................................... 62
9.4   Information Reporting and Back-up Withholding ....................................................... 64

**ARTICLE X CONCLUSION AND RECOMMENDATION** ......................................................... **64**

**<u>EXHIBITS</u>**

<u>Exhibit A</u>        Debtors' Joint Prepackaged Chapter 11 Plan

<u>Exhibit B</u>        Financial Projections

<u>Exhibit C</u>        Unaudited Liquidation Analysis

<u>Exhibit D</u>        Unaudited Valuation Analysis

## INTRODUCTION

The Debtors and their non-debtor affiliates (collectively, "Southcross") provide a number of services across the midstream oil and natural gas sector. These services include natural gas gathering, processing, treating, compression, and transportation services, as well as natural gas liquid ("NGL") fractionation and transportation services. Such services are capital intensive. Indeed, Southcross owns and operates approximately 4,000 miles of pipelines, two sour gas treating facilities, three processing facilities, two fractionating facilities, and one facility with both processing and fractionating capabilities. The Southcross assets that are owned by the Debtors are located in the Eagle Ford shale in South Texas, including approximately 880 miles of natural gas gathering and NGL transportation pipeline, one sour gas treating facility, and one fractionating facility. The Debtors also engage in the purchase and sale of oil and gas products ancillary to their fee-based midstream services. The Debtors are headquartered in Dallas, Texas.

As of the date hereof, the Debtors' funded debt consists of an approximately $575 million term loan facility and a $50 million asset-based revolving credit facility, with approximately $570 million and $50 million outstanding, respectively. For the year ended December 31, 2015, the Debtors preliminarily reported $250 million of total revenue.

Southcross has two primary components: the Debtors' operations and the operations of the non-Debtor MLP Entities. The Debtors' success is linked to the MLP Entities' success. The Debtors' most valuable asset is its majority interest in the MLP and 100 percent interest in the MLP GP. The Debtors and the MLP Entities are operationally and financially intertwined through shared services and other intercompany agreements. These agreements, in effect, create a cash-flow interdependence such that when one segment fails to produce, the strain reverberates across the entire Southcross enterprise. The Debtors' liquidity profile is impacted significantly by intercompany obligations, including the approximately $48.6 million MLP Intercompany Balance. The Debtors' inability to fund such intercompany payables has, in turn, jeopardized the MLP Entities' liquidity profile.

The Debtors' businesses recently have come under significant pressure from macroeconomic forces beyond their control. In the fall of 2014, oil prices plummeted due to global oversupply and have yet to recover. Simultaneously, the natural gas market, which experienced continued growth in domestic production and unseasonably mild weather, sustained a marked decline in natural gas prices which may persist for the foreseeable future. In response, upstream producers in the Eagle Ford, and across the United States, have significantly pared back new drilling activity. This trend has significantly reduced production volumes in the upstream sector, leading to much less transportation and processing activity in the midstream sector. Meanwhile, the Debtors had initiated a costly expansion process in the months before the historic decline in oil and gas prices. Under normal operating conditions, the Debtors' steady cash flows enable them to reliably service their funded debt obligations. But the current operating conditions and attendant enterprise-wide liquidity challenges have made servicing the Debtors' debt obligations unsustainable.

As a result, the Debtors engaged their primary equity holders, a steering committee of the Term Lenders, a steering committee of the Revolving Lenders, and their administrative agents regarding various restructuring alternatives—both out-of-court and in-court—to strengthen the Debtors' balance sheet, provide near-term liquidity support enterprise-wide, and create a sustainable capital structure to position the Debtors for long-term success.

After extensive, hard-fought negotiations, the Debtors, certain Revolving Lenders holding approximately 95 percent of the Revolving Facility Claims, certain Term Lenders holding approximately 68 percent of the Term Loan Facility Claims, holders of 100 percent of the Holdings Class B Interests, and holders of 100 percent of the Holdings Interests—including EIG and Tailwater as the Supporting Common Interest Holders—reached a global agreement for a consensual, balance-sheet restructuring to be implemented through a prepackaged chapter 11 plan of reorganization—namely, the Plan—that deleverages the Debtors by nearly 80 percent, provides immediate liquidity through a $170 million new money investment (including an $85 million DIP Facility), facilitates a much needed capital contribution to the MLP Entities, and minimizes the time and expense associated with the restructuring. In exchange for this much-needed liquidity and other compromises contained in the Plan, the Supporting Common Interest Holders will receive 66.66 percent of the equity in Reorganized Holdings and 100 percent of the New Unsecured Notes; the Term Lenders will receive the remaining 33.34 percent of the equity in Reorganized Holdings under the Plan. The Plan maximizes the value of the Debtors' assets, including certain estate causes of action the

Debtors may have against the Supporting Common Interest Holders and their affiliates related to the Equity Commitment Letters, described further herein.  Rather than expose the Debtors, the MLP Entities, and other stakeholders to the risks of potentially value-destructive litigation with EIG and Tailwater—the only parties that have offered to invest new money in furtherance of a balance-sheet restructuring—the Plan contemplates a global settlement of the Debtors' and the Supporting Class B Interest Holders' claims against the Supporting Common Interest Holders and their affiliates, pursuant to which the Debtors secured the $170 million new money investment that drives recoveries (in both quantum and form of consideration) for all of the Debtors' stakeholders.

Significantly, the disinterested directors at Holdings GP—which were advised by separate counsel—undertook an independent review of alternative transaction structures, including a standalone reorganization predicated upon parallel litigation against the Supporting Common Interest Holders and their affiliates.  Following such review, the disinterested directors have determined that the Plan is the best alternative to maximize value and they support the transactions contemplated thereunder.  Without the new money equity investment, the Debtors are projected to run out of cash in a matter of days, and would be unable to continue operating as a going concern (which may also jeopardize the MLP Entities' continued viability).

Given the Debtors' core strengths, including the experience of its team, the strategic location of its assets, and its ability to pursue growth opportunities, the Debtors are confident that they can implement the balance-sheet restructuring contemplated by the RSA and the Plan and therefore ensure the long-term viability of the entire Southcross enterprise.

## ARTICLE I

## THE PLAN

### 1.1    Discharge of Claims and Interests

The Plan provides for the discharge of Claims and Interests through:  (a) the issuance of Reorganized Holdco Interests and New Unsecured Notes; (b) the Reinstatement of certain Claims and Interests; (c) the New Term Loan B Facility and the New Term Loan A Facility; and (d) payment of Cash.  As more fully described herein:

- holders of Allowed DIP Facility Claims will receive their Pro Rata share of approximately 33.33 percent of the Reorganized Holdco Interests—i.e., the DIP Equity Recovery—subject to Pro Rata dilution on account of the Management Incentive Plan;

- holders of Allowed Revolving Facility Claims will receive their Pro Rata share of the loans arising under the New Term Loan A Facility;

- holders of Allowed Term Loan Facility Claims will receive their Pro Rata share of the loans arising under the New Term Loan B Facility and approximately 33.34 percent of the Reorganized Holdco Interests, subject to Pro Rata dilution on account of the Management Incentive Plan;

- holders of Allowed General Unsecured Claims will be paid in full in Cash on the later of the Effective Date or in the ordinary course of business;

- holders of the Holdings Class B Interests will receive their Pro Rata share of $100,000;

- the Holdings Interests will be canceled;

- Intercompany Claims and Interests will be Reinstated or canceled, provided that any Non-Debtor Intercompany Claims held by any of the MLP Entities shall be Reinstated; and

- holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed Professional Claims will be (a) paid in full in Cash, (b) Reinstated, or (c) otherwise rendered Unimpaired, as applicable.

**1.2     New Capital Structure**

On the Effective Date, the Debtors will effectuate the Transaction by:  (a) entering into the New Term Loan B Facility and the New Term Loan A Facility; (b) issuing the New Unsecured Notes; (c) converting the DIP Facility Claims into 33.33 percent of the Reorganized Holdco Interests; (d) consummating the Capital Equity Investment in exchange for 33.33 percent of the Reorganized Holdco Interests and the New Unsecured Notes; and (e) entering into all related documents to which the Reorganized Debtors are contemplated to be a party on the Effective Date.  All such documents shall become effective in accordance with their terms and the Plan.

(a)     **New Term Loan A Facility**

The Reorganized Debtors shall enter into the New Term Loan A Facility on the Effective Date, on terms set forth in the New Term Loan Agreement Documents.  The New Term Loan A Facility shall be a $50 million secured term loan facility comprised of:  (a) an aggregate principal amount of $47,850,000 of first-out term loans; and (b) a new first lien senior secured letter of credit facility with a commitment of $2.15 million.  The terms of the New Term Loan A Facility shall be consistent with the RSA and the documentation for the New Term Loan A Facility shall be included in the Plan Supplement and acceptable to the Debtors and the Required Consenting Revolving Lenders and reasonably acceptable to the Required Consenting Term Lenders and the Supporting Common Interest Holders.

Confirmation shall be deemed approval of the New Term Loan A Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Term Loan A Facility, including the New Term Loan Agreement Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the New Term Loan A Facility.

(b)     **New Term Loan B Facility**

The Reorganized Debtors shall enter into the New Term Loan B Facility on the Effective Date, on terms set forth in the New Term Loan Agreement Documents.  The New Term Loan B Facility shall be a $75 million secured term loan facility.  The terms of the New Term Loan B Facility shall be in accordance with the RSA and the documentation for the New Term Loan B Facility shall be included in the Plan Supplement and otherwise acceptable to the Debtors and the Required Consenting Term Lenders and reasonably acceptable to the Required Consenting Revolving Lenders and the Supporting Common Interest Holders.

Confirmation shall be deemed approval of the New Term Loan B Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Term Loan B Facility, including the New Term Loan Agreement Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the New Term Loan B Facility.

(c)     **New Unsecured Notes**

The Reorganized Debtors shall issue the New Unsecured Notes on the Effective Date, on terms set forth in the New Unsecured Notes Documents.  The New Unsecured Notes shall be in the aggregate principal amount of $8 million.  The documentation for the New Unsecured Notes shall be included in the Plan Supplement and

otherwise acceptable to the Debtors and reasonably acceptable to the Required Consenting Term Lenders and the Supporting Common Interest Holders (and solely with respect to terms affecting their treatment or rights, reasonably acceptable to the Required Consenting Revolving Lenders).

Confirmation shall be deemed approval of the New Unsecured Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to issue the New Unsecured Notes, including the New Unsecured Notes Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the New Unsecured Notes.

(d)    **Issuance and Distribution of the Reorganized Holdco Interests**

All existing Interests in Holdings and Holdings GP shall be cancelled as of the Effective Date and Reorganized Holdco shall issue the Reorganized Holdco Interests to Entities entitled to receive the Reorganized Holdco Interests pursuant to the Plan—namely, the Supporting Common Interest Holders (as DIP Facility Lenders and providers of the Capital Equity Investment) and the Term Lenders.  The issuance of the Reorganized Holdco Interests, including Interests, if any, reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Holdco Organizational Documents shall authorize the issuance and distribution on the Effective Date of the Reorganized Holdco Interests to the Distribution Agent for the benefit of Entities entitled to receive the Reorganized Holdco Interests pursuant to the Plan.  All of the Reorganized Holdco Interests issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the Reorganized Holdco Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(1)    **DIP Facility Claims**

On the Effective Date, the DIP Facility shall be equitized such that holders of Allowed DIP Facility Claims shall receive their Pro Rata share of the DIP Equity Recovery.

(2)    **Capital Equity Investment**

On the Effective Date, the Supporting Common Interest Holders shall make the following capital contributions to Reorganized Holdco:  (a) EIG shall contribute an amount in cash equal to $85 million less its Pro Rata portion of any obligations then outstanding under the DIP Facility; and (b) Tailwater shall contribute an amount in cash equal to $85 million less its Pro Rata portion of any obligations then outstanding under the DIP Facility.  In return, each Supporting Common Interest Holder shall receive its Pro Rata share of (a) the Capital Equity Recovery; and (b) the New Unsecured Notes.  For the avoidance of doubt:  (a) such recovery shall be in addition to the Supporting Common Interest Holders' recovery pursuant to Article II.B of the Plan on account of their DIP Facility Claims; (b) the accrual and satisfaction of any fees, interest paid in kind, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement pursuant to Article II.B of the Plan shall not reduce in any way the Supporting Common Interest Holders' obligations under the RSA and Article IV.C of the Plan to fund the full amount of the Capital Equity Investment; and (c) the Capital Equity Recovery is being issued entirely on account of the Supporting Interest Holders' new money investment and not on account of existing equity interests.

**1.3**     **Unclassified Claims**

(a)     **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan. The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|-------|----------------|-------------------------|
| Administrative Claims | Paid in Full in Cash | 100% |
| DIP Facility Claims | Pro Rata Share of DIP Equity Recovery | 100% |
| Professional Claims | Paid in Full in Cash | 100% |
| Priority Tax Claims | Paid in Full in Cash | 100% |

(b)     **Unclassified Claims**

(1)     **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors, in consultation with the Supporting Common Interest Holders and Required Consenting Term Lenders, or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

(2)     **DIP Facility Claims**

Subject to the terms, conditions, and priorities set forth in the DIP Facility Order, the DIP Facility Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Facility as of the Effective Date. In full satisfaction of and in exchange for each DIP Facility Claim, each holder of a DIP Facility Claim shall receive its Pro Rata share of the DIP Equity Recovery. Such treatment shall render each DIP Facility Claim satisfied in full on the Effective Date, consistent with the terms of the DIP Facility Loan Agreement and the RSA. For the avoidance of doubt: (a) any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement shall be satisfied in full upon the receipt of the DIP Equity Recovery by the holders of the DIP Facility Claims pursuant to Article II.B of the Plan; and (b) the accrual and satisfaction of such fees and interest shall not reduce in any way the Supporting Common Interest Holders' obligations to fund the full amount of the Capital Equity Investment pursuant to the RSA and Article IV.C of the Plan.

(3)      **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to Reorganized Holdco.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(4)      **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**1.4      Classified Claims and Interests**

(a)      **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries, estimated as of April 30, 2016, of the Claims and Interests, by Class, under the Plan. Amounts assumed in the liquidation recovery analysis are estimates only. The projected liquidation recoveries are based on certain assumptions described herein. Accordingly, recoveries received by holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|-------|-------------------|---------------|-----------|-------------------------|----------------------|
| 1 | Other Secured Claims | Not Entitled to Vote / Presumed to Accept | Paid in Full in Cash | 100% | 100% |
| 2 | Other Priority Claims | Not Entitled to Vote / Presumed to Accept | Paid in Full in Cash | 100% | 0% |
| 3 | Revolving Facility Claims | Entitled to Vote | Pro Rata Share of New Term Loan A Facility | 100% | 43% |
| 4 | Term Loan Facility Claims | Entitled to Vote | Pro Rata Share of New Term Loan B Facility and Term Loan Equity | 27% | 0% |

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | | Recovery | | |
| 5 | General Unsecured Claims | Not Entitled to Vote / Presumed to Accept | Paid in Full in Cash | 100% | 0% |
| 6 | Debtor Intercompany Claims | Not Entitled to Vote / Presumed to Accept or Deemed to Reject | Reinstated or Canceled | 0% / 100% | 0% |
| 7 | Non-Debtor Intercompany Claims | Not Entitled to Vote / Presumed to Accept or Deemed to Reject | Reinstated or Canceled | 0% / 100% | 0% |
| 8 | Interests in Debtors Other than Holdings GP and Holdings | Not Entitled to Vote / Presumed to Accept or Deemed to Reject | Reinstated or Canceled | 0% / 100% | 0% |
| 9 | Holdings Class B Interests | Entitled to Vote | Pro Rata Share of $100,000 | Less than 1% | 0% |
| 10 | Holdings Interests | Not Entitled to Vote / Deemed to Reject | Canceled | 0% | 0% |
| 11 | Section 510(b) Claims | Not Entitled to Vote / Deemed to Reject | Canceled | 0% | 0% |

(b)     **Classified Claims and Interests Details**

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by: (a) the Debtors; (b) the holder of such Allowed Claim or Allowed Interest, as applicable; (c) the Supporting Common Interest Holders; and (d) the Required Consenting Term Lenders. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(1)     **Class 1 — Other Secured Claims**

A.     *Classification*: Class 1 consists of any Other Secured Claims against any Debtor.

B.     *Treatment*: Each holder of an Allowed Class 1 Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders:

i.      payment in full in Cash of its Allowed Class 1 Claim;

ii.     the collateral securing its Allowed Class 1 Claim;

iii.    Reinstatement of its Allowed Class 1 Claim; or

iv.     such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

C.      *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

(2)     **Class 2 — Other Priority Claims**

A.      *Classification*:   Class 2 consists of any Other Priority Claims against any Debtor.

B.      *Treatment*:   Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim.

C.      *Voting*:   Class 2 is Unimpaired under the Plan. Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

(3)     **Class 3 — Revolving Facility Claims**

A.      *Classification*:  Class 3 consists of any Revolving Facility Claims.

B.      *Allowance:*  On the Effective Date, Class 3 Claims shall be Allowed in the aggregate principal amount of $50,000,000, plus any accrued but unpaid interest thereon payable at the applicable default interest rate in accordance with the terms and conditions applicable to the Revolving Facility under the Holdings Credit Agreement.

C.      *Treatment*:  Each holder of an Allowed Class 3 Claim shall receive its Pro Rata share of:

       i.      the loans arising under the New Term Loan A Facility; and

       ii.     Cash in an amount equal to any accrued but unpaid interest on the aggregate principal amount of Class 3 Claims payable at the applicable default interest rate in accordance with the terms and conditions applicable to the Revolving Facility under the Holdings Credit Agreement.

D.      *Voting*:  Class 3 is Impaired under the Plan. Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

(4)     **Class 4 — Term Loan Facility Claims**

A.      *Classification*:  Class 4 consists of any Term Loan Facility Claims.

B.      *Allowance*:  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate principal amount of $566,375,000, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate in accordance with the terms and conditions applicable to the Term Loan Facility under the Holdings Credit Agreement.

C.      *Treatment*:  Each holder of an Allowed Class 4 Claim shall receive its Pro Rata share of:

8

      i.      the loans arising under the New Term Loan B Facility; and

      ii.      the Term Loan Equity Recovery.

D.      *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

(5)      **Class 5 — General Unsecured Claims**

A.      *Classification*:  Class 5 consists of any General Unsecured Claims against any Debtor.

B.      *Treatment*:  Each holder of an Allowed Class 5 Claim shall receive Cash in an amount equal to such Allowed Class 5 Claim on the later of:  (i) the Effective Date; or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 5 Claim.

C.      *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed Class 5 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

(6)      **Class 6 — Debtor Intercompany Claims**

A.      *Classification*:  Class 6 consists of any Debtor Intercompany Claims.

B.      *Treatment*:  Each Allowed Class 6 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders, either:

      i.      Reinstated; or

      ii.      canceled and released without any distribution on account of such Claims.

C.      *Voting*:  Holders of Allowed Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

(7)      **Class 7 — Non-Debtor Intercompany Claims**

A.      *Classification*:  Class 7 consists of any Non-Debtor Intercompany Claims.

B.      *Treatment*:  Each Allowed Class 7 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders, either:

      i.      Reinstated; or

      ii.      canceled and released without any distribution on account of such Claims;

*provided, however*, that Non-Debtor Intercompany Claims held by any of the MLP Entities shall be Reinstated to the extent not paid by the Debtors during the Chapter 11 Cases prior to the Effective Date.

C.  *Voting*:  Holders of Allowed Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan.

(8)  **Class 8 — Interests in Debtors other than Holdings GP and Holdings**

A.  *Classification*:  Class 8 consists of Interests in Debtors other than Holdings GP and Holdings.

B.  *Treatment*:  Class 8 Interests shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders, either:

   i.   Reinstated; or

   ii.  canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 8 Interests will not receive any distribution on account of such Class 8 Interests.

C.  *Voting*:  Holders of Class 8 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

(9)  **Class 9 — Holdings Class B Interests**

A.  *Classification*:  Class 9 consists of the Holdings Class B Interests.

B.  *Treatment*:  Each holder of Allowed Holdings Class B Interests shall receive its Pro Rata share of $100,000.

C.  *Voting*:  Class 9 is Impaired under the Plan.  Holders of Holdings Class B Interests are entitled to vote to accept or reject the Plan.

(10)  **Class 10 — Holdings Interests**

A.  *Classification*:  Class 10 consists of the Holdings Interests.

B.  *Treatment*:  Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.

C.  *Voting*:  Class 10 is Impaired under the Plan.  Holders of Class 10 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(11)    **Class 11 — Section 510(b) Claims**

A.    *Classification*:  Class 11 consists of any Section 510(b) Claims against any Debtor.

B.    *Allowance:*  Notwithstanding anything to the contrary herein, a Class 11 Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Class 11 Claim and believe that no such Class 11 Claim exists.

C.    *Treatment*:  Allowed Class 11 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Allowed Section 510(b) Claims.

D.    *Voting*:  Class 11 is Impaired.  Holders (if any) of Allowed Class 11 Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders (if any) of Allowed Class 12 Claims are not entitled to vote to accept or reject the Plan.

(c)    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

(d)    **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of Reorganized Holdco Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

(e)    **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

(f)    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors, with the consent of the Supporting Common Interest Holders and Required Consenting Term Lenders (and (a) the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan), reserve the right to modify the Plan in

11

accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## 1.5    Certain Intercompany Claims

All Non-Debtor Intercompany Claims, Intercompany Contracts, and other pre-Petition Date intercompany agreements and arrangements by and among one or more of the Debtors, on the one hand, and one or more of the MLP Entities, on the other hand, shall be assumed and the Debtors or Reorganized Debtors, as applicable, shall continue such intercompany arrangements in the ordinary course of business, including the payment of prepetition amounts related thereto and the funding of any equity cures pursuant to a separate agreement related thereto.

## 1.6    Liquidation Analysis

The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including:  (a) the Debtors' primary assets are intangible and include goodwill and customer relationships, which would have little to no value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the sale of the Debtors' assets and services in which such assets and services could be marketed and sold.

The Debtors, with the assistance of Alvarez & Marsal LLC ("A&M"), have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit C** (the "Liquidation Analysis"), to assist holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

## 1.7    Valuation Analysis

The Plan provides for the distribution of Reorganized Holdco Interests to holders of Allowed Term Loan Facility Claims, holders of Allowed DIP Facility Claims, and the Supporting Common Interest Holders upon consummation of the transactions contemplated by the Plan.  Accordingly, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), at the request of the Debtors, has performed an analysis, which is attached hereto as **Exhibit D**, of the estimated implied value of the Debtors on a going-concern basis as of August 31, 2016 (the "Valuation Analysis").  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with ARTICLE VI of this Disclosure Statement, entitled "Certain Factors To Be Considered."  The Valuation Analysis is based on data and information as of March 9, 2016.  Houlihan Lokey makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## 1.8    Financial Information and Projections

In connection with the planning and development of the Plan, the Debtors, with the assistance of their advisors, prepared projections for the fiscal years 2016 through 2019, including management's assumptions related thereto, which are attached hereto as **Exhibit B**, to present the anticipated impact of the Plan.  For purposes of the financial projections, the Debtors have assumed an Effective Date of April 30, 2016.  The projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the projections due to a material change in the Debtors' prospects.

The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, commodity prices, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and other financial information.

## ARTICLE II

## VOTING PROCEDURES AND REQUIREMENTS

### 2.1    Class Entitled to Vote on the Plan

The following Classes are entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Revolving Facility Claims | Impaired |
| 4 | Term Loan Facility Claims | Impaired |
| 9 | Holdings Class B Interests | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package, including a ballot setting forth detailed voting instructions.  If your Claim or Interest is included in the Voting Classes, you should read your ballot and carefully follow the instructions included in the ballot.  Please use only the ballot that accompanies this Disclosure Statement or the ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.

### 2.2    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of more than two-thirds in amount of the total allowed interests that have voted.

### 2.3    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

13

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims or Interests in the Voting Classes.

For a further discussion of risk factors, please refer to <u>ARTICLE VI</u>, entitled "Certain Factors to Be Considered" of this Disclosure Statement.

**2.4**      <u>**Classes Not Entitled To Vote on the Plan**</u>

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Debtor Intercompany Claims | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| 7 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| 8 | Interests in Debtors other than Holdings GP and Holdings | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| 10 | Holdings Interests | Impaired | Deemed to Reject |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |

**2.5**      <u>**Solicitation Procedures**</u>

     (a)      <u>**Solicitation Agent**</u>

The Debtors have retained Epiq Bankruptcy Solutions, LLC to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

     (b)      <u>**Solicitation Package**</u>

The following materials constitute the solicitation package (the "<u>Solicitation Package</u>") distributed to holders of Claims and Interests in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- the appropriate ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

(c)      **Distribution of the Solicitation Package and Plan Supplement**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to holders of Claims and Interests in the Voting Classes on March 21, 2016, which is 7 days before the Voting Deadline (*i.e.*, 4:00 p.m. prevailing Eastern Time on March 28, 2016).

The Solicitation Package (except the ballots) may also be obtained from the Solicitation Agent by: (1) calling the Debtors' restructuring hotline at +1 (646) 282-2500 (ask for Solicitation Group), (2) emailing tabulation@epiqsystems.com and referencing "SCH" in the subject line, and/or (3) writing to the Solicitation Agent at SCH Ballot Processing, c/o Epiq Corporate Restructuring, 777 Third Avenue, 12th Floor, New York, NY 10017. When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, http://dm.epiq11.com/Southcross, or for a fee via PACER at https://www.pacer.gov/.

At least seven days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at the telephone number set forth above; (2) visiting the Debtors' restructuring website, http://dm.epiq11.com/Southcross; and/or (3) writing to the Solicitation Agent at Southcross, c/o Epiq Corporate Restructuring, 777 Third Avenue, 12th Floor, New York, NY 10017.

## 2.6    Voting Procedures

March 8, 2016, (the "Voting Record Date"), is the date that was used for determining which holders of Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

In order for the holder of a Claim or Interest in the Voting Classes to have such holder's ballot counted as a vote to accept or reject the Plan, such holder's ballot must be properly completed, executed, and delivered by (a) using the enclosed pre-paid, pre-addressed return envelope, (b) via first class mail, overnight courier, or hand delivery to SCH Ballot Processing, c/o Epiq Corporate Restructuring, 777 Third Avenue, 12th Floor, New York, NY 10017, or (c) via email (attaching a scanned PDF of the fully executed ballot) to tabulation@epiqsystems.com and referencing "SCH" in the subject line, so that such holder's ballot is actually received by the Solicitation Agent on or before the Voting Deadline, *i.e.* March 28, 2016 at 4:00 p.m. prevailing Eastern Time.

If a holder of a Claim or Interest in a Voting Class transfers all of such Claim or Interest to one or more parties on or after the Voting Record Date and before the holder has cast its vote on the Plan, such Claim or Interest holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the holder's Claim or Interest, and such purchaser(s) shall be deemed to be the holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the RSA, if applicable.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH

RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS OR INTERESTS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## ARTICLE III

## BUSINESS DESCRIPTIONS

### 3.1    Corporate History and Organizational Structure

Southcross is the product of (a) an August 4, 2014, merger transaction by which the businesses of Legacy Southcross and Legacy TexStar (each as defined below) combined (the "Merger"), (b) Holdings' issuance of certain preferred units, and (c) related drop-down transactions from the Debtors to the MLP Entities.

(a)    **Merger; Class A Common Units**

In 2009, Charlesbank Capital Partners LLC ("Charlesbank") formed Southcross Energy, LLC ("Southcross LLC," and together with its direct and indirect subsidiaries, "Legacy Southcross"), for the purpose of acquiring and operating midstream oil and gas assets.  Between 2009 and 2012, Legacy Southcross expanded and developed its core assets and secured anchor contracts with upstream E&P companies in the Eagle Ford.  In late 2012, Legacy Southcross formed a publicly traded master limited partnership, Southcross Energy Partners, L.P. (the "MLP"), and completed an initial public offering.  In February 2014, Legacy Southcross completed an additional public equity offering of 9,200,000 common units.  Notwithstanding both of the foregoing public offerings, Southcross LLC retained a controlling interest (taking into account both common and subordinated units) in the MLP and a 100% ownership interest in the MLP's general partner, Southcross Energy Partners GP, LLC (the "MLP GP" and together with the MLP and its direct and indirect subsidiaries, the "MLP Entities").

Under the terms of the Merger, BBTS Borrower, LP ("BBTS Borrower") contributed 100% of the equity interests in TexStar Midstream Services, LP (together with its pre-Merger direct and indirect subsidiaries, "Legacy TexStar") to Southcross Holdings Borrower LP ("Holdings Borrower") and Southcross LLC contributed its controlling interest (i.e., its common and subordinated units) in the MLP and 100% interest in the MLP GP to Holdings Borrower.  BBTS Borrower is controlled by funds and entities affiliated with EIG Global Energy Partners, LLC ("EIG") and Tailwater Capital LLC ("Tailwater").

The MLP is indirectly majority-owned by a holding company that also owns the Legacy TexStar entities, Southcross Holdings LP ("Holdings").  Holdings, along with its general partner, Southcross Holdings GP LLC ("Holdings GP"), and its direct and indirect subsidiaries, other than the MLP Entities, are the Debtors in the Chapter 11 Cases.  As a result of the Merger, Charlesbank, EIG, and Tailwater (collectively, the "Sponsors") each indirectly own approximately one-third of the common equity of Southcross's ultimate parent, Holdings (as well as Holdings GP).

(b)    **Class B Preferred Units**

On November 4, 2014, Holdings entered into a unit purchase agreement with two private investors, GE Energy Financial Services ("GEFS") and Energy Capital Partners ("ECP," and together with GEFS, the "Class B Unitholders"), under which Holdings issued approximately 160,000 Mandatorily Redeemable Class B Units (the "Class B Units") in exchange for $160 million and a commitment from the Class B Holders to purchase 50,000 more Class B Units for $50 million within 18 months.  On March 19, 2015, Holdings issued the remaining 50,000 Class B Units to the Class B Unitholders in return for $50 million.  The Class B Units are mandatorily redeemable

on December 31, 2024 (at the face value of $210 million plus accrued but unpaid distributions) or callable by Holdings after three years (at face value plus accrued but unpaid distributions). The Class B Units have no voting rights but have quarterly distribution rights and are senior in priority to Holdings' other equity securities for purposes of liquidation and distribution. The Holdings Limited Partnership Agreement (the "Holdings LPA") provides that the Class B Unitholders have certain consent rights with respect to the Debtors' ability to incur new debt obligations or initiate a voluntary chapter 11 proceeding (the "Class B Consent Right").[4]

       (c)      **Drop-Down Transactions**

Contemporaneously with the Merger, Legacy TexStar contributed to the MLP its interest in certain NGL-rich natural gas gathering and processing assets (the "TexStar Rich Gas System"). The TexStar Rich Gas System assets include a natural gas processing facility located in Bee County, Texas, and joint venture interests in over 230 miles of NGL-rich natural gas gathering and residue pipelines spanning across the Debtors' core operating region in the Eagle Ford. The joint venture interests are held by three limited liability companies (the "JV Entities") that own the TexStar Rich Gas System pipelines. The JV Entities are indirect subsidiaries of the MLP; they are not Debtors in the Chapter 11 Cases. The MLP paid $80 million in cash, assumed $100 million in liabilities, and issued 14,633,000 in Class B Convertible Units (now held by Holdings Borrower) to Legacy TexStar in connection with the TexStar Rich Gas System drop-down transaction.

In May 2015, the Debtors completed another drop-down transaction whereby the MLP acquired the Valley Wells sour gas gathering and treating system, certain compression assets connected to the Debtors' Lancaster gathering and treating system, and two NGL pipelines (collectively, the "Valley Wells Assets") from the Debtors. The MLP paid $15 million in cash and issued 4,500,000 new common units to Holdings Borrower in connection with the Valley Wells Assets drop-down transaction. The MLP also assumed certain remaining capital expenditure obligations related to the NGL pipeline.

Generally speaking, the Legacy Southcross operations are conducted by the MLP Entities and, with the exception of the TexStar Rich Gas System and Valley Wells Assets, the Legacy TexStar operations are conducted by the Debtors.

*[Remainder of Page Intentionally Left Blank]*

---

[4]    The Debtors reserve all rights with respect to the enforceability of any such consent rights.

(d)      **Summary**

As a result of the Merger and above-described drop-down transactions, Holdings owns: (i) a 60 percent interest in the MLP; (ii) a 100 percent equity interest in the MLP GP (which owns a 2 percent interest in the MLP); and (iii) a 100 percent equity interest in the Legacy TexStar entities.  Public holders own the balance of the MLP's common units, which trade on the New York Stock Exchange under the symbol "SXE."  On March 18, 2016, the closing price of MLP's common units was $0.82.  A simplified version of the Debtors' post-Merger corporate structure is set forth below:



## 3.2     **The Debtors' Business Operations**

Southcross operates across the midstream oil and gas industry sector.  Southcross also engages in the purchase and sale of oil and gas products ancillary to its fee-based midstream services operations. The vast majority of Southcross's assets (and all of the Debtors' assets) are located in the Eagle Ford and divided between the Debtors and the MLP Entities.  Because master limited partnerships are valued, in large part, based on their ability to produce steady cash flows in order to pay dividends to their unitholders, this arrangement is reflective of the Debtors' prepetition growth model, which focused on harvesting growth opportunities while sustaining cash flows for the MLP.

The Debtors' assets are located in the Eagle Ford and include approximately 880 miles of natural gas gathering and NGL transportation pipeline, one sour gas treating facility, and one fractionating facility.  The Debtors' operations primarily consist of gathering and treating extracted raw natural gas and fractionating the y-grade stream into its NGL components.

The MLP Entities' Eagle Ford assets include over 3,100 miles of natural gas pipeline, one sour gas treating facility, three processing facilities, one fractionating facility, and one facility with both processing and fractionating

capabilities. Similar to the Debtors' operations, the MLP Entities' Eagle Ford assets are geared toward gathering, treating, and processing extracted raw natural gas and fractionating the y-grade stream into its NGL components. The customer relationships tied to the MLP Entities' Eagle Ford assets are primarily upstream E&P companies.[5]

The Debtors' success is linked to the MLP's success. Although Southcross's assets are nominally separated into two corporate ownership silos, the Debtors and the MLP Entities are operationally and financially intertwined through a series of intercompany arrangements and agreements. This structure has the effect of creating a sort of cash flow interdependence, such that when one asset fails to produce for a sustained period of time, the strain reverberates across the entire enterprise. For example, in addition to their own liquidity challenges, the Debtors' inability to satisfy approximately $48.6 million of intercompany obligations owing to the MLP Entities has essentially starved the MLP Entities of cash. The intercompany arrangements are described in further detail below.

The Debtors' operations also depend, in part, on the vitality of its upstream customer base. These risks, however, are mitigated, in part, by Southcross's customer contracts, which can range for periods of one month to several years, and generally are structured from a cash flow perspective as follows:

- *fixed-fee*: Southcross receives a fixed fee per unit of natural gas volume it gathers at the wellhead, treats, processes, compresses, and/or transports for their customers, as well as a fixed fee per unit of NGL volume it fractionates for the customers;

- *fixed-spread*: Southcross purchases volumes of natural gas and NGLs at an index price plus or minus a fixed price differential and subsequently sells these volumes at an index price plus or minus a fixed differential—Southcross remains subject to commodity price variations only to the extent it is unable to precisely match volumes purchased and sold; and

- *commodity-sensitive*: in exchange for processing services, Southcross may accept a percentage of proceeds from the ultimate sale of the hydrocarbons or a percentage volume of the natural gas or NGLs.

Southcross's customer contracts are 88 percent fixed in nature—*i.e.*, the payment that Southcross receives in return for services rendered does not fluctuate with commodities prices. Additionally, 56 percent of Southcross's customer contracts contain minimum volume commitments, which is essentially a "use or pay" arrangement under which the customers must pay for a certain minimum throughput volume, irrespective of whether that volume actually flows through Southcross's facilities. Southcross's minimum volume commitment contracts are generally with the MLP Entities and not the Debtors. Southcross's other customer contracts generally contain acreage dedications, which offer less protection in a low-drilling environment than minimum volume commitments. The exact terms of a given customer contract depend on Southcross's competitive position and the amount of up-front capital costs the Debtors incurred to provide the contracted-for services.

### 3.3     The Debtors' Key Assets and Intercompany Relationships

As described above, the Debtors' key assets consist of its ownership interests in the MLP and MLP GP, certain natural gas gathering and NGL transportation pipelines, and an NGL fractionation facility.

(a)     **The MLP Interests**

The Debtors' most significant asset is their approximately 60 percent ownership interest in the MLP. Under section 7704 of the Internal Revenue Code (the "IRC"), a limited partnership qualifies for treatment as a publicly-traded master limited partnership if it derives at least 90 percent of its income from "qualifying," sources, which includes, among others, income derived from transporting and processing natural gas. A master limited partnership's value is driven, in large part, by its ability to pay quarterly dividends to its common unitholders.

---

5     Additionally, the MLP Entities own over 1,100 miles of natural gas gathering and transmission pipelines in southern Mississippi and northwest Alabama, along with two treating facilities connected to the Mississippi pipeline.

Pursuant to the MLP's limited partnership agreement (the "MLP LPA"), the MLP is required to distribute *all* available cash to unitholders within 45 days of the end of each quarter. The MLP LPA further defines a minimum quarterly distribution of 40 cents per unit, or a total of $1.60 per unit, per year. Until its announcement in January 2016 to suspend quarterly distributions, the MLP paid cash distributions of at least 40 cents per unit to common unitholders, including Holdings Borrower, each quarter since its initial public offering.

The MLP's assets are located in South Texas, Mississippi, and Alabama and include four natural gas processing plants, two fractionation facilities, and approximately 3,100 miles of pipeline. The majority of the MLP Entities' assets and operations are located in, or within close proximity to, the Eagle Ford. The MLP Entities' Eagle Ford facilities are located along the Gulf Coast between Houston and Laredo. Because of its strategic position across the Eagle Ford, the MLP Entities also have direct access to the Corpus Christi ship channel and Agua Dulce market areas. The MLP Entities' South Texas assets form an integrated system of approximately 2,000 miles of pipeline, which interconnect with all of the major intrastate and interstate pipelines along the Gulf Coast. In addition, the MLP Entities operate the Lone Star, Woodsboro, Gregory[6], and Conroe processing plants in the Eagle Ford, which, in the aggregate, provide 685 million cubic feet per day ("MMcf/d") of processing capacity. The Eagle Ford is also the home of the Bonnie View and Gregory fractionation plants, which provide an aggregate fractionation capacity of 27,300 barrels per day. The MLP Entities' customers in South Texas are primarily upstream E&P companies.

The MLP Entities also own pipelines in Mississippi and Alabama. The Mississippi pipeline system is the largest intrastate pipeline system in the state. The system includes approximately 600 miles of transmission and gathering pipelines with an estimated capacity of 345 MMcf/d and two compressor stations located near Piney Woods and Baxterville. This system serves several high-demand markets in Mississippi, including lumber and paper mills, power plants, city gates, and off-system customers whose gas is delivered through interstate pipeline systems. The MLP Entities' Alabama pipeline system comprises approximately 500 miles of gathering pipeline with an estimated capacity of 375 MMcf/d. The MLP Entities' primary customers in the region include industrials, a county gas authority, and producers who are transporting gas to interstate pipeline interconnects, city gates, and off-system customers.

In addition to its approximately 60 percent limited partner ownership interest in the MLP, the Debtors own 100 percent of the MLP GP. The MLP GP in turn owns 2 percent of the MLP. In addition to any regular distribution on account of its 2 percent ownership interest, the MLP GP is entitled to certain "incentive distribution rights," as defined in the MLP LPA. Put simply, incentive distribution rights provide a mechanism for the MLP GP to gain a greater share of MLP distributions as cash distributions paid per unit increases. This arrangement creates an incentive for the MLP GP to increase cash available for distribution by investing in capital expenditures and growing the MLP Entities' businesses. Pursuant to the LPA, the MLP may receive up to 50 percent of distributions under certain conditions.

(b)      **The Debtors' Gathering and Fractionation Assets**

The Debtors also own certain natural gas gathering and fractionating assets—including the "Lancaster Gathering System," the "Robstown Fractionator," and certain NGL transportation pipelines connected to the Robstown Fractionator.

The Lancaster Gathering System is located in Frio and LaSalle Counties, Texas, and consists of approximately 500 miles of sweet and sour rich gas gathering lines and a sour gas treating facility with capacity of 100 MMcf/d that is expandable to more than 250 MMcf/d. Notably, the Lancaster Gathering System is connected to the MLP Entities' pipeline system and its gathered gas is processed at the MLP Entities' Lone Star Plant, near Pettus, Texas. The Debtors' NGL system also consists of the Robstown Fractionator, a new fractionation facility near Corpus Christi, Texas, and more than 100 miles of related NGL transportation pipelines. The Robstown Fractionator came fully online in October 2015, and has a fractionation capacity of 63,000 barrels per day.

---

6      The MLP Entities' Gregory processing facility is not operating as of the date hereof.

     (c)     **Intercompany Arrangements**

In keeping with the integrated nature of the Southcross enterprise, various intercompany arrangements connect the Debtors and the MLP Entities and give rise to obligations flowing back and forth between the entities. These arrangements fall into three major categories: shared services arrangements, arrangements related to the purchase and sale of y-grade, and certain other arrangements for natural gas services related to Southcross's businesses.

With respect to shared services, the MLP GP, which is not a debtor, employs all of Southcross's employees, which include: 280 individuals on a full-time basis, one individual on a part-time basis, and, at a given time depending on need, up to 14 independent contractors (collectively, the "Employees"). The Debtors operate in a highly technical field, where safety and proper training are of the utmost importance. The Employees' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency—in many instances, the Employees include highly trained personnel who are not easily replaced.

The MLP Entities and Debtors reimburse the MLP GP for Employee-related expenses through an allocation process on both a direct basis, where Employee-related expenses are directly attributable to either the MLP Entities' or the Debtors' operations, and a percentage basis for certain shared administrative services. The Debtors remit payment either to the MLP GP or directly to the MLP in connection with this shared services expense allocation process. Historically, Holdings has borne the cost of approximately 35 percent of enterprise-wide, shared services expenses. Where certain Employee obligations are directly attributable to the Debtors, the Debtors are responsible for 100 percent of such costs. The Debtors typically remit Employee-related reimbursements to the MLP Entities on a bi-weekly basis. Southcross reviews the Employee shared services allocation for reasonableness on a quarterly basis.

Additionally, the MLP Entities and the Debtors are party to a number of intercompany agreements relating to the purchase and sale of y-grade (the "Y-Grade Agreements"), as well as agreements concerning gas gathering, processing, treating, compression, and transportation services (the "Services Agreements"). Under the Y-Grade Agreements, the MLP Entities deliver y-grade to the Debtors at the Robstown Fractionator, which the Debtors fractionate into its NGL components. The Debtors then market the NGL components downstream and remit payment back to the MLP Entities at a price determined by the levels of NGL components extracted; in some instances the MLP Entities purchase condensate from the Debtors in connection with this process. Under the Services Agreements, the Debtors generally pay the MLP Entities as the service provider, with the exception of one such agreement where the relationship is reversed.

In the normal course of business, the Debtors and the MLP Entities settle intercompany balances arising under the foregoing arrangements at the end of each month. Due to current distressed operating conditions, though, and in addition to the funded debt obligations described below, the Debtors owe approximately $48.6 million to the MLP on account of certain intercompany obligations as of the Petition Date.

**3.4**     **Directors and Officers**

As of the date of this Disclosure Statement, the Debtors' officers include: (a) John E. Bonn, President and Chief Executive Officer; (b) Bret M. Allan, Chief Financial Officer; (c) Joel D. Moxley, Chief Commercial Officer; (d) G. Tracy Owens, Chief Accounting Officer; and (e) Kelly J. Jameson, General Counsel.

The members of the Reorganized Holdco Board and the officers, directors, and/or managers of each of the Reorganized Debtors will be identified in the Plan Supplement. The members of Holdings GP's board of directors are deemed to have resigned as of the Effective Date. On the Effective Date, the Reorganized Holdco Board will consist of 6 members. The Members of the Reorganized Holdco Board shall be appointed by the Supporting Common Interest Holders and the Consenting Term Lenders in accordance with the terms of the RSA and the members of the board of directors of any subsidiary of Reorganized Holdco shall be acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders. On the Effective Date, the existing officers of the Debtors shall serve in their current capacities for the Reorganized Debtors. From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation. In accordance with section 1129(a)(5) of the Bankruptcy Code, the

identities and affiliations of the members of the Reorganized Holdco Board and any Person proposed to serve as an officer of Reorganized Holdco shall be disclosed at or before the Confirmation Hearing.

On the Effective Date, the MLP Board shall be reorganized (and all necessary documents executed) to provide the Supporting Common Interest Holders and Consenting Term Lenders with representation equal in number to such parties' representation on the Reorganized Holdco Board; *provided*, *however* that the composition of the MLP Board shall comply in all respects with the MLP Organizational Documents, including with respect to independent directors.

The Debtors shall purchase, on or before the Effective Date, and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.

## 3.5    Prepetition Credit Facility

Holdings Borrower, and certain of the Debtors, as guarantors, are party to that certain Credit Agreement, dated as of August 4, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Holdings Credit Facility"), by and among Holdings Borrower, the Debtor guarantors, UBS AG, Stamford Branch, as administrative agent, and the lenders party thereto.  As amended, the Holdings Credit Facility provides the Debtors with:  (a) a senior secured asset-based revolving credit facility (the "Holdings Revolver"), with a maximum borrowing availability in the amount of $50 million; and (b) a senior secured term loan facility (the "Holdings Term Loan") in an aggregate principal amount of $575 million.  The Holdings Revolver matures in August 2019 and bears an annual interest rate of the London Interbank Offered Rate ("LIBOR") plus an incremental margin of 2.25 percent to 2.5 percent or the Alternate Base Rate ("ABR") plus an incremental margin of 1.25 percent to 1.5 percent.  The Holdings Term Loan matures in August 2021 and bears an annual interest rate of LIBOR plus an incremental margin of 5 percent or ABR plus an incremental margin of 4 percent (which margins are subject to increase under certain conditions).  As of the date hereof, approximately $50 million remains outstanding under the Holdings Revolver, which amount includes $2.15 million in outstanding letters of credit, and $566 million remains outstanding under the Holdings Term Loan, for a total of $616 million outstanding under the Holdings Credit Facility.

Obligations arising under the Holdings Credit Facility are secured by liens on substantially all of Holdings Borrower's assets and those of the Debtor guarantors.  Neither the MLP nor any of MLP Entities are liable for obligations arising under Holdings Credit Facility.  Holdings Term Loan principal is payable in quarterly installments, with a balloon payment of substantially all Holdings Term Loan obligations due and payable on maturity.  All amounts owing under the Holdings Revolver are due and payable on maturity.

| The Debtors' Capital Structure | |
| --- | --- |
| **Revolver:** | |
| *Max. Availability:* | $50 million |
| *Amt. Outstanding:* | $50 million |
| | |
| **Term Loan:** | |
| *Borrowed Amount:* | $575 million |
| *Amt. Outstanding:* | $566 million |
| | |
| **Total Debt Obligations:** | $616 million |
| | |
| **Borrower:** | Holdings Borrower |

| Guarantors: | Certain Debtors[7] |
|---|---|
| Preferred Equity: | $224 million |

## ARTICLE IV

## EVENTS LEADING TO THE CHAPTER 11 CASES

**4.1    Plummeting Oil Prices Force Upstream Producers to Slow Production**

As noted above, Southcross's business recently has come under significant pressure from macroeconomic forces beyond its control.  Rig counts, an indicator of the level of new upstream drilling activity, are down nearly 60 percent over the past year.  Demonstrating just how closely Southcross's fortunes are tied to commodities prices, the unit price of the MLP's publicly-traded common units has fallen approximately 91 percent over the course of the past year.

The Debtors—and Southcross generally—are highly dependent on production activity the Eagle Ford. While the Eagle Ford has traditionally been considered one of the more attractive Shale plays, its upstream producers have been uniformly hit hard by the recent market malaise.  With oil prices currently at approximately $40 per barrel, it has become uneconomic to drill new wells in the Eagle Ford.

Approximately 44 percent of Southcross's customer contracts do not contain minimum throughput provisions, and instead contain, at most, acreage dedications.  Under an acreage dedication arrangement, the upstream producer agrees to dedicate all extracted hydrocarbons from a given acreage to Southcross, but there is no requirement that the producer dedicate a minimum volume of hydrocarbons.  If the E&P company does not produce any hydrocarbons, Southcross does not gain anything from the acreage dedication.  Given the recent low drilling activity environment, Southcross has felt the sagging volumes especially hard where they only have acreage dedications in place.  Specifically, the Debtors' Lancaster Gathering System is connected to 18 upstream producers, but none have minimum volume commitments.  Over the course of the past year, the number of active drilling rigs connected to the Lancaster Gathering System has gone from 16 to two.  While existing wells sustained volume throughput in the short term, these wells will taper off over time.  Less volume gathered at the Lancaster Gathering System means less volume compressed, treated, processed, and fractionated company-wide and decreased revenues across the Debtors' and MLP Entities' enterprise.  Further, even where Southcross has minimum throughput provisions in place, it still faces counterparty credit risk and short-term liquidity pressure as deficiency payments under its customer contracts are made in arrears, in some instances up to a year in arrears.

**4.2    The Debtors' Capital Expenditures to Expand Their Business**

The timing of this historic market malaise could not have been worse for Southcross.  After the Merger in August 2014, Southcross initiated a costly process to expand the MLP Entities' asset base and maximize cash distributions to MLP unitholders. For example, the Debtors spent more than $50 million connecting and integrating the Legacy Southcross and Legacy TexStar assets and more than $100 million to bring the Robstown Fractionator online.  While the cash crunch has hit the Debtors the hardest, given the interconnected nature of Southcross's businesses, the MLP Entities have also felt the pain.

---

[7]    The entities liable for the Debtors' funded debt obligations are: Frio LaSalle GP, LLC; Frio LaSalle Pipeline, LP; Southcross Holdings Borrower GP LLC; Southcross Holdings Borrower LP; Southcross Holdings Guarantor LP; TexStar Midstream GP, LLC; TexStar Midstream Services, LP; TexStar Midstream T/U GP, LLC; and TexStar Midstream Utility, LP.

### 4.3      The Debtors' Efforts to Address Liquidity Issues

(a)      **The August 2015 Equity Commitment Letter and October 2015 Capital Call**

Southcross began exploring alternatives to address its capital structure and liquidity needs in mid-2015. Over the course of June, July, and August 2015, Southcross engaged the Sponsors in discussions regarding an equity infusion. On August 13, 2015, Holdings and certain affiliates of the Sponsors executed a commitment letter (the "August Equity Commitment Letter")[8] pursuant to which such Sponsor affiliates agreed to provide up to $175 million to pursue growth opportunities, under certain conditions. Under the clear terms of the August Equity Commitment Letter, two of the three Sponsor affiliates that are parties to the August Equity Commitment Letter must agree to fund amounts contemplated therein. Holdings does not have that level of agreement. Accordingly, no amounts have been funded under the August Equity Commitment Letter.

In October 2015, Southcross, and especially the Debtors, began to face mounting liquidity pressures. However, the Sponsors confirmed that the conditions precedent to the $175 million equity infusion under the August Equity Commitment Letter had not been satisfied. To address its liquidity needs, on October 5, 2015, Holdings' management team elected to issue a capital call for $20 million pursuant to section 4.1(b) of the Holdings Limited Partnership Agreement. All of Holdings' Class A Unitholders explicitly declined to contribute any incremental capital.

Recognizing the need for a comprehensive balance sheet solution, the Debtors sought external strategic advice and assistance, ultimately engaging Houlihan Lokey Capital, Inc. as financial advisor in October 2015 to engage with Southcross's broader group of stakeholders and aid in Southcross's exploration of strategic alternatives.

(b)      **The December 2015 Negotiations and Class B Unitholder Contention**

With a financial advisor in place, from October to December 2015, the Debtors diligently pursued strategic alternatives, engaging EIG and Tailwater in extensive discussions regarding the terms of an equity investment in Holdings. In addition, the Debtors' management team and advisors solicited restructuring proposals from the Debtors' other key stakeholders, including the Class B Unitholders and Term Lenders.

In December 2015, EIG and Tailwater made a proposal to invest new capital in Holdings. However, the initial negotiations stalled as macro conditions in the oil and gas industry continued to deteriorate. None of the Debtors' other key stakeholders made a proposal during this time period. In late December, the Debtors engaged Kirkland & Ellis LLP as legal counsel to advise on strategic alternatives for addressing the Debtors' capital structure and liquidity needs.

Also in late December 2015, the Debtors' management team and advisors re-engaged in discussions with EIG, Tailwater, and certain of the Term Lenders regarding a temporary waiver and amendment to the credit agreement along with incremental financing to avoid a freefall bankruptcy filing. The Debtors' substantially negotiated a temporary waiver and amendment to the credit agreement from the Term Lenders and $20 million in secured incremental financing from EIG and Tailwater. On December 30, 2015, however, the Class B Unitholder ECP informed the Debtors that fundamental elements of the secured incremental financing were not acceptable to the Class B Unitholders. Instead, ECP suggested on behalf of the Class B Unitholders that the Debtors seek to compel performance under the August Equity Commitment Letter.

---

[8]     In connection with the yearly audit of Holdings Borrower, on March 3, 2015, and April 30, 2015, certain affiliates of the Sponsors sent letters to the Debtors' auditor, Deloitte & Touche LLP, suggesting that Holdings Borrower may require additional liquidity support during the twelve months following the audit opinion date to ensure compliance with financial covenants under the Holdings Credit Facility (the "Spring Equity Commitment Letters" and, together with the August Equity Commitment Letter, the "Equity Commitment Letters"). In the Spring Equity Commitment Letters, certain affiliates of the Sponsors indicated their intent to provide up to $53 million for an "Additional Equity Contribution" as needed to ensure compliance with the Holdings Credit Facility financial covenants.

(c)        **The January 2016 Incremental Financing and Negotiated Waiver**

While the Debtors and the Board took the Class B Unitholders' suggestions seriously, the Board determined, in consultation with the Debtors' management team and advisors and in light of continued deterioration in the commodities markets and near-term liquidity needs, that exploring consensual solutions with the Sponsors was the better near-term alternative.  On January 3, 2016, the Debtors informed the Class B Unitholders, among other things, that the Sponsors "have taken the position that the conditions precedent to the funding obligations contained in the August 2015 equity commitment letter have not yet been met."  On January 11, 2016 and February 9 and 17, 2016, the Board received additional letters from Class B Unitholders, essentially reiterating their position regarding the August Equity Commitment Letter.

Meanwhile, because the $20 million incremental secured financing was not acceptable to the Class B Unitholders, the Debtors' management team and advisors explored alternative financing transactions involving the MLP.  In early January 2016, the MLP Entities negotiated the terms of certain senior unsecured payment-in-kind notes (the "MLP PIK Notes") to be issued by the MLP Entities to certain funds managed by EIG and Tailwater with an aggregate principal amount of $14 million.  None of the Debtors have guaranteed or are otherwise liable for the obligations arising under the MLP PIK Notes, other than as set forth below.  Because the MLP Entities issued the MLP PIK Notes directly, the issuance did not trigger the Class B Consent Right.  On January 5, 2016, the Conflicts Committee considered and approved the terms of the MLP PIK Notes and the MLP Entities executed the requisite documentation on January 7, 2016, which stabilized Southcross's short-term liquidity.

In connection with the unsecured incremental financing, the Debtors simultaneously negotiated and entered into a temporary waiver and amendment agreement with the requisite Term Lenders (the "Holdings Waiver"), which the Board approved on January 8, 2016. Under the terms of the Holdings Waiver:

- certain Term Lenders agreed to waive potential and/or anticipated events of default under the Holdings Credit Facility;

- the Holdings Credit Facility was amended to require additional financial reporting; and

- the Holdings Credit Facility was amended to effectively eliminate Holdings' ability to incur additional debt and consummate certain other transactions.

In mid-February 2016, the Holdings Waiver was extended to March 14, 2016.  The Debtors' management team and advisors have taken full advantage of the runway afforded to them by the unsecured incremental financing and Holdings Waiver to engage in extensive, arms'-length negotiations with the Sponsors and a majority of the Term Lenders (the "Ad Hoc Lender Group") regarding a more permanent solution.

(d)        **The Appointment of Disinterested Directors and Hiring of Separate Counsel**

On January 19, 2016, Holdings GP added two disinterested directors (the "Disinterested Directors") to the Board to aid the Board in its evaluation of various alternatives.  On February 10, 2016, the Disinterested Directors retained Kramer Levin Naftalis & Frankel LLP as their independent legal advisor.  In the weeks since their appointment, the Disinterested Directors have played a key role in the restructuring negotiations and the analysis of the RSA, Plan, and other related matters.  The Disinterested Directors have met on several occasions and, with the help of their independent legal counsel, have conducted substantial diligence and analysis in respect of the RSA and the Plan since their appointment.  For example, the Disinterested Directors carefully considered the merits of the Class B Unitholder's assertions *vis-à-vis* the August Equity Commitment Letter, together with other matters such as collectability, foreseeable creditor recoveries, and Southcross's near-term liquidity requirements, specifically comparing the costs and benefit of litigating such claims related to the August Equity Commitment Letter versus proceeding with the consensual path contemplated by the RSA.  As set forth herein, the Disinterested Directors ultimately concluded that the Debtors' entry into the RSA and the transactions contemplated under the Plan maximize value for the benefit of all parties in interest and recommended that the Board authorize a balance-sheet restructuring on the terms described herein.

(e)      **The March 2016 Restructuring Support Agreement**

During the additional time afforded by the Holdings Waiver and the MLP PIK Notes, Southcross re-engaged with all of its stakeholders in search of a value-maximizing transaction that deleveraged the company while also raising much needed incremental liquidity.  Over the course of the past 11 weeks, the Debtors engaged in substantial arms' length, good faith negotiations with EIG and Tailwater, the Revolving Lenders, the Term Lenders, and the Class B Unitholders, the culmination of which is a global settlement embodied by the RSA, the Plan, and the Proposed DIP Financing (as defined below).  The Disinterested Directors met with the Debtors' management team and advisors on several occasions to fully understand and separately evaluate the terms of the RSA and Proposed DIP Financing.  From January 1, 2016 to March 21, 2016, the full Board met 13 times to review and consider restructuring transactions that would maximize value for all of the Debtors' stakeholders.

Specifically, between January 27, 2016 and February 2, 2016, EIG, Tailwater, and the Ad Hoc Lender Group each made a number of formal restructuring proposals predicated on a $170 million new money investment from EIG and Tailwater, including:

- EIG and Tailwater's initial proposal provided for a $368 million transaction value and a 70 percent (EIG and Tailwater) to 30 percent (Term Lenders) new equity split;

- the Ad Hoc Lender Group's initial proposal provided for a $408 million transaction value (approximately $200 million less than the Debtors' funded debt obligations) and a 60 percent (EIG and Tailwater) to 40 percent (Term Lenders) new equity split; and

- the parties ultimately agreed to a $380 million transaction value and a 66.7 percent (EIG and Tailwater) to 33.3 percent (Term Lenders) new equity split.

The Debtors, the Supporting Common Interest Holders, and the Ad Hoc Lender Group negotiated a restructuring term sheet based on the foregoing general economic terms.  The parties also negotiated a debtor-in-possession financing term sheet, an equity term sheet, and the terms of a restructuring support agreement, as described further below.  Meanwhile, the Debtors and the Supporting Common Interest Holders continued to engage the Class B Unitholders in good faith, arms'-length negotiations regarding a consensual resolution of their issues.  Ultimately, in late March 2016, the Debtors were able to finalize the terms of the RSA, the Plan, and the Proposed DIP Financing.  Contemporaneously, certain affiliates of the Sponsors and the Class B Unitholders entered into a confidential settlement agreement and related inter-Sponsor agreement pursuant to which, among other things, the Class B Unitholders and such affiliates of the Sponsors provided each other with mutual releases.  The Class B Unitholders also agreed to become parties to the RSA and support the Plan (including the releases provided thereunder) pursuant to which they will receive $100,000 on account of their Holdings Class B Interests.  As an integral component of the overall compromise, the Plan contains broad, mutual releases by and among the Debtors, the Supporting Common Interest Holders, the Supporting Class B Interest Holders, the Ad Hoc Lender Group, and the Revolving Lenders, among others, including, without limitation, with respect to the Equity Commitment Letters.

The RSA and related DIP Facility Loan Agreement contain certain milestones to ensure that the Debtors move forward with the restructuring contemplated by the Plan as expeditiously yet responsibly as possible, including:

- the Debtors commence solicitation of the Plan within 5 days of the RSA Effective Date;

- the Debtors commence Chapter 11 Cases on or before March 28, 2016;

- the Bankruptcy Court enters the Final DIP Order within 45 days of the entry of the Interim DIP Order;

- the hearing with respect to confirmation of the Plan commences within 90 days of the Petition Date;

- the Bankruptcy Court enters an order confirming the Plan within 130 days of the Petition Date; and

- the effective date of the Plan occurs within 150 days of the Petition Date.

The failure to satisfy any of the foregoing milestones may result in a termination event under the RSA and/or, potentially, a default or event of default under the DIP Facility Loan Agreement.

(f)     **Disinterested Director Process**

In connection with their analysis of the restructuring alternatives available to the Debtors, the Disinterested Directors have met with their counsel and advisors and with the full Board on a number of occasions and, with the help of their independent legal counsel, have conducted substantial diligence and analysis in respect of the RSA and the Plan since their appointment. Each of the Debtors and their creditors and interest holders urged the Disinterested Directors to conduct a thorough but expeditious investigation into the merits of the potential litigation claims. To conduct their investigation, the Disinterested Directors and their legal advisors reviewed a series of letters exchanged among the various parties that set forth the Sponsors', the Debtors' and the Class B Unitholders' views of potential litigation theories and also reviewed documents furnished by the Debtors in response to informal document requests from the Disinterested Directors. Under the direction and supervision of the Disinterested Directors, their legal advisors conducted interviews with counsel to the Sponsors, the Class B Unitholders and the Term Lenders as well as with the Debtors' chief financial officer to discuss the allegations raised by the Class B Unitholders.

The Disinterested Directors and their legal advisors also participated in a number of meetings and discussions with the Debtors' counsel and financial advisor on the potential litigation claims, the RSA, bankruptcy and non-bankruptcy alternatives, and other related issues. The diligence and analysis provided by their legal advisors supplemented the Disinterested Directors' knowledge and experience, including from participation in numerous meetings of the Board.

The Disinterested Directors considered the allegations of the Class B Unitholders arising from the Equity Commitment Letters. The potential claims arising out of these letters include breach of contract, promissory estoppel, fraud, negligent misrepresentation, and breach of fiduciary duty. The Disinterested Directors determined that any litigation would be fact intensive, hotly contested, likely protracted and with an uncertain outcome for several reasons. First, the Equity Commitment Letters are not callable by the Debtors in their discretion because they only have certain rights as a third-party beneficiary. Second, the Sponsors contend that the conditions precedent in the August Equity Commitment Letter have not been met. Third, while the Sponsors will argue that the August Equity Commitment Letter is clear with respect to the conditions, the August Equity Commitment Letter is at best ambiguous from the Debtors' perspective. Fourth, even if Holdings prevailed in litigation, collectability on a judgment likely would be uncertain based on the understanding that the Sponsor-entities that are signatories to the August Equity Commitment Letter are special purpose entities. Finally, the Term Lenders, who have agreed to a material impairment, are consenting to release of any claims against the Sponsors as part of the Plan. Based on what is currently known, the Disinterested Directors believed that the potential litigation claims being released against the Debtors and the Sponsors would likely be assigned a low value (if any), both in terms of their merits and the ultimate risk of collection.

As part of their analysis, the Disinterested Directors considered whether the Debtors had any non-bankruptcy alternatives available to them. The Debtors have been projected to run out of liquidity in a matter of days and would need a significant cash infusion to sustain operational needs and debt service at the prepetition capital structure. Moreover, even if the Equity Commitment Letters had been enforced at the end of December 2015, the capital infusion would have only provided the Debtors with liquidity through the third quarter of 2016. The Debtors have been unable to obtain any alternative source of funding outside of the DIP Facility and the Capital Equity Investment. The Disinterested Directors determined that maintaining the status quo was untenable and that a comprehensive restructuring was needed to preserve value and to avoid a piecemeal sale. Moreover, the Disinterested Directors recognized that the market deterioration has resulted in the value of the Debtors being less than the full amount of the Term Lenders' claims, with or without the Equity Commitment Letters. Thus, regardless of whether the Equity Commitment Letters were enforced (for which no funds exist to pursue such litigation), any such funds would not have resulted in a recovery for the Class B Unitholders.

Ultimately, the Disinterested Directors considered the restructuring alternatives available to the Debtors given near-term liquidity requirements – (i) commence a non-consensual, freefall chapter 11 bankruptcy which would include the pursuit of the Debtors' putative contract rights against the Sponsors or (ii) pursue the negotiated RSA and Plan.  No other alternatives have been presented to the Board from any other constituency, including the Class B Unitholders.  A non-consensual bankruptcy filing would result in the Debtors being forced to pursue litigation against the Sponsors that would likely be lengthy and costly without certainty of outcome nor funding for the chapter 11 cases.  The Disinterested Directors also determined that a non-consensual bankruptcy filing for the Debtors could result in a bankruptcy filing for the MLP which would likely destroy the Debtors' equity value in the MLP, which would in turn directly impact the recoveries of the Debtors' creditor constituencies.  On the other hand, the Disinterested Directors recognized the benefits obtained from the consensual RSA and Plan holistically.  The Term Lenders are consensually accepting materially impaired treatment and have determined that the Plan which converts their $490 million of funded debt into 33.34% of the reorganized equity is a superior outcome than pursuit of litigation. All other creditors, including employees, vendors, customers and certain funded debt creditors are being left unimpaired, which would not be available treatment in non-consensual chapter 11 scenario.

The Disinterested Directors presented their conclusions and recommendation to the Debtors' Board on March 11, 2016.  After consideration of all of the litigation theories and defenses, the Disinterested Directors determined that settling the potential litigation claims between the Debtors and the Sponsors facilitates a consensual balance sheet restructuring that is beneficial and value maximizing not only to the Debtors, but to both Southcross and the MLP.  Without such settlement, it seemed likely that the Debtors would be forced into a liquidation scenario with piecemeal asset sales, which would have been value destructive for all creditor constituencies.  The Disinterested Directors ultimately concluded that the Debtors' entry into the RSA and the transactions contemplated under the Plan maximize value for the benefit of all parties whose interests possess value, and recommended that the Board authorize a balance-sheet restructuring on the terms described herein, after specifically comparing the costs and benefit of litigating such claims related to the Equity Commitment Letters versus proceeding with the consensual path contemplated by the RSA.

(g)      **Potential Claims under the Equity Commitment Letters**

Much like the Disinterested Directors and their independent counsel, in connection with negotiating the RSA, the Debtors and their advisors also undertook an extensive evaluation of the potential claims, if any, against the Sponsors under the Equity Commitment Letters and/or any other applicable law (the "Potential Claims").

Section 1123(b)(A) of the Bankruptcy Code provides that a chapter 11 plan may effectuate "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  Bankruptcy Rule 9019 authorizes the Bankruptcy Court to approve compromises or settlements of claims after notice and a hearing.  While the Bankruptcy Court will independently analyze the reasonableness of the terms of any settlement, as well as the releases granted in connection therewith, bankruptcy courts generally favor settlements and compromises of the type incorporated in the Plan.  The Bankruptcy Court will evaluate such compromises or settlements effectuated under the Plan under a 9019 standard.  More specifically, in determining whether to approve a settlement, bankruptcy courts consider the following factors:

- the probability of success in litigation;

- the likely difficulties in collecting on the claims;

- the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

- the paramount interest of the creditors.

*See, e.g., Myers v. Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  It is well-established that a settlement proponent does not need to convince the court that a settlement is the best possible compromise, but only that the settlement falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness."  *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008).

Applying the *Martin* factors, the Debtors have determined the following:

- **Probability of Success.** There are strong defenses against the Potential Claims because the conditions precedent to the Sponsors' affiliates funding the amounts contemplated by the Equity Commitment Letters were not satisfied. A favorable result for the Debtors is far from assured. The Debtors have placed a low value, if any, on the Potential Claims.

- **Collectability.** It is unclear what assets, if any, the entities that counter-signed the Equity Commitment Letters own or whether it would be possible to pierce the corporate veil for purposes of collecting from a parent entity. In particular, the August Equity Commitment Letter was signed by special purpose entities that are unlikely to own any recoverable assets.

- **Complexity and Expense.** The Potential Claims present complex, fact-intensive issues related to intricate financial transactions and arrangements. Litigating such claims would be expensive and extend the length of the Debtors' stay in bankruptcy. Further, any quick resolution of such claims would likely be against Debtors—*i.e.*, summary judgment in favor of the Sponsors' affiliates based on a finding that the Equity Commitment Letters' conditions precedent were not met.

- **Interest of Creditors.** Creditors and interest holders—including the Class B Unitholders— are either unimpaired or agreeing to support a consensual transaction over speculative litigation of the Potential Claims. In the absence of proceeding on a consensual basis, a "free fall" chapter 11 is the Debtors' only option—which would result in piecemeal liquidation of the Debtors at distressed prices and is likely to decrease recoveries for all stakeholders. Further, a long stay in bankruptcy would increase administrative expenses and could also have a deleterious effect on the Debtors' businesses, including an adverse, destabilizing effect on their investment in the MLP. Accordingly, the settlement of such claims in exchange for the EIG and Tailwater's capital investment, which amount includes the debtor in possession financing necessary to administer the Debtors' bankruptcy proceeding, through the Plan facilitates a cost-effective, controlled proceeding that maximizes recoveries for all of the Debtors' stakeholders.

Further, analysis conducted by the Debtors' advisors demonstrates that, even if the Sponsors had funded the full amounts contemplated by the Equity Commitment Letters, such incremental liquidity would not have solved the need for a comprehensive restructuring. That is, even with the amounts contemplated by the Equity Commitment Letters, the Debtors would still run out of liquidity during the third quarter of 2016, the MLP would not have sufficient capital available for equity cures beginning in the first quarter of 2018, and the Debtors likely would not be able to obtain a clean opinion on their 2015 audited financial statements since they would not be able to show sufficient liquidity to operate through the following year's audit date (March 2017). As a result, the Debtors would have been required to execute a comprehensive balance sheet restructuring in any event.

That the settlement of the Potential Claims contemplated by the Plan falls "above the lowest point in the range of reasonableness" is further evidenced by the lack of restructuring alternatives. EIG and Tailwater are the Debtors' only stakeholders willing to invest new capital to address its near-term liquidity needs. The proposed transaction also satisfies certain "change in control" covenants under the MLP's credit agreements—thus maximizing transaction value by avoiding the need to pay off or refinance the MLP's funded debt obligations. Other potential investors the Debtors have contacted have been unable or unwilling to commit new capital. The Class B Unitholders and the Ad Hoc Lender Group have each declined to invest new capital on multiple occasions. Most strategic investors are unwilling to invest new capital given the widespread distress in the oil and gas industry and resulting strain on their own balance sheets. Most financial investors are likewise unwilling to assume the incremental credit risk currently associated with the oil and gas industry.

In light of the lack of viable restructuring alternatives, absent the transactions contemplated by the Plan, the Debtors would likely run out of cash in a matter of days and be forced into a free fall chapter 11 bankruptcy. The only entities willing to provide the debtor-in-possession financing necessary to execute an in-court process under such circumstances would likely be the Term Lenders. Any Term Lender-funded debtor-in-possession financing

would be on less favorable terms than the Proposed DIP Financing and likely require a quick-sale process. The Debtors would thus be forced to sell their assets piecemeal into a depressed market. This sort of fire sale liquidation of the Debtors would almost certainly precipitate an MLP Entities bankruptcy filing, thus eliminating the Debtors' most valuable asset—its equity interest in the MLP.

For all of these reasons, the Debtors—together with the Disinterested Directors—submit that the Potential Claims are not likely to succeed and the expense of pursuing such claims is so great that proceeding on the path contemplated by the RSA is the best available value-maximizing transaction. Both the Ad Hoc Lender Group, the Debtors' fulcrum creditor class, and the Class B Unitholders support releasing the Potential Claims in favor of the consensual path contemplated by the RSA and Plan.

       (h)      **Conclusion**

The Debtors, together with the Disinterested Directors, believe that the restructuring embodied in the RSA and Plan give the Debtors the best opportunity to withstand current adverse market conditions, generate sufficient new capital to fund their operations, avoid an enterprise-wide, piecemeal liquidation, and maximize value for the benefit of their stakeholders. Under the terms of the RSA and the Plan, the Debtors anticipate emerging from bankruptcy in less than two months. The restructuring contemplated by the RSA and the Plan preserves the Debtors' value as a going concern, including the Debtors' ownership interest in the MLP Entities. Consummation of the restructuring contemplated by the RSA and Plan will deleverage the Debtors' balance sheet by nearly 80 percent (as well as all obligations arising under the DIP Facility), leave general unsecured creditors unimpaired, and otherwise has support from the vast majority of the Debtors' stakeholders. Further, implementation of the terms of the RSA, Plan, and proposed DIP Facility likely will prevent a near-term bankruptcy filing of the MLP Entities and avoid protracted litigation. The Debtors' negotiation of this result represents a significant achievement against such a challenging market backdrop. Based on the foregoing, the Debtors may commence the Chapter 11 Cases to implement the terms of the RSA and the Plan.

## ARTICLE V

## OTHER KEY ASPECTS OF THE PLAN

**5.1**      **Distributions**

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or Interest in the Debtors.

       (a)      **Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims and Interests; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no less frequently than once in every 30 day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

(b)        **Rights and Powers of Distribution Agent**

(1)        **Powers of the Distribution Agent**

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

(2)        **Expenses Incurred on or after the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

(c)        **Record Date for Distributions to Holders of Non-Publicly Traded Securities**

On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded Certificate, is transferred and the Debtors have been notified in writing of such transfer less than 10 days before the Effective Date, the Distribution Agent shall make distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(d)        **Disputed Claims Process**

Except as otherwise provided in the Plan, if a party files a Proof of Claim and the Debtors, or the Reorganized Debtors, as applicable, do not determine, without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.  Except as otherwise provided in the Plan, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

(e)        **Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

(f)        **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or

Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged. Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

(g)    **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

(h)    **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

(i)    **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**5.2    Restructuring Transactions**

On or after the Confirmation Date, or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, consistent with and pursuant to the terms and conditions of the RSA, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) execution and delivery of the New Term Loan Agreement Documents; (e) the execution and delivery of the New Unsecured Notes Documents; (f) the issuance and distribution of the Reorganized Holdco Interests; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors, as applicable.  Such actions may include the following:  (a) the adoption and filing of the Reorganized Holdco Organizational Documents; (b) the selection of the

directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Holdco Board; (c) the authorization, issuance, and distribution of Reorganized Holdco Interests; (d) the adoption or assumption, as applicable, of Executory Contracts or Unexpired Leases; (e) the entry into the New Term Loan A Facility and the New Term Loan B Facility and the execution and delivery of the New Term Loan Agreement Documents, as applicable; (f) the issuance of the New Unsecured Notes and the execution and delivery of the New Unsecured Notes Documents; and (g) the adoption of a Management Incentive Plan on terms and conditions determined by the Reorganized Holdco Board in accordance with Article IV.N of the Plan.

**5.3**      **Management Incentive Plan**

On the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan. Confirmation shall be deemed approval of the Management Incentive Plan, without any further action or approval required by the Bankruptcy Court.

**5.4**      **Treatment of Executory Contracts and Unexpired Leases**

(a)      **Assumption of Executory Contracts and Unexpired Leases**

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors, the Supporting Common Interest Holders, the Required Consenting Term Lenders, and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)      **Cure of Defaults and Objections to Cure and Assumption**

The Debtors or Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other

33

matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

(c)     **Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

(d)     **Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

(e)     **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

(f)     **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**5.5     Release, Injunction, and Related Provisions**

(a)     **Discharge of Claims and Termination of Interests**

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account**

of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

(b)    **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Merger, the Drop-Down Transaction, the 2015 Letter, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Facility, the Commitment Letter, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any claims or Causes of Action related to the MLP Credit Facilities.

(c)    **Releases by Holders of Claims and Interests**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Merger, the Drop-Down Transaction, the 2015 Letter, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Facility, the Commitment Letter, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Commitment Letter, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any claims or Causes of Action related to the MLP Credit Facilities.

(d)    **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act

or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

    (e)    **Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following:  (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein or in the DIP Facility Order.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

    (f)    **Injunction**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any**

**judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

**5.6     Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**5.7     Indemnification**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

**5.8     Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**5.9     Release of Liens**

Except (a) with respect to the Liens securing (i) the New Term Loan B Facility, (ii) the New Term Loan A Facility, and (iii) Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**5.10**     **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**5.11**     **Indemnification of Holders of Holdings Interests**

If the Bankruptcy Court modifies the Plan in a way that affects the releases or exculpation granted to EIG, Tailwater, and/or Southcross Energy, LLC, as holders of Holdings Interests, under <u>Article VIII</u> of the Plan, the Debtors or Reorganized Debtors, as applicable, shall indemnify such holders of Holdings Interests, including with respect to the cost of defense and any liability, for any Cause of Action from which such holders of Holdings Interests would have been released or exculpated absent such Plan modification.  Such indemnification obligation in favor of such holders of Holdings Interests shall be (i) on terms and with documentation acceptable to the Debtors, such holders of Holdings Interests, the Required Consenting Term Lenders, and the Required Consenting Revolving Lenders, each in their sole discretion, and (ii) secured by substantially the same collateral as the New Term Loan A Facility and New Term Loan B Facility and such security interest shall be junior in priority to the New Term Loan A Facility and senior in Priority to the New Term Loan B Facility.

**5.12**     **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Holdco Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**5.13**     **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**5.14**     **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes

of (a) allowing holders of Allowed Claims to receive distributions under the Plan and (b) allowing and preserving the rights of the Holdings Credit Agreement Agent and any Servicer, as applicable, to make distributions on account of Allowed Claims as provided herein.

**5.15**    **Reorganized Holdco Organizational Documents**

On the Effective Date, the Debtors shall enter into new formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) as may be necessary to effectuate the transactions contemplated by the Plan and the RSA and shall be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, the Required Consenting Term Lenders, and (to the extent adverse in any material respect to the interests of the Required Consenting Revolving Lenders) the Required Consenting Revolving Lenders, it being expressly agreed and understood that all of the provisions of the organizational documents (i) described in the RSA and (ii) in effect as of the date hereof, are acceptable to the Consenting Revolving Lenders.  The Debtors' respective formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the RSA, and the Bankruptcy Code.  The Reorganized Holdco Organizational Documents shall be included as exhibits to the Plan Supplement and shall, among other things:  (a) be consistent with the terms of the RSA; (b) be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, the Required Consenting Term Lenders, and (to the extent adverse in any material respect to the interests of the Required Consenting Revolving Lenders) the Required Consenting Revolving Lenders, it being expressly agreed and understood that all of the provisions of the organizational documents (i) described in the RSA and (ii) in effect as of the date hereof, are acceptable to the Consenting Revolving Lenders; (c) authorize the issuance of the Reorganized Holdco Interests; and (d) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

**5.16**    **Modification of Plan**

Effective as of the date hereof, (a) the Debtors, with the consent of the Supporting Common Interest Holders and the Required Consenting Creditors (and (a) the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan), reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Supporting Common Interest Holders and Required Consenting Creditors (and (a) the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan) or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**5.17**     **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**5.18**     **Withdrawal of Plan**

The Debtors, subject to and in accordance with the RSA, reserve the right to withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**5.19**     **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**5.20**     **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://dm.epiq11.com/Southcross or for a fee via PACER at https://www.pacer.gov/.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**5.21**     **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, and the Required Consenting Term Lenders (and (a) acceptable to the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and  (b) reasonably acceptable to the Supporting Class B Interest Holders solely with respect to (i) their treatment under Article III.B.9 of the Plan and (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties), and shall:

(1)     authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(2)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(3)      authorize the Debtors, as applicable or necessary, to: (i) implement the Restructuring Transactions, including all Restructuring Transactions related the Equity Investment and more specifically described in Articles II.B and IV.C of the Plan; (ii) distribute the New Term Loan B Facility, the New Term Loan A Facility, and the Reorganized Holdco Interests pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including cash, the New Term Loan B Facility, the New Term Loan A Facility, and the Reorganized Holdco Interests; and (iv) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan;

(4)      authorize the implementation of the Plan in accordance with its terms; and

(5)      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the New Term Loan A Facility and the New Term Loan B Facility, as applicable); and

(b)      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(c)      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the RSA and the Plan and shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders (and solely with respect to provisions relating to their treatment or rights, reasonably acceptable to the Required Consenting Revolving Lenders);

(d)      the MLP Entities shall have paid in full the MLP PIK Notes, including all accrued fees and interest, or otherwise satisfied all obligations arising thereunder;

(e)      all Professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

(f)      all reasonable and documented fees and expenses of the Supporting Common Interest Holders, in their capacities as such and as the DIP Facility Lenders, and the Consenting Creditors (including legal and financial and any other special advisors retained by the Consenting Creditors either before or during the Chapter 11 Cases) shall have been paid according to the terms of the RSA and DIP Facility as approved by the Bankruptcy Court; and

(g)      the Debtors shall have implemented the Restructuring Transactions, including all Restructuring Transactions related to the Equity Investment and more specifically described in Articles II.B and IV.C of the Plan, the Management Incentive Plan, and all transactions contemplated by the RSA, in a manner consistent in all respects with the RSA and the Plan and, without limiting any definition contained in Article I.A of the Plan or other provision of the Plan, according to documentation acceptable to the Debtors and reasonably acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders (and solely with respect to provisions relating to their treatment or rights, reasonably acceptable to the Required Consenting Revolving Lenders).

**5.22**     **Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Supporting Common Interest Holders and Required Consenting Creditors (and solely with respect to provisions relating to their treatment or rights, with the consent of the Required Consenting Revolving Lenders), may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**5.23**     **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE VI

# CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

**6.1**     **General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**6.2**     **Risks Relating to the Plan and Other Bankruptcy Law Considerations**

(a)     **A Claim or Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eleven Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  However, a Claim or Interest holder could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

(b)     **The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from Classes 3, 4, and/or 9, the Debtors may elect, subject to the terms of the RSA, to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

(c)     **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  With respect to impaired classes of claims or interests that do not accept the plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation the "absolute priority rule") and not discriminate unfairly with respect to such classes.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan.

The Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded.  The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. Typically, this process involves a 60- to 90-day period and includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited Liquidation Analysis, attached hereto as **Exhibit C**.  The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the absence of a market for the Debtors' assets on a going concern basis;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

(d)     **The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(e) **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied. The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.

(f) **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**

The distributions available to holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions under the Plan.

(g) **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(h) **The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases**

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases. If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason (including for cause or any grounds supporting abstention), the Debtors may be unable to consummate the transactions contemplated by the RSA and the Plan, and the Supporting Common Interest Holders may be unwilling to proceed with their $170 million new money investment. If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding and/or liquidate their businesses in another forum to the detriment of all parties in interest.

(i)      **The United States Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions**

Any party in interest, including the United States Trustee (the "U.S. Trustee"), could object to the Plan on the grounds that the third-party release contained in Article VIII.C of the Plan is not given consensually or in a permissible non-consensual manner.  In response to such an objection, the Bankruptcy Court could determine that the third-party release is not valid under the Bankruptcy Code.  If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release.  This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

(j)      **The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors, with the consent of the Supporting Common Interest Holders and Required Consenting Creditors, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the RSA, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the RSA and necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

(k)      **The Plan May Have a Material Adverse Effects on the Debtors' Operations**

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective users, employees, partners, and other parties.  Such adverse effects could materially impair the Debtors' operations.

(l)      **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 60 to 75 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.  There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- producers, suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(m)  **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  Other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims and Interests.  An alternative plan of reorganization also may not be predicated on the $170 million new money investment from the Supporting Common Interest Holders, which may result in less favorable treatment for a number of constituencies, including the holders of Claims and Interests, as applicable, in Classes 3, 4, and 9.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly.  However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive.  If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

(n)  **The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases.  The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive.  The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

(o)  **Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred.  A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer

were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy court could order the recovery of all amounts received by the recipient of the transfer.

(p)      **The Debtors May Be Unsuccessful in Obtaining First Day Orders To Permit Them to Pay Their Vendors or Continue Operating Their Businesses in the Ordinary Course of Business**

The Debtors have attempted to address potential concerns of their customers, vendors, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

(q)      **The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral or the DIP Facility.**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the lenders under the prepetition credit agreements, which requests will be in accordance with the terms of the RSA. Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the DIP Facility and/or such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

(r)      **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

**6.3      Risks Relating to the Transaction**

(a)      **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date**

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause users and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, if key employees depart because of uncertainty about their future roles and the potential complexities of the Transaction, the Debtors' businesses could be harmed.

(b)      **The Support of the Consenting Creditors and the Supporting Interest Holders Is Subject to the Terms of the RSA Which Is Subject to Termination in Certain Circumstances**

Pursuant to the RSA, the Consenting Creditors and the Supporting Interest Holders are obligated to support the restructuring transaction discussed above and the Plan. Nevertheless, the RSA is subject to termination upon the occurrence of certain termination events. Accordingly, the RSA may be terminated after the date of this Disclosure

Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of the Consenting Creditors and/or the Supporting Interest Holders.

(c)        **There Is Inherent Uncertainty in the Debtors' Financial Projections**

The financial projections attached hereto as **Exhibit B** includes projections covering the Debtors' operations through 2019.  These projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the Reorganized Holdco Interests and the ability of the Debtors to make payments with respect to its indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

(d)        **The Debtors Must Continue to Retain, Motivate, and Recruit Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure To Do So Could Negatively Affect the Debtors' Business**

For the Transaction to be successful, during the period before the Effective Date, the Debtors must continue to retain, motivate, recruit executives and other key employees and maintain employee morale.  Moreover, the Debtors must be successful at retaining and motivating key employees following the Effective Date.  Employees of the Debtors may feel uncertainty about their future roles with the Debtors until, or even after, future strategies are announced or executed.  The potential distractions of the Transaction may adversely affect the ability of the Debtors to retain, motivate, and recruit executives and other key employees and keep them focused on applicable strategies and goals.  Additionally, the Debtors' employees could seek employment with one of the Debtors' competitors, which, in light of the Chapter 11 Cases, may seek to lure the employees at a time when such employees may be fearful about the Debtors' future.  To be sure, a failure by the Debtors to attract, retain, and motivate executives and other employees during the period prior to or after the Effective Date could have a negative impact on the Debtors' businesses.

(e)        **Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtors**

If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Transaction, without realizing any of the anticipated benefits of the Transaction;

- the incurrence of substantial costs by the Debtors in connection with the Transaction, without realizing any of the anticipated benefits of the Transaction;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing traditional chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and  interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

**6.4**       **Risks Relating to Reorganized Holdco Interests**

(a)       **The Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects.  If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence.  The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Debtors' future financial performance.

(b)       **The Plan Exchanges Senior Securities for Junior Securities**

If the Plan is confirmed and consummated, certain holders of Claims and Interests will receive Reorganized Holdco Interests.  Thus, in agreeing to the Plan, certain of such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for Reorganized Holdco Interests, which will be subordinate to all future creditor claims.

(c)       **A Liquid Trading Market for the Reorganized Holdco Interests May Not Develop**

The Debtors make no assurance that liquid trading markets for the Reorganized Holdco Interests will develop.  The liquidity of any market for the Reorganized Holdco Interests will depend, among other things, upon the number of holders of Reorganized Holdco Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

(d)       **The Debtors May Be Controlled by Significant Holders**

Under the Plan, certain holders of Allowed Claims and Interests may receive Reorganized Holdco Interests. If holders of a significant portion of the Reorganized Holdco Interests were to act as a group, such holders might be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.  In addition, the Reorganized Holdco Board shall be appointed by the Supporting Common Interest Holders and the Consenting Term Lenders, with board seats commensurate with such groups' Reorganized Holdco Interests ownership.

(e)       **The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based**

The Debtors' financial projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors; industry

performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following Consummation.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur.  Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement.  The Debtors do not intend to update the projections and therefore the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

**6.5     Risks Relating to the Debtors' Business**

**(a)     The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings in connection with emergence.

**(b)     Natural Gas and NGL Prices Are Volatile, and Continued Low Natural Gas Prices or NGL Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors are dependent on upstream natural gas and NGL producers for hydrocarbons, which the Debtors treat, process, and fractionate in the Debtors' midstream facilities.  Accordingly, the Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing natural gas and NGL prices. Natural gas and NGLs are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand.  Natural gas and NGL prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  During 2015, Henry Hub[9] natural gas prices fell from as high as $3.32 per MMBtu to as low as $1.63 per MMBtu, with prices closing at $1.56 per MMBtu on March 7, 2016.   The Debtors expect such volatility to continue in the future.  The prices for natural gas and NGLs are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for natural gas and NGLs;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign natural gas and NGLs;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

---

[9]     Natural gas delivered to the Henry Hub in Louisiana and listed on the New York Mercantile Exchange.

- the level of global natural gas and NGLs exploration and production activity;

- the level of global natural gas and NGLs inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- the effect of energy conservation measures;

- the nature and extent of governmental regulation and taxation;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

The Debtors currently generate a large portion of their revenues pursuant to fixed-fee contracts under which they are paid based on the volumes of natural gas they gather, process, treat, compress and transport and the volumes of NGLs they fractionate and transport, rather than the value of the underlying natural gas or NGLs. Consequently, this portion of the Debtors' existing operations and cash flows have limited direct exposure to commodity price levels. Although the Debtors intend to enter into similar fixed-fee contracts with new customers in the future, their efforts to obtain such contractual terms may not be successful. The Debtors may acquire or develop additional midstream assets or change the arrangements under which the Debtors process their volumes. These changes may also impact the Debtors' transportation and gathering costs in a manner that increases their exposure to commodity price risk. Extended or future exposure to the volatility of crude oil and natural gas prices could have a material adverse effect on the Debtors' business and results of operations and financial condition.

In addition, another large portion of the Debtors' revenues is generated pursuant to fixed-spread contracts under which the Debtors strive to buy and sell equal volumes of natural gas and NGLs at prices based upon the same index price of the commodity. The Debtors' ability to do this is based upon a number of factors, including willingness of customers to accept the same index as a basis, physical differences in geography, product specifications, and ability to market products at the anticipated differential from the pricing index.

(c)     **The Debtors May Not Successfully Balance Their Purchases and Sales of Natural Gas, Which Would Increase the Debtors' Exposure to Commodity Price Risks**

The Debtors purchase from producers and other suppliers a substantial amount of the natural gas that flows through the Debtors' pipelines and processing facilities for sale to third parties, including natural gas marketers and others. The Debtors are exposed to fluctuations in the price of natural gas through volumes sold pursuant to commodity-sensitive arrangements and, to a lesser extent, through volumes sold pursuant to the Debtors' fixed-spread contracts. In order to mitigate the Debtors' direct commodity price exposure, they typically attempt to balance their natural gas sales with their natural gas purchases on an aggregate basis across all of their systems. The Debtors may not be successful in balancing their purchases and sales, and as such may become exposed to fluctuations in the price of natural gas.

The Debtors' overall net position with respect to natural gas can change over time and their exposure to fluctuations in natural gas prices could materially increase, which in turn could result in increased volatility in their revenue, gross operating margin and cash flows. Although the Debtors enter into back-to-back purchases and sales of natural gas in their fixed-spread contracts in which they purchase natural gas from producers or suppliers at receipt points on their systems and simultaneously sell a similar volume of natural gas at delivery points on their systems, the Debtors may not be able to mitigate all exposure to commodity price risks. Any of these actions could cause the Debtors' purchases and sales to become unbalanced. If that occurs, the Debtors will face increased exposure to commodity price risks, which in turn could result in increased volatility in revenue, gross operating margin, and cash flows.

(d)    **The Debtors' Success Is Dependent on Producers Growing Production and Replacing Declining Production and on the Debtors' Ability to Obtain New Sources of Natural Gas**

The natural gas volumes that support the Debtors' business depend on the level of production from natural gas wells connected to the Debtors' systems, which may be less than expected and will naturally decline over time. As a result, the Debtors' cash flows associated with these wells also will decline over time.  In order to maintain or increase throughput levels on the Debtors' systems, the Debtors must obtain new sources of natural gas.  The primary factors affecting the Debtors' ability to obtain non-dedicated sources of natural gas include (i) the level of successful drilling activity in the Debtors' areas of operation, (ii) the Debtors' ability to compete for volumes from successful new wells and (iii) the Debtors' ability to compete successfully for volumes from sources connected to other pipelines.

The Debtors have no control over the level of drilling activity in the Debtors' areas of operation, the amount of reserves associated with wells connected to the Debtors' systems or the rate at which production from a well declines.  In addition, the Debtors have no control over producers or their drilling or production decisions, which are affected by, among other things:

- the availability and cost of capital;

- prevailing and project crude oil, natural gas, and NGL prices;

- demand for crude oil, natural gas, and NGLs;

- levels of reserves;

- geological considerations;

- environmental or other governmental regulations, including the availability of drilling permits and the regulation of hyrdraulic fracturing; and

- the availability of drilling rigs and other costs of production and equipment.

Fluctuations in energy prices can also greatly affect the development of crude oil and natural gas reserves. Drilling and production activity generally decreases as natural gas, crude oil or NGL prices decrease.  Declines in natural gas, crude oil or NGL prices could have a negative impact on exploration, development, and production activity, and sustained low prices could lead to a material decrease in such activity. Sustained reductions in exploration or production activity in the Eagle Ford area could lead to reduced utilization of the Debtors' assets.

As with falling crude oil prices, declines in natural gas or NGL prices could have a negative impact on exploration, development and production activity, and sustained low prices of any of these commodities could lead to a material decrease in such activity.  Any sustained reduction in exploration or production activity in the Eagle Ford area, whether related to crude oil, natural gas or NGLs, or a combination of them, could lead to reduced utilization of the Debtors' assets, including the volume of natural gas flowing on the Debtors' system.

Because of these and other factors, even if natural gas and liquid reserves are known to exist in areas served by the Debtors' assets, producers may choose not to develop those reserves. If reductions in drilling activity result in the Debtors' inability to maintain the current levels of throughput on the Debtors' systems, those reductions could reduce the Debtors' revenue and cash flow.

(e)    **The Debtors Depend on a Limited Number of Customers for a Significant Portion of the Debtors' Revenues**

A significant percentage of the Debtors' revenue is attributable to a relatively limited number of customers. The Debtors' top ten customers accounted for over 90 percent of our revenue for the year ended December 31, 2015, including one customer that accounted for approximately 34 percent of revenue for that period. The Debtors have gathering, processing, transportation and/or sales contracts with each of these customers of varying duration and

commercial terms.  If the Debtors are unable to renew the Debtors' contracts with one or more of these customers on favorable terms, the Debtors may not be able to replace any of these customers in a timely fashion, on favorable terms or at all.  In addition, some of the Debtors' customers may have material financial and liquidity issues or may, as a result of operational incidents or other events, be disproportionately affected as compared to larger, better capitalized companies.  Any material nonpayment or nonperformance by any of the Debtors' key customers could have a material adverse effect on the Debtors' revenue, gross operating margin, and cash flows.  In any of these situations, the Debtors' revenue, gross operating margin, and cash flows may be adversely affected.

(f)    **The Debtors' Success Is Dependent on Activity in a Specific Geographic Area**

The Debtors' assets and capital expenditure projects are located in the Eagle Ford shale play. As a result, the Debtors' financial condition, results of operations and cash flows are dependent upon the demand for the Debtors' services in this area.  Due to the Debtors' focus on this area, an adverse development in natural gas production from this area, such as decreased development or production activity, would have a significantly greater impact on the Debtors' financial condition and results of operations than if the Debtors spread expenditures more evenly over a wider geographic area.

(g)    **The Debtors' Success Is Closely Linked to the MLP's Success**

As set forth herein, the Debtors' single largest asset is its majority ownership interest in the MLP.  The Debtors and the MLP entities are operationally and financially intertwined, through shared services and intercompany agreements.  The Debtors' success is closely linked to the MLP's success.  The unit price of the MLP's publicly-traded common units has fallen nearly 91 percent over the past year.  If the MLP continues to struggle, the Debtors' revenue, gross operating margin, and cash flows may continue to be adversely affected.

(h)    **The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation In Connection With the Equity Commitment Letters or Arising Out of the Chapter 11 Cases**

In the future, the Debtors may become a party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results.  Certain parties may pursue litigation in connection with the Equity Commitment Letters.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**6.6    Certain Tax Implications of the Chapter 11 Cases**

Holders of Allowed Claims and Interests should carefully review ARTICLE IX herein, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

**6.7    Disclosure Statement Disclaimer**

(a)    **Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(b)    **Disclosure Statement May Contain Forward-Looking Statements**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected dividends;

- projected price increases;

- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;

- growth opportunities for existing products and services;

- results of litigation;

- disruption of operations;

- contractual obligations;

- projected general market conditions;

- plans and objectives of management for future operations;

- off-balance sheet arrangements; and

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(c)     **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(d)     **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

(e)     **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors,

reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

(f)     **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(g)     **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)     **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(i)     **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

**ARTICLE VII**

**CONFIRMATION PROCEDURES**

The following is a brief summary of the Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**7.1     The Confirmation Hearing**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  On the Petition Date, the Debtors will file a motion requesting that the Bankruptcy Court set a date and time approximately 30 days after the Petition Date for the Confirmation Hearing.  In this case, the Debtors will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.  The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

## 7.2    Confirmation Standards

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization. The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, or officer, the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

### 7.3    Best Interests Test / Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Based on the Liquidation Analysis, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan. As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

### 7.4    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit B**. Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 7.5    Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)    **No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

(b)    **Fair and Equitable Test**

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class. As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors: Each holder of a secured claim: (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>:  Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- <u>Equity Interests</u>:  Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 10 (the Holdings Interests) and Class 11 (Section 510(b) Claims) are deemed to reject the Plan, because, as to such Classes, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Interests in such Class.  The distribution of Reorganized Holdco Interests and New Unsecured Notes to the Supporting Common Interest Holders on account of Allowed DIP Facility Claims and the Capital Equity Investment do not implicate the absolute priority rule.

**7.6**     <u>**Alternatives to Confirmation and Consummation of the Plan**</u>

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis, attached hereto as **Exhibit C**.

## ARTICLE VIII

## IMPORTANT SECURITIES LAW DISCLOSURE

**8.1**     <u>**Plan Securities**</u>

The Plan provides for the Reorganized Debtors to distribute Reorganized Holdco Interests to certain holders of Allowed Claims in Class 4 and to distribute Reorganized Holdco Interests and New Unsecured Notes to the Supporting Common Interest Holders on account of their DIP Facility Claims and Capital Equity Investment (the "<u>Plan Securities</u>").

The Debtors believe that the Plan Securities may constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

**8.2**     <u>**Issuance and Resale of Plan Securities Under the Plan**</u>

(a)     <u>**Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws**</u>

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitation, section 4(a)(2) thereof, to exempt the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on, or otherwise in connection with, the Plan.  Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act ("<u>Reg. D</u>") provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" as defined in section 501 of Reg. D (17 C.F.R. § 230.501).  The Debtors believe that the holders of Term Loan Facility Claims receiving Plan Securities are "accredited investors," and the ballots include a certification that the voting holder of such Claims is an "accredited investor."   The Plan Securities to be issued to Supporting Common Interest Holders in respect of their Capital

Equity Investment will be issued without registration in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act and will be "restricted securities." The Debtors believe that the Supporting Common Interest Holders receiving Plan Securities are "accredited investors," and those Supporting Common Interest Holders have made representations to the Debtors as such. In reliance upon these exemptions, the offer, issuance and distribution of the Reorganized Holdco Interests and the New Unsecured Notes will not be registered under the Securities Act or any applicable state Blue Sky Laws.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer, issuance and distribution of the Reorganized Holdco Interests to Supporting Common Interest Holders on account of their DIP Facility Claims and to holders of Term Loan Facility Claims will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The Debtors believe that the issuance of the Reorganized Holdco Interests with respect to Allowed Claims is covered by section 1145 of the Bankruptcy Code. Accordingly, the Debtors believe that the Reorganized Holdco Interests that are issued to holders of Allowed Claims in Class 4 (as well as to Supporting Common Interest Holders in respect of their Allowed Claims) may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145 of the Bankruptcy Code. The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. In addition, Reorganized Holdco Interests governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Recipients of the Reorganized Holdco Interests are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to the Plan Securities and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

(b)      **Resales of Reorganized Holdco Interests; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of

section 1145 of the Bankruptcy Code may suggest that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Under certain circumstances, holders of Reorganized Holdco Interests who are deemed to be "underwriters" may be entitled to resell their Reorganized Holdco Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Reorganized Holdco Interests would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Reorganized Holdco Interests and, in turn, whether any Person may freely resell Reorganized Holdco Interests. The Debtors recommend that potential recipients of Reorganized Holdco Interests consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

## ARTICLE IX

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

### 9.1 <u>Introduction</u>

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain U.S. Holders (as defined below) of Claims or Interests. Except as provided below, this summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), the U.S. Treasury Regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), judicial decisions, and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "<u>IRS</u>") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given that the IRS would not assert, or that a Court would not sustain, a different position than any position discussed herein.

This discussion addresses only those U.S. Holders that hold Claims or Interests as capital assets within the meaning of Section 1221 of the Tax Code. In addition, this summary does not address non-U.S., state, local, estate, or gift tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as persons who are related to a Debtor within the meaning of the Tax Code, persons that are not U.S. Holders, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims or Interests, or who will hold equity interests in Reorganized Holdco, as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and U.S. Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this discussion assumes that U.S. Holders of Claims or Interests hold only Claims or Interests in a single Class. U.S. Holders of Claims or Interests in more than a single Class should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

For purposes of this discussion, the term "<u>U.S. Holder</u>" means a Holder of a Claim or Interest that is for U.S. federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the

trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

The U.S. federal income tax consequences to a partner in an entity or arrangement treated as a partnership for U.S. federal income tax purposes that holds a Claim or Interest generally will depend on the status of the partner and the activities of the partnership.  Partners in a partnership holding a Claim or Interest should consult their own tax advisors.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular U.S. Holder of a Claim or Interest.  Each U.S. Holder of a Claim or Interest should seek advice from its own independent tax advisors concerning the U.S. federal, state, local, foreign income, and other tax consequences of the Plan to it in light of its particular circumstances.

This discussion assumes that the various debt and other arrangements to which any Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

## 9.2    Certain U.S. Federal Income Tax Consequences to the Debtors

Holdings is treated as a partnership for U.S. federal income tax purposes.  Accordingly, as described further below, the U.S. federal income tax consequences of the Plan will generally not be borne by Holdings, but will be borne by Holdings's partners.

The cancellation of Equity Interests in Holdings and the issuance of equity interests in Reorganized Holdings is not intended to constitute a termination of Holdings under Section 708 of the Tax Code.  If, however, Holdings were treated as terminated, the MLP may also be treated as terminated under Section 708 of the Tax Code, resulting in Reorganized Holdings having lower depreciation and amortization deductions available to offset future taxable income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  CODI is taxable as ordinary income. The amount of CODI, in general, is the excess of (i) the adjusted issue price of the indebtedness discharged, over (ii) the sum of (x) the issue price of any new indebtedness of the taxpayer issued, (y) the amount of cash paid, and (z) the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange (e.g., new equity interests).  Where the debtor is a partnership for U.S. federal income tax purposes, such as Holdings, such CODI is allocated to its partners, and the partners (rather than the partnership) are subject to tax on such amount.  Accordingly, the U.S. Holders of Equity Interests in Holdings will be treated as receiving their allocable share of the CODI realized by Holdings.

There are exceptions to the recognition of CODI.  For example, a taxpayer is not required to include CODI in gross income if either the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or the taxpayer is insolvent, as specifically defined under the Tax Code, at the time the CODI is triggered.  In the case of any entity taxed as a partnership, such as Holdings, any exception to the recognition of CODI is applied at the partner level rather than at the entity level.

As a result of the consummation of the transactions contemplated by the Plan, Holdings expects to realize substantial CODI.  U.S. Holders are urged to consult their tax advisors as to the particular tax consequences to them

of the allocation of such CODI, including the ability to offset any such CODI with available losses, if any, and whether or not they may avail themselves of any exception to the recognition of CODI.

**9.3     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests**

(a)        **Consequences to U.S. Holders of Class 3 Claims**

Pursuant to the Plan, each U.S. Holder of a Revolving Facility Claim will receive its Pro Rata share of the loans arising under the New Term Loan A Facility.  The following discussion assumes that the Revolving Facility Claim and the New Term Loan A Facility are not treated as publicly traded for U.S. federal income tax purposes. The New Term Loan A Facility will contain terms and conditions that differ from the Revolving Facility.  Thus, a U.S. Holder's exchange of a Class 3 Claim for such U.S. Holder's Pro Rata share of the loans arising under the New Term Loan A Facility may be considered a "significant modification" of the Revolving Facility, and would be deemed a taxable exchange for U.S. federal income tax purposes.  A U.S. Holder of a Revolving Facility Claim should recognize gain or loss equal to the difference between (i) the stated principal amount of its Pro Rata share of the loans arising under the New Term Loan A Facility and (ii) the U.S. Holder's tax basis in the Claim surrendered by the U.S. Holder.  Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long-term capital gain or loss if the Claim was held for more than one year by the U.S. Holder.  A U.S. Holder's tax basis in its Pro Rata share of the loans arising under the New Term Loan A Facility received on the Effective Date should generally equal the stated principal amount.  A U.S. Holder's holding period for its Pro Rata share of the loans arising under the New Term Loan A Facility should begin on the day following the Effective Date.

To the extent that the exchange is not a "significant modification," it would not be deemed to be a taxable exchange for U.S. federal income tax purposes, and as such, there would be no U.S. federal income tax consequences.

(b)        **Consequences to U.S. Holders of Class 4 Claims**

Pursuant to the Plan, each U.S. Holder of a Term Loan Facility Claim will receive its Pro Rata share of the loans arising under the New Term Loan B Facility and equity interests in Reorganized Holdco.  A U.S. Holder that receives equity interests in Reorganized Holdco and its Pro Rata share of the loans arising under the New Term Loan B Facility in exchange for its Claim pursuant to the Plan (1) generally should not recognize any gain or loss on the portion of its Claim for which it receives equity interests in Reorganized Holdco (except to the extent such interests are received with respect to accrued but unpaid interest) and (2) may recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the issue price of the U.S. Holder's Pro Rata share of the loans arising under the New Term Loan B Facility and (ii) the U.S. Holder's adjusted tax basis in the portion of the Claim exchanged therefor.  Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long-term capital gain or loss if the Claim was held for more than one year by the U.S. Holder.

The issue price of the New Term Loan B Facility will depend on whether a substantial amount of either the New Term Loan B Facility or the Term Loan Facility Claims for which they are exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property.  Notwithstanding the preceding rules, a debt instrument will not be treated as traded on an established market if, at the time the determination of the issue price is made, the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million.  Because the New Term Loan B Facility will have a stated principal amount of only $75 million, the New Term Loan B Facility should not be viewed as traded on an established market.  However, there is a substantial possibility that the Term Loan Facility Claims are deemed to be traded on an established market.

If the New Term Loan B Facility is not traded on an established market and the Term Loan Facility Claims are traded on an established market at the time of the exchange, the issue price of the New Term Loan B Facility will be determined by applying the "investment unit" rules and treating the New Term Loan B Facility as part of an investment unit (including the equity interests in Reorganized Holdco) issued in exchange for the Term Loan Facility Claims.  Generally, the issue price of an investment unit is determined by applying the issue price rules applicable to debt instruments, and the debt instrument's issue price is its allocable portion of the issue price of the investment unit, based on the relative fair market value of the debt instrument and the other property right (i.e., the new equity interests in Reorganized Holdco).  Thus, assuming that the Term Loan Facility Claims are traded on an established market but the New Term Loan B Facility is not, the issue price of the investment unit would be equal to the fair market value of the Term Loan Facility Claims on the date the New Term Loan B Facility is issued, and the issue price of the New Term Loan B Facility will equal the allocable portion of such investment unit's issue price determined by multiplying the investment unit's issue price by the fraction obtained by dividing the fair market value of the New Term Loan B Facility by the sum of the fair market value of the New Term Loan B Facility and the fair market value of the equity interests in Reorganized Holdco.  If neither the New Term Loan B Facility nor the Term Loan Facility Claims are traded on an established market at the time of the exchange, the issue price of the New Term Loan B Facility will generally equal its stated principal amount.  These rules are complex and U.S. Holders are urged to consult with their tax advisors regarding the determination of the issue price of the New Term Loan B Facility.

Since Reorganized Holdings is expected to be taxed as a partnership for U.S. federal income tax purposes, the income of Reorganized Holdings will be allocated to the holders of equity interests in Reorganized Holdings and such holders will be taxable on that income whether or not Reorganized Holdings makes any distributions to its partners.  The resulting tax liability of a partner in respect of such income may exceed the cash that such partner receives from Reorganized Holdings.  In addition, tax-exempt and non-U.S. persons may be subject to certain adverse tax consequences from owning and disposing of an equity interest in Reorganized Holdings.  Each holder of equity interests in Reorganized Holdings is urged to consult its tax advisor regarding the tax consequences of owning and disposing of equity interests in a partnership.

(c)       **Consequences to U.S. Holders of Class 9 Interests**

Pursuant to the Plan, each U.S. Holder of a Holdings Class B Interest shall receive cash on the Effective Date on account of such Interest.  Such U.S. Holder will recognize gain or loss in an amount equal to the difference between (1) the sum of (i) the cash received and (ii) the amount of any liabilities of Holdings allocable to such U.S. Holder, and (2) such U.S. Holder's tax basis in the Interest exchanged therefor.

(d)       **Accrued Interest**

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest, such amount should be taxable to the U.S. Holder as interest income (to the extent not already taken into income by the Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the U.S. Holder of a Claim will be attributable to accrued interest is unclear.  The Plan generally provides that Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  The applicability of these Treasury Regulations to a partial recovery in a bankruptcy is unclear.  A U.S. Holder of a Claim with accrued and unpaid interest is urged to consult its own tax advisor as to the allocation of any recovery between principal and interest.

(e)      **Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a U.S. Holder of a Claim who exchanges the Claim for Cash, debt under the New Term Loan A Facility, or debt under the New Term Loan B Facility on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim.  In addition, if accrued market discount is not recognized upon the receipt of equity interests in Reorganized Holdco, gain recognized upon a subsequent disposition of such equity interests may be treated as ordinary income to the extent of the accrued market discount not previously recognized.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**9.4      Information Reporting and Back-up Withholding**

Payments with respect to Claims and Interests under the Plan and gains on a future disposition of equity interests in Reorganized Holdco may be subject to applicable information reporting and backup withholding (at the applicable rate).  Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**The U.S. federal income tax consequences of the Plan are complex.  The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation.  All Holders of Claims or Interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.**

### ARTICLE X

### CONCLUSION AND RECOMMENDATION

The Plan effects the Transaction required for the Debtors to continue to operate and provide goods and services.  The Debtors urge all holders of Claims and Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 4:00 p.m. prevailing Eastern Time on March 28, 2016.

[*Remainder of Page Intentionally Left Blank*]

Respectfully submitted,

SOUTHCROSS HOLDINGS LP
By:  SOUTHCROSS HOLDINGS GP LLC, its general partner

on behalf of itself and all other Debtors

By: _____

Name:    Bret M. Allan
Title:    Senior Vice President & Chief Financial Officer

Prepared by:

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* admission pending)
Chad J. Husnick (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:           james.sprayregen@kirkland.com
                 anup.sathy@kirkland.com
                 chad.husnick@kirkland.com
                 emily.geier@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A TO THE DISCLOSURE STATEMENT

DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

*SOLICITATION VERSION*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE [DISTRICT OF DELAWARE / SOUTHERN DISTRICT OF
TEXAS - CORPUS CHRISTI DIVISION][1]**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHCROSS HOLDINGS LP, *et al.*,[2] | ) | Case No. 16-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* admission pending)
Chad J. Husnick (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              anup.sathy@kirkland.com
              chad.husnick@kirkland.com
              emily.geier@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated:  March 21, 2016

---

[1]    The Debtors are still considering venue.

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Southcross Holdings LP (7700); Frio LaSalle GP, LLC (9882); Frio LaSalle Pipeline, LP (9792); Southcross Holdings Borrower GP LLC (6790); Southcross Holdings Borrower LP (6880); Southcross Holdings GP LLC (2020); Southcross Holdings Guarantor GP LLC (6523); Southcross Holdings Guarantor LP (6622); TexStar Midstream GP, LLC (7001); TexStar Midstream Services, LP (7100); TexStar Midstream T/U GP, LLC (3754); and TexStar Midstream Utility, LP (3706).  The location of the Debtors' service address is: 1717 Main Street, Dallas, Texas, 75201.

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................................1

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,**
    **GOVERNING LAW, AND OTHER REFERENCES**..........................................................1
    A.    Defined Terms ....................................................................................................1
    B.    Rules of Interpretation .......................................................................................12
    C.    Computation of Time .........................................................................................12
    D.    Governing Law ..................................................................................................12
    E.    Reference to Monetary Figures ...........................................................................13
    F.    Reference to the Debtors or the Reorganized Debtors ...........................................13
    G.    Controlling Document ........................................................................................13

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** ............................................................13
    A.    Administrative Claims .......................................................................................13
    B.    DIP Facility Claims ...........................................................................................13
    C.    Professional Claims ...........................................................................................14
    D.    Priority Tax Claims ...........................................................................................14

**ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**...........14
    A.    Classification of Claims and Interests .................................................................14
    B.    Treatment of Classes of Claims and Interests ......................................................15
    C.    Special Provision Governing Unimpaired Claims .................................................19
    D.    Elimination of Vacant Classes ............................................................................19
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes ..............................19
    F.    Intercompany Interests ......................................................................................19
    G.    Subordinated Claims .........................................................................................19
    H.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........................19

**ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN** ............................................**20**
    A.    General Settlement of Claims and Interests .........................................................20
    B.    Sources of Consideration for Plan Distributions ...................................................20
    C.    The Capital Equity Investment ...........................................................................21
    D.    Non-Debtor Intercompany Claims .......................................................................22
    E.    Professional Fees and Expenses ..........................................................................22
    F.    Exemption from Registration Requirements .........................................................22
    G.    Corporate Existence ..........................................................................................22
    H.    Vesting of Assets in the Reorganized Debtors .....................................................22
    I.    Cancellation of Notes, Instruments, Certificates, and Other Documents ...................23
    J.    Reorganized Holdco Organizational Documents ...................................................23
    K.    Effectuating Documents; Further Transactions .....................................................23
    L.    Section 1146(a) Exemption ................................................................................23
    M.    Directors and Officers .......................................................................................24
    N.    Management Incentive Plan ................................................................................24
    O.    Incentive Plans and Employee and Retiree Benefits .............................................24
    P.    Preservation of Rights of Action .........................................................................25
    Q.    Restructuring Transactions .................................................................................25

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................**26**
    A.    Assumption of Executory Contracts and Unexpired Leases ...................................26
    B.    Indemnification .................................................................................................26
    C.    Cure of Defaults and Objections to Cure and Assumption .....................................26
    D.    Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date...................27

    E.    Insurance Policies. ..................................................................................................27
    F.    Nonoccurrence of Effective Date.........................................................................27
    G.    Reservation of Rights............................................................................................27

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ...............................................**28**
    A.    Distributions on Account of Claims and Interests Allowed as of the Effective Date ...................28
    B.    Rights and Powers of Distribution Agent .............................................................28
    C.    Special Rules for Distributions to Holders of Disputed Claims and Interests................28
    D.    Delivery of Distributions ......................................................................................28
    E.    Claims Paid or Payable by Third Parties..............................................................30
    F.    Setoffs ...................................................................................................................31
    G.    Allocation Between Principal and Accrued Interest ............................................31

**ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**........................**32**
    A.    Disputed Claims Process.......................................................................................32
    B.    Claims Administration Responsibilities................................................................32
    C.    Adjustment to Claims Without Objection .............................................................32
    D.    No Interest .............................................................................................................32
    E.    Disallowance of Claims and Interests ..................................................................32

**ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN** ...........................................**33**
    A.    Discharge of Claims and Termination of Interests...............................................33
    B.    Releases by the Debtors ........................................................................................33
    C.    Releases by Holders of Claims and Interests........................................................33
    D.    Exculpation ...........................................................................................................34
    E.    Injunction .............................................................................................................34
    F.    Protection Against Discriminatory Treatment ......................................................35
    G.    Recoupment ..........................................................................................................35
    H.    Document Retention .............................................................................................35
    I.    Reimbursement or Contribution ...........................................................................35
    J.    Release of Liens ....................................................................................................35
    K.    Indemnification of Holders of Holdings Interests ................................................35

**ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**...............................**36**
    A.    Conditions Precedent to the Effective Date. .........................................................36
    B.    Waiver of Conditions Precedent ..........................................................................37
    C.    Effect of Non-Occurrence of Conditions to Consummation ...............................37

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**..............................**38**
    A.    Modification of Plan .............................................................................................38
    B.    Effect of Confirmation on Modifications .............................................................38
    C.    Withdrawal of Plan ...............................................................................................38

**ARTICLE XI RETENTION OF JURISDICTION** ...................................................................**38**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ..................................................................**40**
    A.    Immediate Binding Effect.....................................................................................40
    B.    Additional Documents ..........................................................................................40
    C.    Payment of Statutory Fees ....................................................................................40
    D.    Reservation of Rights............................................................................................40
    E.    Successors and Assigns.........................................................................................40
    F.    Service of Documents ...........................................................................................40
    G.    Term of Injunctions or Stays ................................................................................41
    H.    Entire Agreement ..................................................................................................41
    I.    Plan Supplement Exhibits .....................................................................................41
    J.    Non-Severability ...................................................................................................41

K.      Votes Solicited in Good Faith. ...............................................................................................42
L.      Closing of Chapter 11 Cases. ................................................................................................42
M.      Waiver or Estoppel..................................................................................................................42

**INTRODUCTION**

Southcross Holdings LP and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases jointly propose this Plan.  Capitalized terms used in the Plan shall have the meanings set forth in Article I.A of the Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  The Debtors seek to consummate the Transaction on the Effective Date of the Plan.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, the Transaction, and certain related matters.

**ARTICLE I**

**DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A.**  **Defined Terms**

1.  "*2015 Letter*" means that certain letter, dated as of August 13, 2015, issued to Holdings and the MLP sent by EIG BBTS Holdings LLC, TW BBTS Aggregator LP, and Southcross Energy, LLC, each in their capacities as holders of Holdings Interests.

2.   "*Accredited Investor*" has the meaning set forth in Rule 501 of Regulation D promulgated under the Securities Act.

3.  "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.  "*Advisor Directors*" means each individual appointed as an Advisor Director as set forth in the Amendment No. 1 to the Holdings GP LLCA.

5.  "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.  "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

7.  "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

8.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

9.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the [District of Delaware/Southern District of Texas - Corpus Christi Division] or such other court having jurisdiction over the Chapter 11 Cases.

10.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

11.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

12.     "*Capital Equity Investment*" means the cash capital contributions by the Supporting Common Interest Holders to Reorganized Holdco described in Article IV.C of the Plan.

13.     "*Capital Equity Recovery*" means 33.33% of the Reorganized Holdco Interests issued on the Effective Date, subject to Pro Rata dilution on account of the Management Incentive Plan.

14.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

15.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

16.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

17.     "*Chapter 11 Cases*" means the procedurally consolidated Chapter 11 Cases pending for the Debtors in the Bankruptcy Court.

18.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

19.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent.

20.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

21.     "*Commitment Letter*" means that certain letter to Holdings from the Commitment Parties memorializing the Equity Investment, dated as of March 21, 2016.

22.     "*Commitment Parties*" means the Supporting Common Interest Holders, in their capacities as the providers of the Equity Investment.

23.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

24.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

25.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement, which order shall be in form and

substance acceptable to the Debtors, the Supporting Common Interest Holders, and the Required Consenting Term Lenders (and (a) acceptable to the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) reasonably acceptable to the Supporting Class B Interest Holders solely with respect to (i) their treatment under Article III.B.9 of the Plan and (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties).

26.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27.     "*Consenting Creditors*" means, collectively, the Consenting Term Lenders and the Consenting Revolving Lenders.

28.     "*Consenting Revolving Lenders*" means the Revolving Lenders that are party to the RSA.

29.     "*Consenting Term Lenders*" means the Term Lenders that are party to the RSA.

30.     "*Consummation*" means the occurrence of the Effective Date.

31.     "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

33.     "*Debtor Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

34.     "*Debtors*" means, collectively, Holdings GP, Holdings, Holdings Borrower, Southcross Holdings Guarantor GP LLC, Southcross Holdings Guarantor LP, Southcross Holdings Borrower GP LLC, TexStar Midstream GP LLC, TexStar Midstream Services LP, TexStar Midstream T/U GP, LLC, TexStar Midstream Utility, LP, Frio LaSalle Pipeline, LP, and Frio LaSalle GP, LLC.

35.     "*DIP Equity Recovery*" means 33.33% of the Reorganized Holdco Interests issued on the Effective Date, subject to Pro Rata dilution on account of the Management Incentive Plan.

36.     "*DIP Facility Agent*" means that certain administrative agent under the DIP Facility Loan Agreement.

37.     "*DIP Facility Claims*" means any Claim held by the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Facility Loan Agreement or the DIP Facility Order, including any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement.

38.     "*DIP Facility Lenders*" means the Supporting Common Interest Holders, in their capacity as lenders party to the DIP Facility Loan Agreement.

39.     "*DIP Facility Loan Agreement*" means that certain debtor-in-possession credit agreement by and among the Holdings Borrower, the guarantors party thereto, the DIP Facility Agent, and the DIP Facility Lenders as approved by the DIP Facility Order, which shall be substantially in the form attached as an exhibit to the RSA and otherwise in form and substance reasonably acceptable to the DIP Facility Lenders, the Required Consenting Term Lenders, and the Required Consenting Revolving Lenders.

40.     "*DIP Facility Order*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility Loan Agreement and access the DIP Facility, which shall be in form and substance acceptable to the DIP Facility Lenders, the Debtors, the Required Consenting Term Lenders, and the Required Consenting Revolving Lenders.

41.     "*DIP Facility*" means that certain $85 million multiple draw non-amortizing senior secured term loan debtor-in-possession credit facility under the DIP Facility Loan Agreement.

42.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

43.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

44.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

45.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

46.     "*Drop-Down Transaction*" means those certain transactions pursuant to that certain Purchase, Sale and Contribution Agreement, dated as of May 7, 2015, by and among certain of the Debtors, as sellers, and certain of the MLP Entities, as purchasers.

47.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

48.     "*EIG*" means one or more investment funds or accounts managed or advised by EIG Management Company, LLC or its affiliates.

49.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

50.     "*Equity Investment*" means the $170 million total equity investment commitment provided by the Commitment Parties pursuant to the terms of the Commitment Letter, RSA, DIP Facility Loan Agreement, and the Plan, which amount includes the DIP Facility and the Capital Equity Investment.

51.     "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code and includes, for the avoidance of doubt, membership interests, the Holdings Interests, and the Holdings Class B Interests.

52.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

53.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors (including the Advisor Directors), managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including the attorneys and other professionals to the Advisor Directors), each in their capacity as such.

54.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

55.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

56.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

57.     "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Term Loan Facility Claim, a Revolving Facility Claim, a DIP Facility Claim, or a Section 510(b) Claim.

58.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

59.     "*Holdings Borrower*" means Southcross Holdings Borrower LP, a Delaware limited partnership.

60.     "*Holdings Class A Interests*" means Holdings' outstanding Class A Units, as defined in the Holdings LPA.

61.     "*Holdings Class B Interests*" means all Mandatorily Redeemable Class B Units issued by Holdings pursuant to that certain Unit Purchase Agreement, dated as of November 4, 2014.

62.     "*Holdings Credit Agreement Agent*" means UBS AG, Stamford Branch, in its capacity as administrative and collateral agent pursuant to the Holdings Credit Agreement Documents, and as Arranger (as defined in the Holdings Credit Agreement), and its successors, assigns, or any replacement agent appointed pursuant to the terms of the Holdings Credit Agreement.

63.     "*Holdings Credit Agreement Documents*" means, collectively, the Holdings Credit Agreement, each other Loan Document (as defined in the Holdings Credit Agreement), and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

64.     "*Holdings Credit Agreement*" means that certain Credit Agreement dated as of August 4, 2014, by and among Southcross Holdings Guarantor LP, Southcross Holdings Borrower GP LLC, Holdings Borrower, the guarantors party thereto, the lenders party thereto, and UBS AG, Stamford Branch, as administrative and collateral agent.

65.     "*Holdings GP Interests*" means Holdings GP's outstanding membership Interests, as set forth in the Holdings GP LLCA.

66.     "*Holdings GP LLCA*" means that certain Second Amended and Restated Limited Liability Company Agreement of Southcross Holdings GP LLC dated as of November 21, 2014, as amended by that certain Amendment No. 1 to the Second Amended and Restated Limited Liability Company Agreement of Southcross Holdings GP LLC dated as of January 19, 2016.

67.     "*Holdings GP*" means Southcross Holdings GP LLC, a Delaware limited liability company and Holdings' general partner.

68.     "*Holdings Interests*" means, collectively, the Holdings GP Interests and Holdings Class A Interests.

69.     "*Holdings LPA*" means that certain Second Amended and Restated Agreement of Limited Partnership of Southcross Holdings LP dated as of November 21, 2014.

70.     "*Holdings*" means Southcross Holdings LP, a Delaware limited partnership.

71.     "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

72.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

73.     "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

74.     "*Intercompany Contract*" means a contract between or among two or more Debtors or a contract between or among one or more Debtors and one or more of its Affiliates.

75.     "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate of a Debtor.

76.     "*Interest*" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

77.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

78.     "*Management Incentive Plan*" means  that certain post-Effective Date management incentive plan that shall provide for 6.6% of the Reorganized Holdco Interests, on a fully diluted basis, to be reserved for issuance to management of the Reorganized Debtors after the Effective Date at the discretion of the Reorganized Holdco Board and substantially on the terms set forth in the RSA.

79.     "*Merger*" means those certain transactions on or around August 4, 2015, by and among the predecessors-in-interest to the Debtors and the MLP Entities, effectuating a merger of such entities.

80.     "*MLP Board*" means the MLP's board of directors.

81.     "*MLP Credit Agreement Documents*" means, collectively, the MLP Credit Agreements, each other Loan Document (as defined in the MLP  Revolving Credit Agreement and MLP Term Loan Credit Agreement, respectively), and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

82.     "*MLP Credit Agreements*" means, collectively, the MLP Revolving Credit Agreement and the MLP Term Loan Credit Agreement.

83.     "*MLP Credit Facilities Claim*" means any Claim arising under, derived from, or based upon the MLP Credit Facilities.

84.     "*MLP Credit Facilities*" means those certain senior secured revolving and term loan credit facilities under the MLP Credit Agreements.

85.     "*MLP Entities*" means, collectively, the MLP GP, the MLP, and the MLP's direct and indirect subsidiaries.

86.     "*MLP GP*" means Southcross Energy Partners GP, LLC, a Delaware limited liability partnership and the MLP's general partner.

87.     "*MLP Lenders*" means each Lender, as defined in the MLP  Revolving Credit Agreement and MLP Term Loan Credit Agreement, respectively, that is a party to the MLP Credit Agreements.

88. "*MLP Organizational Documents*" means, as applicable, the charters, bylaws, operating agreements, or other organization documents of, collectively, the MLP GP and the MLP.

89. "*MLP PIK Notes*" means those certain Senior Unsecured PIK Notes, dated as of January 7, 2016, issued by the MLP Entities to the Supporting Common Interest Holders in the original aggregate principal amount of $14 million.

90. "*MLP Revolving Credit Agreement*" means that certain Third Amended and Restated Revolving Credit Agreement dated as of August 4, 2014, by and among Southcross Energy Partners, L.P., the lenders party thereto, and Wells Fargo Bank, N.A., as administrative agent.

91. "*MLP Term Loan Credit Agreement*" means that certain Term Loan Credit Agreement dated as of August 4, 2014, by and among Southcross Energy Partners, L.P., the lenders party thereto, and Wells Fargo Bank, N.A., as administrative agent.

92. "*MLP*" means Southcross Energy Partners, L.P., a publicly traded Delaware limited partnership. The MLP's common units trade on the NYSE under the symbol "SXE."

93. "*New Term Loan A Facility*" means that certain first-out term loan and letter of credit facility in an aggregate principal amount of $50 million issued pursuant to the New Term Loan Agreement.

94. "*New Term Loan A Lenders*" means the Revolving Lenders, in their capacities as lenders under the New Term Loan A Facility.

95. "*New Term Loan Agent*" means UBS AG, Stamford Branch, in its capacity as administrative agent under the New Term Loan Agreement.

96. "*New Term Loan Agreement Documents*" means, collectively, the New Term Loan Agreement, each other Loan Document (as defined in the New Term Loan Agreement), and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents), which shall be in form and substance acceptable to the Debtors, the Required Consenting Term Lenders, and the Required Consenting Revolving Lenders and reasonably acceptable to the Supporting Common Interest Holders.

97. "*New Term Loan Agreement*" means that certain term loan credit agreement, dated as of the Effective Date, by and among the Reorganized Debtors, the New Term Loan Agent, the New Term Loan A Lenders, and the New Term Loan B Lenders, which shall contain terms consistent in all respects with the term sheet attached as an exhibit to the RSA and otherwise be in form and substance acceptable to the Debtors, the Required Consenting Term Lenders, and the Required Consenting Revolving Lenders and reasonably acceptable to the Supporting Common Interest Holders.

98. "*New Term Loan B Facility*" means that certain last-out term loan facility in an aggregate principal amount of $75 million issued pursuant to the New Term Loan Agreement.

99. "*New Term Loan B Lenders*" means certain of the Term Lenders, in their capacity as lenders under the New Term Loan B Facility.

100. "*New Unsecured Noteholders*" means the Supporting Common Interest Holders, in their capacity as holders of the New Unsecured Notes.

101. "*New Unsecured Notes Documents*" means, collectively, the New Unsecured Notes Indenture, and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements and intercreditor agreements).

102.     "*New Unsecured Notes Indenture Trustee*" means that certain indenture trustee under the New Unsecured Notes Indenture.

103.     "*New Unsecured Notes Indenture*" means that certain indenture, dated as of the Effective Date, by and among the Reorganized Debtors, the New Unsecured Notes Indenture Trustee, and the New Unsecured Noteholders, which shall contain terms consistent in all respects with the term sheet attached as an exhibit to the RSA and otherwise be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, and the Required Consenting Term Lenders.

104.     "*New Unsecured Notes*" means those certain unsecured notes in an aggregate principal amount of $8 million to be issued pursuant to the New Unsecured Notes Indenture.

105.     "*Non-Debtor Intercompany Claim*" means any Claim held by a non-Debtor affiliate of the Debtors against a Debtor.

106.     "*NYSE*" means the New York Stock Exchange.

107.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

108.     "*Other Secured Claim*" means any Secured Claim other than the following:  (a) a Revolving Facility Claim; (b) a Term Loan Facility Claim; or (c) a DIP Facility Claim.  For the avoidance of doubt, "Other Secured Claims" includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

109.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

110.     "*Petition Date*" means the date on which the Chapter 11 Cases were commenced.

111.     "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than 7 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth on the exhibits attached hereto, where applicable, and, without limiting any other definition contained in this Article I.A or other provision of the Plan, shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders (and (a) reasonably acceptable to the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and  (b) reasonably acceptable to the Supporting Class B Interest Holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan).

112.     "*Plan*" means this chapter 11 plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules, which plan shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Supporting Common Interest Holders and Required Consenting Term Lenders (and (a) reasonably acceptable to the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and  (b) reasonably acceptable to the Supporting Class B Interest Holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent,

observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan).

113.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

114.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

115.    "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

116.    "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

117.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

118.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

119.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

120.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

121.    "*Released Party*" means collectively, and in each case in its capacity as such:  (a) the Consenting Creditors; (b) the Supporting Interest Holders; (c) the DIP Facility Lenders; (d) the Holdings Credit Agreement Agent; (e) the Term Lenders; (f) the Revolving Lenders; (g) the DIP Facility Agent; (h) the holders of Holdings GP Interests; (i) the holders of Holdings Class A Interests; (j) the holders of Holdings Class B Interests; (k) the Commitment Parties; and (l) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors (including the Advisor Directors), managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including the attorneys and other professionals to the Advisor Directors); *provided*, *however*, that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

122.    "*Releasing Parties*" means, collectively, (a) the Consenting Creditors; (b) the Supporting Interest Holders; (c) the DIP Facility Lenders; (d) the Holdings Credit Agreement Agent; (e) the Term Lenders; (f) the Revolving Lenders; (g) the DIP Facility Agent; (h) the holders of Holdings GP Interests; (i) the holders of Holdings Class A Interests; (j) the holders of Holdings Class B Interests; (k) the Commitment Parties; (l) all holders of Claims or Interests that vote to accept the Plan; (m) all holders of Claims or Interests that abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (n) all holders of Claims or Interests that vote to reject the Plan and who do not opt out of the releases provided by the Plan; (o) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (n), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors (including

the Advisor Directors), managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including the attorneys and other professionals to the Advisor Directors), each in their capacity as such collectively; and (p) all holders of Claims and Interests, solely with respect to releases of all holders of Holdings Interests, and their current and former Affiliates, and such Entities' and their Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

123. "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

124. "*Reorganized Holdco Board*" means Reorganized Holdco's initial board of directors.

125. "*Reorganized Holdco Interests*" means the common equity interests in Reorganized Holdco.

126. "*Reorganized Holdco Organizational Documents*" means, as applicable, the charters, bylaws, operating agreements, or other organization documents of Reorganized Holdco each in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, Required Consenting Term Lenders, and (to the extent adverse in any material respect to the interests of the Required Consenting Revolving Lenders) the Required Consenting Revolving Lenders, it being expressly agreed and understood that all of the provisions of the organizational documents (i) described in the RSA and (ii) in effect as of the date hereof, are acceptable to the Consenting Revolving Lenders.

127. "*Reorganized Holdco*" means, collectively, Reorganized Holdings and Reorganized Holdings GP.

128. "*Reorganized Holdings GP*" means Holdings GP, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

129. "*Reorganized Holdings*" means Holdings, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

130. "*Required Consenting Creditors*" means the Consenting Creditors who hold, in the aggregate, at least 50.1% of the principal amount of the total outstanding loans under the Holdings Credit Agreement held by all Consenting Creditors as of such date the Required Consenting Creditors make a determination in accordance with the RSA or the Plan.

131. "*Required Consenting Revolving Lenders*" means Consenting Revolving Lenders who hold, in the aggregate, at least 50.1% of the principal amount of the total outstanding loans under the Revolving Facility held by all Consenting Revolving Lenders as of such date the Required Consenting Revolving Lenders make a determination in accordance with the RSA or the Plan; *provided*, *however* that at any time there are two or more Consenting Revolving Lenders who are not affiliates of one another, "Required Consenting Revolving Lenders" shall in no event mean fewer than two such Consenting Revolving Lenders who are not affiliates of one another.

132. "*Required Consenting Term Lenders*" means Consenting Term Lenders who hold, in the aggregate, at least 50.1% of the principal amount of the total outstanding loans under the Term Loan Facility held by all Consenting Term Lenders as of such date the Required Consenting Term Lenders make a determination in accordance with the RSA or the Plan.

133. "*Restructuring Transactions*" means the transactions described in <u>Article IV.Q</u> of the Plan.

134.    "*Revolving Facility Claim*" means any Claim arising under, derived from, or based upon the Revolving Facility, together with all existing letters of credit thereunder.

135.    "*Revolving Facility*" means the Revolving Loan, as defined in the Holdings Credit Agreement.

136.    "*Revolving Lenders*" means each Revolving Lender or Issuing Bank, each as defined in the Holdings Credit Agreement.

137.    "*RSA*" means that certain Restructuring Support and Lock-Up Agreement, dated as of March 21, 2016, by and among the Debtors, the Supporting Interest Holders, Southcross Energy, LLC, and the Consenting Creditors, including all exhibits and attachments thereto.

138.    "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

139.    "*Secured Claim*" means a Claim:  (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

140.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

141.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

142.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

143.    "*Servicer*" means an agent or other authorized representative of holders of Claims or Interests.

144.    "*Solicitation Agent*" means Epiq Bankruptcy Solutions, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

145.    "*Supporting Class B Interest Holders*" means, collectively, the holders of the Holdings Class B Interests.

146.    "*Supporting Common Interest Holders*" means, collectively, EIG and Tailwater, in their capacities as holders of (a) 70.4% of the outstanding Holdings GP Interests and (b) 69.4 % of the outstanding Holdings Class A Interests.

147.    "*Supporting Interest Holders*" means, collectively, the Supporting Common Interest Holders and the Supporting Class B Interest Holders.

148.    "*Tailwater*" means one or more investment funds or accounts managed or advised by Tailwater Capital LLC or its affiliates.

149.    "*Term Lender*" means each Term Loan Lender, as defined in the Holdings Credit Agreement.

150.    "*Term Loan Equity Recovery*" means 33.34% of the Reorganized Holdco Interests issued on the Effective Date, subject to Pro Rata dilution on account of the Management Incentive Plan.

151.    "*Term Loan Facility Claim*" means any Claim arising under, derived from, or based upon the Term Loan Facility.

152.    "*Term Loan Facility*" means the Term Loans, as defined in the Holdings Credit Agreement.

153.    "*Transaction*" means the Debtors' recapitalization and restructuring.

154.    "*Unclaimed Distribution*"  means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

155.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

156.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**B.      Rules of Interpretation**

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j)  references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (l) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**C.      Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*,

*however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

**E.**  **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.**  **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**G.**  **Controlling Document**

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**ARTICLE II**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

**A.**  **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors, in consultation with the Supporting Common Interest Holders and Required Consenting Term Lenders, or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**B.**  **DIP Facility Claims**

Subject to the terms, conditions, and priorities set forth in the DIP Facility Order, the DIP Facility Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Facility as of the Effective Date.  In full satisfaction of and in exchange for each DIP Facility Claim, each holder of a DIP Facility Claim shall receive its Pro Rata share of the DIP Equity Recovery.  Such treatment shall render each DIP Facility Claim satisfied in full on

the Effective Date, consistent with the terms of the DIP Facility Loan Agreement and the RSA.  For the avoidance of doubt:  (a) any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement shall be satisfied in full upon the receipt of the DIP Equity Recovery by the holders of the DIP Facility Claims pursuant to this Article II.B; and (b) the accrual and satisfaction of such fees and interest shall not reduce in any way the Supporting Common Interest Holders' obligations to fund the full amount of the Capital Equity Investment pursuant to the RSA and Article IV.C of the Plan.

**C.      Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.  Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  No funds in the Professional Fee Escrow Account shall be property of the Estates.  Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to Reorganized Holdco.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**D.      Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III**

**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

**A.      Classification of Claims and Interests**

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Revolving Facility Claims | Impaired | Entitled to Vote |
| 4 | Term Loan Facility Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Non-Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Interests in Debtors other than Holdings GP and Holdings | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Holdings Class B Interests | Impaired | Entitled to Vote |
| 10 | Holdings Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**     **Treatment of Classes of Claims and Interests**

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by:  (a) the Debtors; (b) the holder of such Allowed Claim or Allowed Interest, as applicable; (c) the Supporting Common Interest Holders; and (d) the Required Consenting Term Lenders.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.       **Class 1 — Other Secured Claims**

(a)       *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

(b)       *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders:

(i)       payment in full in Cash of its Allowed Class 1 Claim;

(ii)       the collateral securing its Allowed Class 1 Claim;

(iii)       Reinstatement of its Allowed Class 1 Claim; or

(iv)    such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

2.    **Class 2 — Other Priority Claims**

(a)    *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

(b)    *Treatment*:  Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan. Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

3.    **Class 3 — Revolving Facility Claims**

(a)    *Classification*:  Class 3 consists of any Revolving Facility Claims.

(b)    *Allowance:*  On the Effective Date, Class 3 Claims shall be Allowed in the aggregate principal amount of $50,000,000, plus any accrued but unpaid interest thereon payable at the applicable default interest rate in accordance with the terms and conditions applicable to the Revolving Facility under the Holdings Credit Agreement.

(c)    *Treatment*:  Each holder of an Allowed Class 3 Claim shall receive its Pro Rata share of:

(i)    the loans arising under the New Term Loan A Facility; and

(ii)    Cash in an amount equal to any accrued but unpaid interest on the aggregate principal amount of Class 3 Claims payable at the applicable default interest rate in accordance with the terms and conditions applicable to the Revolving Facility under the Holdings Credit Agreement.

(d)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

4.    **Class 4 — Term Loan Facility Claims**

(a)    *Classification*:  Class 4 consists of all Term Loan Facility Claims.

(b)    *Allowance:*  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate principal amount of $566,375,000, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate in accordance with the terms and conditions applicable to the Term Loan Facility under the Holdings Credit Agreement.

(c)    *Treatment*:  Each holder of an Allowed Class 4 Claim shall receive its Pro Rata share of:

(i)    the loans arising under the New Term Loan B Facility; and

(ii)    the Term Loan Equity Recovery.

(d)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.    **Class 5 — General Unsecured Claims**

(a)    *Classification*:  Class 5 consists of any General Unsecured Claims against any Debtor.

(b)    *Treatment*:  Each holder of an Allowed Class 5 Claim shall receive Cash in an amount equal to such Allowed Class 5 Claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 5 Claim.

(c)    *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed Class 5 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

6.    **Class 6 — Debtor Intercompany Claims**

(a)    *Classification*:  Class 6 consists of any Debtor Intercompany Claims.

(b)    *Treatment*:  Each Allowed Class 6 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders, either:

(i)    Reinstated; or

(ii)    canceled and released without any distribution on account of such Claims.

(c)    *Voting*:  Holders of Allowed Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.    **Class 7 — Non-Debtor Intercompany Claims**

(a)    *Classification*:  Class 7 consists of any Non-Debtor Intercompany Claims.

(b)    *Treatment*:  Each Allowed Class 7 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders, either:

(i)    Reinstated; or

(ii)    canceled and released without any distribution on account of such Claims;

*provided*, *however*, that Non-Debtor Intercompany Claims held by any of the MLP Entities shall be Reinstated, to the extent not paid by the Debtors during the Chapter 11 Cases prior to the Effective Date.

(c)    *Voting*:  Holders of Allowed Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan.

8.　　**Class 8 — Interests in Debtors other than Holdings GP and Holdings**

(a)　　*Classification*:  Class 8 consists of Interests in Debtors other than Holdings GP and Holdings.

(b)　　*Treatment*:  Class 8 Interests shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Supporting Common Interest Holders and the Required Consenting Term Lenders, either:

(i)　　Reinstated; or

(ii)　　canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 8 Interests will not receive any distribution on account of such Class 8 Interests.

(c)　　*Voting*:  Holders of Class 8 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

9.　　**Class 9 — Holdings Class B Interests**

(a)　　*Classification*:  Class 9 consists of the Holdings Class B Interests.

(b)　　*Treatment*:  Each holder of Allowed Holdings Class B Interests shall receive its Pro Rata share of $100,000.

(c)　　*Voting*:  Class 9 is Impaired under the Plan.  Holders of Holdings Class B Interests are entitled to vote to accept or reject the Plan.

10.　　**Class 10 — Holdings Interests**

(a)　　*Classification*:  Class 10 consists of the Holdings Interests.

(b)　　*Treatment*:  Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.

(c)　　*Voting*:  Class 10 is Impaired under the Plan.  Holders of Class 10 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

11.　　**Class 11 — Section 510(b) Claims**

(a)　　*Classification*:  Class 11 consists of any Section 510(b) Claims against any Debtor.

(b)　　*Allowance:*  Notwithstanding anything to the contrary herein, a Class 11 Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Class 11 Claim and believe that no such Class 11 Claim exists.

(c)　　*Treatment*:  Allowed Class 11 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)     *Voting*:  Class 11 is Impaired.  Holders (if any) of Allowed Class 11 Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders (if any) of Allowed Class 12 Claims are not entitled to vote to accept or reject the Plan.

## C.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## D.     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## E.     Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the holders of such Claims or Interests in such Class.

## F.     Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of Reorganized Holdco Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

## G.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## H.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors, with the consent of the Supporting Common Interest Holders and Required Consenting Term Lenders (and (a) the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan), reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the

19

Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE IV**

**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

**A.**     <u>General Settlement of Claims and Interests</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**B.**     <u>Sources of Consideration for Plan Distributions</u>

    **1.**     **Cash on Hand**

The Reorganized Debtors shall use Cash on hand to fund distributions to certain holders of Claims.

    **2.**     **Issuance and Distribution of the Reorganized Holdco Interests**

All existing Interests in Holdings and Holdings GP shall be cancelled as of the Effective Date and Reorganized Holdco shall issue the Reorganized Holdco Interests to Entities entitled to receive the Reorganized Holdco Interests pursuant to the Plan. The issuance of the Reorganized Holdco Interests, including Interests, if any, reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable. The Reorganized Holdco Organizational Documents shall authorize the issuance and distribution on the Effective Date of the Reorganized Holdco Interests to the Distribution Agent for the benefit of Entities entitled to receive the Reorganized Holdco Interests pursuant to the Plan. All of the Reorganized Holdco Interests issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Holdco Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

    **3.**     **The New Term Loan Facility**

    **(a)**     **The New Term Loan A Facility**

The Reorganized Debtors shall enter into the New Term Loan A Facility on the Effective Date, on terms set forth in the New Term Loan Agreement Documents. The New Term Loan A Facility shall be a $50 million secured term loan facility comprised of: (a) an aggregate principal amount of $47,850,000 of first-out term loans; and (b) a new first lien senior secured letter of credit facility with a commitment of $2.15 million. The terms of the New Term Loan A Facility shall be consistent with the RSA and the documentation for the New Term Loan A Facility shall be included in the Plan Supplement and acceptable to the Debtors and the Required Consenting Revolving Lenders and reasonably acceptable to the Required Consenting Term Lenders and the Supporting Common Interest Holders.

20

Confirmation shall be deemed approval of the New Term Loan A Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Term Loan A Facility, including the New Term Loan Agreement Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the New Term Loan A Facility.

(b)      **The New Term B Loan Facility**

The Reorganized Debtors shall enter into the New Term Loan B Facility on the Effective Date, on terms set forth in the New Term Loan Agreement Documents.  The New Term Loan B Facility shall be a $75 million secured term loan facility.  The terms of the New Term Loan B Facility shall be in accordance with the RSA and the documentation for the New Term Loan B Facility shall be included in the Plan Supplement and otherwise acceptable to the Debtors and the Required Consenting Term Lenders and reasonably acceptable to the Required Consenting Revolving Lenders and the Supporting Common Interest Holders.

Confirmation shall be deemed approval of the New Term Loan B Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Term Loan B Facility, including the New Term Loan Agreement Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the New Term Loan B Facility.

4.      **The New Unsecured Notes**

The Reorganized Debtors shall issue the New Unsecured Notes on the Effective Date, on terms set forth in the New Unsecured Notes Documents.  The New Unsecured Notes shall be in the aggregate principal amount $8 million.  The documentation for the New Unsecured Notes shall be included in the Plan Supplement and otherwise acceptable to the Debtors and reasonably acceptable to the Required Consenting Term Lenders and the Supporting Common Interest Holders (and solely with respect to terms affecting their treatment or rights, reasonably acceptable to the Required Consenting Revolving Lenders).

Confirmation shall be deemed approval of the New Unsecured Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to issue the New Unsecured Notes, including the New Unsecured Notes Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the New Unsecured Notes.

C.      **The Capital Equity Investment**

On the Effective Date, the Supporting Common Interest Holders shall make the following capital contributions to Reorganized Holdco:  (a) EIG shall contribute an amount in cash equal to $85 million less its Pro Rata portion of any obligations then outstanding under the DIP Facility; and (b) Tailwater shall contribute an amount in cash equal to $85 million less its Pro Rata portion of any obligations then outstanding under the DIP Facility.  In return, each Supporting Common Interest Holder shall receive:  (a) its Pro Rata share of the Capital Equity Recovery; and (b) its Pro Rata share of the New Unsecured Notes.  For the avoidance of doubt:  (a) such recovery shall be in addition to the Supporting Common Interest Holders' recovery pursuant to Article II.B of the Plan on account of their DIP Facility Claims; and (b) the accrual and satisfaction of any fees, interest paid in kind, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement pursuant to Article II.B of

the Plan shall not reduce in any way the Supporting Common Interest Holders' obligations under the RSA and this <u>Article IV.C</u> to fund the full amount of the Capital Equity Investment.

**D.**      **Non-Debtor Intercompany Claims**

All Non-Debtor Intercompany Claims, Intercompany Contracts, and other pre-Petition Date intercompany agreements and arrangements by and among one or more of the Debtors, on the one hand, and one or more of the MLP Entities, on the other hand, shall be assumed and the Debtors or Reorganized Debtors, as applicable, shall continue such intercompany arrangements in the ordinary course of business, including the payment of prepetition amounts related thereto and the funding of any equity cures.

**E.**      **Professional Fees and Expenses**

On the Effective Date, the Debtors shall pay in Cash all accrued and unpaid reasonable and documented fees and expenses of the Supporting Common Interest Holders, in their capacities as such and as the DIP Facility Lenders, and the Consenting Creditors (including legal and financial and any other special advisors retained by the Consenting Creditors or Supporting Common Interest Holders either before or during the Chapter 11 Cases).

**F.**      **Exemption from Registration Requirements**

The offering, issuance, and distribution of any Securities, including the Reorganized Holdco Interests, pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code or any other available exemption from registration under the Securities Act, as applicable.  Pursuant to section 1145 of the Bankruptcy Code, the Reorganized Holdco Interests issued under the Plan will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any other applicable regulatory approval.

**G.**      **Corporate Existence**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

**H.**      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.        **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including, for the avoidance of doubt, the 2015 Letter, shall be cancelled and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive distributions under the Plan and (b) allowing and preserving the rights of the Holdings Credit Agreement Agent and any Servicer, as applicable, to make distributions on account of Allowed Claims as provided herein.

J.        **Reorganized Holdco Organizational Documents**

On the Effective Date, the Debtors shall enter into new formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) as may be necessary to effectuate the transactions contemplated by the Plan and the RSA and shall be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, the Required Consenting Term Lenders, and (to the extent adverse in any material respect to the interests of the Required Consenting Revolving Lenders) the Required Consenting Revolving Lenders, it being expressly agreed and understood that all of the provisions of the organizational documents (i) described in the RSA and (ii) in effect as of the date hereof, are acceptable to the Consenting Revolving Lenders.  The Debtors' respective formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the RSA, and the Bankruptcy Code.  The Reorganized Holdco Organizational Documents shall be included as exhibits to the Plan Supplement and shall, among other things:  (a) be consistent with the terms of the RSA; (b) be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, the Required Consenting Term Lenders, and (to the extent adverse in any material respect to the interests of the Required Consenting Revolving Lenders) the Required Consenting Revolving Lenders, it being expressly agreed and understood that all of the provisions of the organizational documents (i) described in the RSA and (ii) in effect as of the date hereof, are acceptable to the Consenting Revolving Lenders; (c) authorize the issuance of the Reorganized Holdco Interests; and (d) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

K.        **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the RSA, the New Term Loan Agreement Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

L.        **Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the Restructuring Transaction; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for any or all of the New Term Loan B Facility and the New Term Loan A Facility; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any

23

transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**M.**     **Directors and Officers**

The members of the Reorganized Holdco Board and the officers, directors, and/or managers of each of the Reorganized Debtors will be identified in the Plan Supplement.  The members of Holdings GP's board of directors are deemed to have resigned as of the Effective Date.  On the Effective Date, the Reorganized Holdco Board will consist of 6 members.  The Members of the Reorganized Holdco Board shall be appointed by the Supporting Common Interest Holders and the Consenting Term Lenders in accordance with the terms of the RSA and the members of the board of directors of any subsidiary of Reorganized Holdco shall be acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders.  On the Effective Date, the existing officers of the Debtors shall serve in their current capacities for the Reorganized Debtors.  From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the Reorganized Holdco Board and any Person proposed to serve as an officer of Reorganized Holdco shall be disclosed at or before the Confirmation Hearing.

On the Effective Date, the MLP Board shall be reorganized (and all necessary documents executed) to provide the Supporting Common Interest Holders and Consenting Term Lenders with representation equal in number to such parties' representation on the Reorganized Holdco Board; *provided*, *however* that the composition of the MLP Board shall comply in all respects with the MLP Organizational Documents, including with respect to independent directors.

The Debtors shall purchase, on or before the Effective Date, and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.

**N.**     **Management Incentive Plan**

On the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan.  Confirmation shall be deemed approval of the Management Incentive Plan, without any further action or approval required by the Bankruptcy Court.

**O.**     **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Holdco Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (a) amend, adopt, assume, and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the

ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**P.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following:  (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein or in the DIP Facility Order.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**Q.      Restructuring Transactions**

On or after the Confirmation Date, or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, consistent with and pursuant to the terms and conditions of the RSA, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the New Term Loan Agreement Documents; (e) the execution and delivery of the New Unsecured Notes Documents; (f) the issuance and distribution of the Reorganized Holdco Interests; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors, as applicable. Such actions may include the following: (a) the adoption and filing of the Reorganized Holdco Organizational Documents; (b) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Holdco Board; (c) the authorization, issuance, and distribution of Reorganized Holdco Interests; (d) the adoption or assumption, as applicable, of Executory Contracts or Unexpired Leases; (e) the entry into the New Term Loan A Facility and the New Term Loan B Facility and the execution and delivery of the New Term Loan Agreement Documents, as applicable; (f) the issuance of the New Unsecured Notes and the execution and delivery of the New Unsecured Notes Documents; and (g) the adoption of a Management Incentive Plan on terms and conditions determined by the Reorganized Holdco Board in accordance with <u>Article IV.N</u> of the Plan.

**ARTICLE V**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**     <u>**Assumption of Executory Contracts and Unexpired Leases**</u>

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors, the Supporting Common Interest Holders, the Required Consenting Term Lenders, and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**B.**     <u>**Indemnification**</u>

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

**C.**     <u>**Cure of Defaults and Objections to Cure and Assumption**</u>

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized

Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

**D.**     **Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**E.**     **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

**F.**     **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**G.**     **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims and Interests; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no less frequently than once in every 30 day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

**B.      Rights and Powers of Distribution Agent**

**1.      Powers of the Distribution Agent**

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

**2.      Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

**C.      Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged. Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

**D.      Delivery of Distributions**

**1.      Record Date for Distributions to Holders of Non-Publicly Traded Securities**

On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Effective Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate, is transferred and the Debtors have been notified in writing of such transfer less than 10 days before the Effective Date, the Distribution Agent shall make distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.      **Distribution Process**

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims or Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (1) to the address of such holder as set forth in the books and records of the applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 10 days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 days before the Effective Date; or (3) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Notwithstanding anything to the contrary in the Plan, including this Article VI.D of the Plan, distributions under the Plan to holders of Revolving Facility Claims and Term Loan Facility Claims shall be made to, or to Entities at the direction of, the Holdings Credit Agreement Agent in accordance with the terms of the Plan and the Holdings Credit Agreement Documents. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

3.      **Accrual of Dividends and Other Rights**

For purposes of determining the accrual of distributions or other rights after the Effective Date, the Reorganized Holdco Interests shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; *provided*, *however*, the Reorganized Debtors shall not pay any such distributions or distribute such other rights, if any, until after distributions of the Reorganized Holdco Interests actually take place.

4.      **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5. **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

6. **Fractional, Undeliverable, and Unclaimed Distributions**

(a) *Fractional Distributions*.  Whenever any distribution of fractional shares or units of the Reorganized Holdco Interests would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest share (up or down), with half shares or less being rounded down.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(b) *Undeliverable Distributions*.  If any distribution to a holder of an Allowed Claim or Interest is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.D.6.(c) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(c) *Reversion*.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is Reorganized Holdco Interests, shall be deemed cancelled.  Upon such revesting, the Claim or Interest of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

7. **Surrender of Cancelled Instruments or Securities**

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  Notwithstanding the foregoing paragraph, this Article VI.D.7 shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. **Claims Paid or Payable by Third Parties**

1. **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim

and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 2.      Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.      Applicability of Insurance Policies

Except as otherwise provided herein, distributions to holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## F.      Setoffs

Except with respect to the Term Loan Facility Claims, Revolving Facility Claims, DIP Facility Claims, or as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

## G.      Allocation Between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Effective Date.

# ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**A.**     **Disputed Claims Process**

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.  **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

**B.**     **Claims Administration Responsibilities.**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

**C.**     **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**D.**     **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**E.**     **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

# ARTICLE VIII

# EFFECT OF CONFIRMATION OF THE PLAN

## A. Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

## B. Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Merger, the Drop-Down Transaction, the 2015 Letter, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Facility, the Commitment Letter, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any claims or Causes of Action related to the MLP Credit Facilities.

## C. Releases by Holders of Claims and Interests

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts,

intercompany transactions, the Merger, the Drop-Down Transaction, the 2015 Letter, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Facility, the Commitment Letter, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Commitment Letter, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any claims or Causes of Action related to the MLP Credit Facilities.

D.      **Exculpation**

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.      **Injunction**

        Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

**F.      Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**G.      Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**H.      Document Retention**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

**I.      Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:   (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.      Release of Liens**

Except (a) with respect to the Liens securing (i) the New Term Loan B Facility, (ii) the New Term Loan A Facility, and (iii) Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**K.      Indemnification of Holders of Holdings Interests**

If the Bankruptcy Court modifies the Plan in a way that affects the releases or exculpation granted to EIG, Tailwater, and/or Southcross Energy, LLC, as holders of Holdings Interests, under <u>Article VIII</u> of the Plan, the Debtors or Reorganized Debtors, as applicable, shall indemnify such holders of Holdings Interests, including with respect to the cost of defense and any liability, for any Cause of Action from which such holders of Holdings Interests would have been released or exculpated absent such Plan modification.  Such indemnification obligation in favor of such holders of Holdings Interests shall be (i) on terms and with documentation acceptable to the Debtors, such holders of Holdings Interests, the Required Consenting Term Lenders, and the Required Consenting Revolving Lenders, each in their sole discretion, and (ii) secured by substantially the same collateral as the New Term Loan A

Facility and New Term Loan B Facility and such security interest shall be junior in priority to the New Term Loan A Facility and senior in Priority to the New Term Loan B Facility.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A.      **Conditions Precedent to the Effective Date**.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors, the Supporting Common Interest Holders, and the Required Consenting Term Lenders (and (a) acceptable to the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) reasonably acceptable to the Supporting Class B Interest Holders solely with respect to (i) their treatment under Article III.B.9 of the Plan and (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties), and shall:

(a)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)      authorize the Debtors, as applicable or necessary, to:  (1) implement the Restructuring Transactions, including all Restructuring Transactions related the Equity Investment and more specifically described in Articles II.B and IV.C of the Plan; (2) distribute the New Term Loan B Facility, the New Term Loan A Facility, and the Reorganized Holdco Interests pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (3) make all distributions and issuances as required under the Plan, including cash, the New Term Loan B Facility, the New Term Loan A Facility, and the Reorganized Holdco Interests; and (4) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan;

(d)      authorize the implementation of the Plan in accordance with its terms; and

(e)      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the New Term Loan A Facility and the New Term Loan B Facility, as applicable); and

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the RSA and the Plan and shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders (and solely with respect to provisions relating to their treatment or rights, reasonably acceptable to the Required Consenting Revolving Lenders);

4. the MLP Entities shall have paid in full the MLP PIK Notes, including all accrued fees and interest, or otherwise satisfied all obligations arising thereunder;

5. all Professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

6. all reasonable and documented fees and expenses of the Supporting Common Interest Holders, in their capacities as such and as the DIP Facility Lenders, and the Consenting Creditors (including legal and financial and any other special advisors retained by the Consenting Creditors either before or during the Chapter 11 Cases) shall have been paid according to the terms of the RSA and DIP Facility as approved by the Bankruptcy Court; and

7. the Debtors shall have implemented the Restructuring Transactions, including all Restructuring Transactions related to the Equity Investment and more specifically described in Articles II.B and IV.C of the Plan, the Management Incentive Plan, and all transactions contemplated by the RSA, in a manner consistent in all respects with the RSA and the Plan and, without limiting any definition contained in Article I.A of the Plan or other provision of the Plan, according to documentation acceptable to the Debtors and reasonably acceptable to the Supporting Common Interest Holders and the Required Consenting Term Lenders (and solely with respect to provisions relating to their treatment or rights, reasonably acceptable to the Required Consenting Revolving Lenders).

**B.** **Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Supporting Common Interest Holders and Required Consenting Creditors (and solely with respect to provisions relating to their treatment or rights, with the consent of the Required Consenting Revolving Lenders), may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**C.** **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE X

# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.    Modification of Plan

Effective as of the date hereof, (a) the Debtors, with the consent of the Supporting Common Interest Holders and the Required Consenting Creditors (and (a) the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan), reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Supporting Common Interest Holders and Required Consenting Creditors (and (a) the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent, observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan) or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

## B.    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## C.    Withdrawal of Plan

The Debtors, subject to and in accordance with the RSA, reserve the right to withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI

# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any

Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.      enforce all orders previously entered by the Bankruptcy Court; and

16.      hear any other matter not inconsistent with the Bankruptcy Code.

**ARTICLE XII**

**MISCELLANEOUS PROVISIONS**

**A.**    **Immediate Binding Effect**

      Subject to <u>Article IX.A</u> hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**B.**    **Additional Documents**

      On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.**    **Payment of Statutory Fees**

      All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.**    **Reservation of Rights**

      Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**E.**    **Successors and Assigns**

      The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**F.**    **Service of Documents**

      After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| **Reorganized Debtors** | **Southcross Holdings LP** |
| --- | --- |
| | 1717 Main Street |
| | Dallas, Texas, 75201 |

Attn:    General Counsel

**Proposed Counsel to Debtors**                      **Kirkland & Ellis LLP**
                                                     **Kirkland & Ellis International LLP**
                                                     300 North LaSalle
                                                     Chicago, Illinois 60654
                                                     Attn.:    Anup Sathy, P.C.
                                                               Chad J. Husnick
                                                               Emily E. Geier

**United States Trustee**                            **Office of the United States Trustee**
                                                     **for the District of [District of Delaware/Southern**
                                                     **District of Texas - Corpus Christi Division]**
                                                     [●]
                                                     [●]
                                                     Attn.:   [●]


**G.**      **Term of Injunctions or Stays**

     **Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**H.**      **Entire Agreement**

     Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**I.**      **Plan Supplement Exhibits**

     All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://dm.epiq11.com/Southcross or the Bankruptcy Court's website at [●].  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.**      **Non-Severability**

     Except as set forth in Article VIII.K of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, Supporting Common Interest Holders, and the Required Consenting Term Lenders (and (a) without the consent of the Required Consenting Revolving Lenders solely with respect to provisions relating to their treatment or rights; and (b) without the consent of the Supporting Class B Interest holders solely with respect to (i) their treatment under Article III.B.9 of the Plan, (ii) any action that affects the releases granted under Article VIII of the Plan in a way that would render the releases granted to any Released Party affiliated with the Supporting Class B Interest Holders not commensurate with those granted to the other Released Parties, and (iii) any consent,

observation or approval rights of the Supporting Class B Interest Holders set forth in Articles III.H, IX.A.1, X.A and XII.J of the Plan), consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

**K.**   **Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**L.**   **Closing of Chapter 11 Cases.**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**M.**   **Waiver or Estoppel.**

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the RSA, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of page intentionally left blank.]*

SOUTHCROSS HOLDINGS LP
By:  SOUTHCROSS HOLDINGS GP LLC, its general partner

on behalf of itself and all other Debtors

Bret M. Allan
Senior Vice President & Chief Financial Officer
1717 Main Street, Suite 5200
Dallas, Texas, 75201

**EXHIBIT B TO THE DISCLOSURE STATEMENT**

FINANCIAL PROJECTIONS

## Financial Projections

The Debtors believe that the Plan[1] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared financial projections (the "Projections") for the years 2016 through 2019 (the "Projection Period").  The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations. The Debtors' board of directors was not asked to, and thus did not, approve the Projections or evaluate or endorse the Projections or the assumptions underlying the Projections.

The Debtors have prepared the Projections based on information available to them, including information derived from public sources that have not been independently verified.  No representation or warranty, express or implied, is provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PRO FORMA BALANCE SHEET DOES NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED.  ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan*, to which this exhibit is attached as **Exhibit B**.

The Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Projections, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

**General Assumptions**

### a. Overview

The Debtors and their subsidiaries are an oil and gas midstream company that owns and operates gathering, treating, and fractionation assets in the Eagle Ford Shale. In addition, the Debtors are the parent company of Southcross Energy Partners GP, LLC and a major unitholder of Southcross Energy Partners, L.P. (the "MLP"), a publicly traded master limited partnership.

### b. Presentation

The Projections are presented on a basis of accounting generally consistent with Generally Accepted Accounting Principals ("GAAP"). GAAP requires that majority owned subsidiaries be reported under the consolidation method of accounting. In an effort to clearly present the stand-alone results of the operating assets of Holdings, the investment in the MLP was illustrated under the equity method of accounting. The investment in the MLP reflects additional capital investments made through the projection period.

### c. Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements and projections. The Projections may not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to ASC 852-10, as issued by the American Institute of Public Accountants.

### d. Methodology

Key personnel from all of the Debtors' operating business lines and across various functions provided input. The Projections incorporate Management's operating assumptions and capital plan and are based on various strategic reviews, historical performance, management's views of market dynamics, as well as corresponding assumptions regarding pricing, market share, competition, and cost structure.

### e. Plan Consummation

The operating assumptions assume that the Plan will be confirmed and consummated by April 30, 2016, and reflects the estimated cash impact of claim class treatments.

## 1) Assumptions With Respect to the Projected Income Statement

### a. Gross Operating Margin

We define gross operating margin as the sum of revenues less the cost of natural gas and natural gas liquids ("NGLs") sold. For our fixed-fee contracts, we record the fee as revenue and there is no offsetting cost of natural gas and NGLs sold. For our fixed-spread arrangements, we record as revenue all of our proceeds from the sale of the natural gas and NGLs and record as an expense the associated cost of natural gas and NGLs sold.

i. **Gathering, Processing & Fractionation Volumes**

The volumetric forecast was based on estimates prepared by Management, discussions with producer customers, evaluation of current production levels and associated production decline curves and evaluation of third party industry experts that have provided an outlook on Eagle Ford natural gas production. Management believes the volumetric forecast is consistent with the current and anticipated commodity price environment. The Holdings gathering volume forecast only reflects production from existing customers. The MLP volume forecast primarily reflects existing customers with some volume from new customers starting in 2017.

ii. **Commodity Pricing**

The commodity price forecast reflects the January 7, 2016 New York Mercantile Exchange ("NYMEX") strip pricing for crude oil, natural gas, and NGLs for the first half of 2016 and analyst estimates for the remainder of the forecast period.

b. **Operating Expenses**

The operating expense ("Opex") forecast is based on Management's review of historical operating results, discussions with field personnel regarding the planned utilization levels and associated cost impact, and an evaluation of opportunities to reduce costs. Opex is primarily comprised of labor costs, materials and supplies for treating and fractionation operations, contractor fees and services to support treating and fractionation operations, property taxes, and utilities costs. Opex is expected to decrease by approximately 7% from 2015 levels to $33.4 million in 2016, primarily associated with higher throughput in full-year 2016 as compared to 2015.

c. **General and Administrative**

General and Administrative Costs ("G&A") are primarily comprised of labor costs, insurance costs, rent, and third–party professional fees associated with the Debtors' corporate overhead. Projected G&A is based primarily on historical G&A costs, adjusted for recent cost reduction efforts. G&A is expected to decrease by approximately 3.4% from 2015 levels to $8.5 million in 2016.

d. **EBITDA**

Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") is projected to increase over the forecast period reflecting the results of the key forecast assumptions described above.

e. **Taxes**

Taxes are projected to remain at an effective rate near zero through the Projection Period due to the impact of deductions for depreciation.

f. **Depreciation and Amortization**

Depreciation and Amortization reflects the anticipated depreciation and amortization of the existing fleet, based on net book values.

**Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

The Projections were last updated January 7, 2016, incorporating projected results from operations and cash flows over the Projection Period.

### a.   Capital Expenditures

Projections for capital expenditures were prepared with consideration of the Debtors' current capital plan and future estimates. The 2016 capital budget is approximately $27.1 million, with the majority of the spending related to reliability and safety upgrades to the Lancaster treating facility and a gathering lateral to a major customer in the area. Capital expenditures in 2017 through 2019 are assumed to be approximately $52.2 million, with the majority of the spending related to a capacity expansion at the Lancaster treating facility to accommodate higher volumes, incremental gathering connections and compressions to add volumes from existing producer customers and maintenance capital expenditures.

### b.   Working Capital

Estimates of accounts payable, accrued liabilities, accounts receivable, and accrued receivables were prepared based on an evaluation of historical average days sales outstanding ("DSO") and days payable outstanding ("DPO") and review of industry average working capital metrics. The forecast generally reflects DSO of 30 days and DPO of 45 days.

### c.   Pro Forma Adjustments Related to Emergence

The balance sheet (the "Balance Sheet") included in the Projections presents a pro forma view of April 2016, assuming the effect of certain adjustments related to the Debtors' emergence from chapter 11. The Debtors have assumed a pay-down of outstanding intercompany balances due to the MLP of approximately $48.6 million. The adjustments are based on estimates; actual adjustments will be based on the determined fair value and may be materially different from those presented herein.

### d.   Capital Structure

The pro forma April 2016 Balance Sheet reflects the following key assumptions:

- approximately $85.0 million of the available DIP Facility is utilized during the bankruptcy period; the DIP facility accrues 10% PIK interest and the outstanding balance is converted to equity upon emergence from bankruptcy on April 30, 2016;

- $85.0 million of incremental committed equity is drawn down as needed to fund cash requirements of the business;

- $50.0 million New Term Loan A Facility comprised of $47.85 million first-out term loan and $2.15 million of a first lien senior secured letter of credit facility;

the New Term Loan A facility accrues LIBOR plus 6% interest (with a 1% LIBOR floor) and amortizes at 5% per annum paid in quarterly installments beginning on the first anniversary of the effective date of the Plan; maturity date in August 2019; and

- $75.0 million New Term Loan B Facility with 7 year maturity, 3.5% cash interest and 5.5% PIK interest, converting from PIK to cash interest.

## Income Statement

| Holdings Summary Income Statement ($ in millions) | 2016 5/1 - 12/31 | | 2016 FY | | 2017 FY | | 2018 FY | | 2019 FY |
|---|---|---|---|---|---|---|---|---|---|
| Gross Margin | $ | 34.5 | $ | 50.0 | $ | 70.7 | $ | 90.8 | $ | 105.8 |
| Total Operating Expenses | | 22.1 | | 33.4 | | 34.4 | | 35.6 | | 36.9 |
| SG&A | | 5.7 | | 8.5 | | 7.5 | | 7.2 | | 7.2 |
| **Operating Asset EBITDA** | | **6.7** | | **8.1** | | **28.7** | | **48.0** | | **61.8** |
| Total Cash Distributions Received | | - | | - | | - | | - | | - |
| **Total Holdings EBITDA** | $ | **6.7** | $ | **8.1** | $ | **28.7** | $ | **48.0** | $ | **61.8** |
| Depreciation & Amortization | $ | 34.5 | $ | 51.4 | $ | 55.8 | $ | 57.6 | $ | 58.8 |
| Interest Expense[1] | | 2.3 | | 2.1 | | 3.4 | | 4.9 | | 3.9 |
| Other Expenses[2] | | 4.0 | | 24.9 | | - | | - | | - |
| Taxes | | - | | 4.2 | | - | | - | | - |
| **Net Income** | $ | **(34.1)** | $ | **(74.5)** | $ | **(30.5)** | $ | **(14.5)** | $ | **(0.9)** |
| (1) Cash & non-cash interest | | | | | | | | | |
| (2) Includes non-recurring restructuring expenses | | | | | | | | | |

## Balance Sheet

| Holdings Balance Sheet<br>($ in millions) | 4/30/2016 | 2016<br>FY | 2017<br>FY | 2018<br>FY | 2019<br>FY |
|---|---|---|---|---|---|
| Cash | $ 92.1 | $ 64.3 | $ 40.4 | $ 66.0 | $ 66.2 |
| Accounts Receivable | 17.5 | 30.4 | 46.9 | 53.7 | 51.0 |
| Other Current Assets | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| **Total Current Assets** | **110.6** | **95.7** | **88.2** | **120.6** | **118.1** |
| Property & Equipment, Net | $ 650.9 | $ 638.3 | $ 609.6 | $ 565.1 | $ 519.3 |
| Investment in SXE MLP | 686.0 | 696.7 | 712.7 | 712.7 | 712.7 |
| **Total Assets** | **1,447.4** | **1,430.7** | **1,410.5** | **1,398.3** | **1,350.1** |
| **Liabilities & Stockholders' Equity** | | | | | |
| Current Liabilities | | | | | |
| Trade Accounts Payable | $ 8.7 | $ 25.7 | $ 40.7 | $ 45.6 | $ 41.7 |
| Construction Accounts Payable | 4.3 | 4.7 | 1.7 | 1.6 | 1.8 |
| Other Current Liabilities | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 |
| **Total Current Liabilities** | **17.4** | **34.8** | **46.9** | **51.6** | **47.9** |
| Existing Revolving Credit Facility | $ - | $ - | $ - | $ - | $ - |
| New Term Loan A Facility | 47.9 | 47.9 | 46.1 | 43.7 | - |
| Existing Term Loan | - | - | - | - | - |
| New Term Loan B Facility | 75.0 | 78.1 | 82.5 | 87.2 | 92.1 |
| Subordinated Note | 8.0 | 8.3 | 8.8 | 9.3 | 9.8 |
| Other Long-Term Liabilities | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 |
| **Total Liabilities** | **173.3** | **194.1** | **209.2** | **216.7** | **174.8** |
| **Stockholders' Equity** | | | | | |
| Class B Equity | $ - | $ - | $ - | $ - | $ - |
| Legacy Common Equity | 1,300.0 | 1,300.0 | 1,300.0 | 1,300.0 | 1,300.0 |
| Equity Investment | 170.0 | 170.0 | 170.0 | 170.0 | 170.0 |
| Retained Earnings | (195.9) | (233.5) | (268.8) | (288.5) | (294.8) |
| **Total Stockholders' Equity** | **1,274.1** | **1,236.6** | **1,201.2** | **1,181.6** | **1,175.3** |
| **Total Liabilities & Stockholders' Equity** | **$ 1,447.4** | **$ 1,430.7** | **$ 1,410.5** | **$ 1,398.3** | **$ 1,350.1** |

## Cash Flow Statement

| Holdings Cash Flow Statement<br>*($ in millions)* | 2016<br>FY[1] | 2017<br>FY | 2018<br>FY | 2019<br>FY |
|---|---|---|---|---|
| **Beginning Period Cash** | $ 92.1 | $ 64.3 | $ 40.4 | $ 66.0 |
| | | | | |
| **Cash Flow From Operations** | | | | |
| Net Income | $ (34.1) | $ (30.5) | $ (14.5) | $ (0.9) |
| Depreciation & Amortization | 34.5 | 55.8 | 57.6 | 58.8 |
| **Working Capital Requirements:** | | | | |
| (Increase) / Decrease in Current Assets | (12.9) | (16.5) | (6.8) | 2.7 |
| Increase / (Decrease) in Current Liabilities | 17.4 | 12.1 | 4.8 | (3.7) |
| **Total Cash Flow From Operations** | **4.8** | **20.9** | **41.1** | **56.9** |
| | | | | |
| Capital Expenditures | $ (21.9) | $ (27.1) | $ (13.1) | $ (13.0) |
| **Cash Flow From Investing Activities** | **(21.9)** | **(27.1)** | **(13.1)** | **(13.0)** |
| | | | | |
| **Cash Flow From Financing Activities** | | | | |
| Borrowing / (Repayment) of New Term Loan A Facility | - | (1.8) | (2.4) | (43.7) |
| Borrowing / (Repayment) of New Term Loan B Facility | - | - | - | - |
| Sale / (Purchase) of Common MLP Equity | (10.5) | (15.7) | - | - |
| Equity Investment | - | - | - | - |
| General Partner Unit Purchase | (0.2) | (0.3) | - | - |
| **Cash Flow From Financing Activities** | **(10.7)** | **(17.8)** | **(2.4)** | **(43.7)** |
| | | | | |
| **Total Change in Cash** | **(27.8)** | **(24.0)** | **25.6** | **0.2** |
| | | | | |
| **Ending Period Cash** | $ 64.3 | $ 40.4 | $ 66.0 | $ 66.2 |

*(1) Cash flow projections from 5/1/16 to 12/31/16*

**EXHIBIT C TO THE DISCLOSURE STATEMENT**

UNAUDITED LIQUIDATION ANALYSIS

**Exhibit C**

Liquidation Analysis

## 1) Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's chapter 11 case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; determine the distribution (the "Liquidation Distribution") that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and compare each holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such holders would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The analysis (the "Liquidation Analysis") is based upon certain assumptions discussed herein and in the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

## 2) Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or about April 30, 2016 (the "Liquidation Date"). The pro forma values referenced herein are projected as of April 30, 2016 and include a roll-forward amount representative of activity between January 31, 2016 and April 30, 2016, which the Debtors assume to be a reasonable proxy for the anticipated Effective Date. The Liquidation Analysis was prepared on a legal entity basis, and summarized into a consolidated report.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if a trustee were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by management and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management team.  The Liquidation Analysis should be read in

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan*, to which this exhibit is attached as **Exhibit C**.

conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Liquidation Analysis assumes operations continue for 6-months following a conversion to chapter 7 and that certain Debtor assets would be sold as a going concern where possible. The 6-month assumption is made because of the Debtors' management's assessment that, in the wake of a chapter 7 conversion and the consequent disruption and attrition of business, the likelihood that the Debtors or substantial business units of the Debtors can continue operations long-term and do so in a manner that yields material positive incremental cash flow is low. Further, this assumption considers that the Debtors' businesses are managed and run by business units across legal entities and localities, and certain business functions, such as engineering, finance and accounting, legal, and human resources are shared across business units. These factors increase the complexity of selling business units as going concerns, however the Liquidation Analysis employs the going concern approach to be conservative.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of claims include various potential employee claims (for such items as severance), unpaid chapter 11 administrative claims and, and unexpired lease rejection damages. Some of these claims could be significant and will be entitled to priority in payment over general unsecured claims. Those priority claims would be paid before the balance would be made available to pay general unsecured claims.

The Liquidation Analysis also does not include estimates for the tax consequences, both federal and state, that may be triggered upon the liquidation and sale events of assets in the manner described above. Such tax consequences may be material.

The Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions.

### 3)  Liquidation Process

The Debtors' liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate (the "Estate") to maximize recovery in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity specific assets for distribution to creditors. The three major components of the liquidation are as follows:

- generation of cash proceeds from asset sales, largely sold on a going concern basis;

- costs related to the liquidation process, such as post-conversion operating cash flow through asset dispositions, personnel retention costs, estate wind-down costs and trustee, professional, and other administrative fees; and

- distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme under Chapter 7 of the Bankruptcy Code.[2]

**4) Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to the applicable Holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.

- Super-Priority Claims: includes outstanding balances owed under any postpetition Debtor-in-Possession ("DIP") financing facility and professional and U.S. Trustee carve-out pursuant to the DIP Facility Order.

- Secured Claims: includes claims arising under the Debtors' secured credit facilities.

- Administrative & Priority Claims: includes claims for postpetition accounts payable, postpetition accrued expenses, certain accrued / unpaid professional fees, claims arising under section 503(b)(9) of the Bankruptcy Code, and certain unsecured claims entitled to priority under section 507 of the Bankruptcy Code.

- Unsecured Claims: includes non-secured, non-priority debt, including trade payables, and various other unsecured liabilities.

**5) Conclusion**

- The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such holders would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

---

[2] The liquidation process includes a reconciliation of Claims to determine the Allowed Clam amount per Class.

**Summary of Net Proceeds Available for Distribution**

| *$ in Millions* | Total Southcross Holdings Debtors | | | | | |
|---|---|---|---|---|---|---|
| | **Low** | | **Midpoint** | | **High** | |
| Gross Liquidation Proceeds | $ | 115 | $ | 123 | $ | 131 |
| Less: Liquidation Costs | | (10) | | (12) | | (14) |
| **Net Liquidation Proceeds** | **$** | **106** | **$** | **111** | **$** | **117** |

**Summary of Recovery (%)**

| | | | |
|---|---|---|---|
| Less: DIP Facility | 100% | 100% | 100% |
| Less: Revolving Facility Claims | 32% | 43% | 54% |
| Less: Term Loan Facility Claims | 0% | 0% | 0% |
| Less: Other Secured Claims | 0% | 0% | 0% |
| Less: Admin / Priority Claims | 0% | 0% | 0% |
| Less: General Unsecured Claims | 0% | 0% | 0% |
| Less: Equity Interests | 0% | 0% | 0% |

The following Liquidation Analysis should be reviewed with the accompanying notes.

**Southcross Holdings**

*($ in millions)*

| Assets | Notes | 1/31/2016 Net Book Value | Adjustments | Pro Forma Value at 4/30/16 | Potential Recovery Recovery Estimate % Low | Midpoint | High | Midpoint |
|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds:** | | | | | | | | |
| Cash | [A] | 12.6 | (5.4) | 7.3 | 100.0% | 100.0% | 100.0% | 7.3 |
| Accounts Receivable | [B] | 32.0 | (14.5) | 17.5 | 75.0% | 87.5% | 100.0% | 15.3 |
| A/R - Affiliates | [C] | 5.5 | (5.5) | - | 100.0% | 100.0% | 100.0% | - |
| Property, Plant & Equipment | | | | | | | | |
| Pipelines | [D] | 195.6 | - | 195.6 | 0.0% | 0.0% | 0.0% | - |
| Gas Processing, Treating, and Other Plants | [E] | 301.5 | - | 301.5 | 15.6% | 17.3% | 19.0% | 52.1 |
| Compresssors | [F] | 54.0 | - | 54.0 | 0.0% | 0.0% | 0.0% | - |
| Rights of Ways and Easements | [G] | 73.3 | - | 73.3 | 0.0% | 0.0% | 0.0% | - |
| Other | [H] | 35.1 | - | 35.1 | 6.8% | 7.5% | 8.3% | 2.6 |
| Investment in MLP | [I] | 560.6 | - | 560.6 | 7.6% | 7.6% | 7.6% | 42.4 |
| Investment in MLP GP | [J] | 41.1 | - | 41.1 | 7.7% | 7.7% | 7.8% | 3.2 |
| Prepaid Assets / Other | [K] | 16.2 | - | 16.2 | 0.0% | 0.0% | 0.0% | - |
| Total Assets | | 1,327.6 | (25.4) | 1,302.3 | 8.9% | 9.4% | 10.0% | 123.0 |
| | | | | | | Rates | | |
| **Less: Liquidation Costs** | | | | | Low | Midpoint | High | |
| Post-Conversion Cash Flow | [L] | | | | | | | (2.8) |
| Retention Costs | [L] | | | | | | | (1.9) |
| Estate Wind-Down Costs | [L] | | | | | | | (2.0) |
| Professional Fees | [M] | | | | 1% | 1% | 1% | (1.2) |
| Ch. 7 Trustee Fees | [M] | | | | 3% | 3% | 3% | (3.7) |
| Total Liquidation Adjustments | | | | | | | | (11.7) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | | | **111.3** |

**Southcross Holdings**

*($ in millions)*

| Net Liquidation Proceeds Available for Distribution to Creditors | | | | | | | | 111.3 |
|---|---|---|---|---|---|---|---|---|
| | | Claims | | | % Recovery | | | |
| | | Low | Midpoint | High | Low | Midpoint | High | Midpoint |
| Proceeds Remaining | | | | | | | | 111.3 |
| **Less: DIP Facility** | [N] | 89.7 | 89.7 | 89.7 | 100% | 100% | 100% | 89.7 |
| Proceeds Remaining | | | | | | | | 21.5 |
| **Less: Revolving Facility Claims** | [N] | 50.2 | 50.2 | 50.2 | 32% | 43% | 54% | 21.5 |
| Proceeds Remaining | | | | | | | | - |
| **Less: Term Loan Facility Claims** | [N] | 570.7 | 570.7 | 570.7 | 0% | 0% | 0% | - |
| Proceeds Remaining | | | | | | | | - |
| **Less: Other Secured Claims** | [N] | - | - | - | 0% | 0% | 0% | - |
| Proceeds Remaining | | | | | | | | - |
| **Less: Admin / Priority Claims** | [N] | 33.8 | 33.8 | 33.8 | 0% | 0% | 0% | - |
| Proceeds Remaining | | | | | | | | - |
| **Less: General Unsecured Claims** | [N] | 39.5 | 39.5 | 39.5 | 0% | 0% | 0% | - |
| Proceeds Remaining | | | | | | | | - |
| **Less: Equity Interests** | [N] | 630.8 | 630.8 | 630.8 | 0% | 0% | 0% | - |
| Proceeds Remaining | | | | | | | | - |

**Specific Notes to the Liquidation Analysis**

<u>Gross Liquidation Proceeds</u>

A.    <u>Cash</u>

- Cash consists of cash in banks.

- The Liquidation Analysis assumes that the Debtors' operations during the Liquidation Period would not generate additional cash available for distribution.

- The pro forma balance as of April 30, 2016 is based on the latest pro forma business plan projections prepared by the Debtors and their advisors.

- The Liquidation Proceeds of cash for all entities holding cash is estimated to be 100% of the pro forma balance.

B.    <u>Accounts Receivable</u>

- The analysis of accounts receivable assumes that the Trustee would retain certain existing staff to handle a collection effort for outstanding trade accounts receivable for the entities undergoing liquidation.

- Collectible accounts receivable includes all third-party trade accounts receivable due under normal trade terms.

- The Liquidation Proceeds of accounts receivable were estimated to range from 75% to 100% of the pro forma balance.

C.    <u>Accounts Receivable - Affiliates</u>

- The accounts receivable due from affiliates is assumed to be offset by the intercompany payable due to affiliates prior to the Liquidation Date.

- The Liquidation Proceeds of accounts receivables - affiliates were estimated to be 100% of the pro forma value.

D.    <u>Property, Plant & Equipment (Pipelines)</u>

- Pipeline Property, Plant & Equipment consists of approximately 880 miles of pipelines located in South Texas in the Eagle Ford Shale.

- The Liquidation Analysis assumes the assets are sold as a going concern and all Liquidation Proceeds are reflected in Property, Plant & Equipment (Gas Processing, Treating, and Other Plants).

E.      Property, Plant & Equipment (Gas Processing, Treating, and Other Plants)

- Gas Processing, Treating, and Other Plants consists of gas and NGL processing facilities. This includes the Robstown Fractionator and Lancaster Treater.

- The Liquidation Analysis assumes these assets and supporting assets continue to operate and are sold as a going concern. For presentation purposes, all Liquidation Proceeds are included in the Gas Processing, Treating and Other Plants PP&E.

- The Liquidation Analysis assumes a recovery range from 16% to 19% of the pro forma balance.

F.      Property, Plant & Equipment (Compressors)

- Compressors Property, Plant & Equipment consist of compressor station sites located in South Texas in the Eagle Ford Shale.

- The Liquidation Analysis assumes the assets are sold as a going concern and all Liquidation Proceeds are reflected in Property, Plant & Equipment (Gas Processing, Treating, and Other Plants).

G.      Property, Plant & Equipment (Rights of Ways and Easements)

- Rights of Ways and Easements consists of agreements that allow the Debtors to construct and maintain pipelines on others property.

- The Liquidation Analysis assumes the assets are sold as a going concern and all Liquidation Proceeds are reflected in Property, Plant & Equipment (Gas Processing, Treating, and Other Plants).

H.      Property, Plant & Equipment (Other)

- Other Property, Plant & Equipment consists of buildings, land, vehicles, and construction in progress account.

- The majority of Other Property, Plant & Equipment balance is in construction in progress, and the Liquidation Analysis assumes a recovery range from 6.8% to 8.3% of the pro forma balance.

I.      Investment in MLP

- Includes equity interest in Southcross Energy Partners, L.P. (the "MLP").

- The Liquidation Proceeds of the equity investment in MLP were estimated to be approximately 7.6% of total equity interest, which was based on recent publicly traded pricing.

J.      Investment in MLP GP

- Includes equity interest in Southcross Energy Partners GP, LLC (the "MLP GP")

- The Liquidation Proceeds of the equity investment in MLP GP were estimated to be approximately 7.7% of the pro forma balance.

K.      Prepaid and Other

- Prepaid and Other Assets include long-term prepaid expenses and deferred bank fees. Due to the nature of these assets, the Liquidation Analysis assumes a recovery of 0% of the pro forma value.

- Liquidation Adjustments

Post-Conversion Cash Flow

- Post-Conversion Cash Flow represents Debtors' anticipated cash flow in a chapter 7 environment for a 6-month asset monetization period post-Liquidation Date, and assumes no capital expenditures for the completion of current projects.

1.      Retention Costs

- To maximize recoveries on remaining assets, minimize the amount of Claims, and generally ensure an orderly liquidation, the Trustee would need to continue to reimburse the MLP GP for the cost of a number of employees supporting the Debtors' operating facilities for a limited amount of time during the chapter 7 liquidation process.

- These individuals would primarily be responsible for overseeing and maintaining the Debtors' operations, providing historical knowledge and insight to the Trustee regarding the Debtors' businesses, and concluding the administrative liquidation of the businesses after the sale of all of the Debtors' assets.

- The Liquidation Analysis assumes that the Trustee would reduce employee headcount to a minimal staff from the current levels over an estimated 12-month period, although the majority of any such employee-related reductions are assumed to be incurred following the initial 120-day period while the Trustee continues to operate the Debtors' businesses.

- Retention costs are estimated as 10% - 25% of projected 2016 base labor expenses and payroll taxes, excluding overtime, benefits, and bonuses.

2.      Estate Wind-Down Costs

- Estate wind-down costs consist primarily of the regularly occurring general and administrative costs which will be required to operate the Debtors' businesses for a 12-month period following the 6-month asset monetization period.

- The Debtors currently rely on a non-debtor subsidiary for these functions. This analysis assumes this relationship would continue during the wind-down period at current costs.

- All other support functions are assumed to continue at heavily reduced proportions to normal operating environments. These functions are assumed to continue to be scaled back over the 12-month wind-down period.

- Certain key employees may be required to be retained with the Estate, or via a transition services agreement with the buyer(s) of the assets.

3. <u>Professional Fees</u>

- Professional fees include estimates for certain professionals required during the wind-down period.

- Fees are estimated at a rate of 1% of gross liquidation proceeds.

4. <u>Chapter 7 Trustee Fees</u>

- Section 326 of the Bankruptcy Code provides for Trustee fees of 3% for liquidation proceeds in excess of $1 million. The Liquidation Analysis, therefore, assumes Trustee fees are 3% of Liquidation Proceeds.

<u>Claims</u>

1. <u>DIP Facility Claims and Superpriority Carve-Out Claims</u>[3]

- The Liquidation Analysis assumes the DIP Facility is fully drawn as of the Liquidation Date. Thus, there will be approximately $86.7 million, exclusive of the carve-out, in outstanding DIP Facility Claims principal, plus accrued and unpaid interest, as of the Liquidation Date.

- The Debtors estimate that there will be approximately $3.0 million in Superpriority Carve-Out Claims from the DIP Facility for professional fees and UST fees.

- The Liquidation Analysis projects that the Liquidation Proceeds shall cause DIP and carve-out Claims to be paid, on a pro rata basis, at 100% of allowed DIP and carve-out Claims.

---

[3] For purposes of this Liquidation Analysis, the Debtors have not assumed the order in which liquidation proceeds would be received by the Debtors (i.e., which assets would be sold first, second, etc.). As such, and because it is impossible to know such order, the Debtors have assumed that the DIP Facility will be repaid from all sale proceeds, pro rata, without giving effect to any potential marshaling or other order of proceeds application.

2.      Revolving Facility Claims

- Class 3 consists of all Revolving Facility Claims (which includes principal, interest, and outstanding letters of credit) against any Debtor.  The Debtors estimate that there will be approximately $50.2 million in Class 3 Claims on the Liquidation Date. The Liquidation Analysis projects that Class 3 Claims were estimated to be recoverable between 32% and 54% of the pro forma value.

3.      Term Loan Facility Claims

- Class 4 consists of all Term Loan Facility Claims (which includes principal and interest) against any Debtor.  The Debtors estimate that there will be approximately $570.7 million in Class 4 Claims on the Liquidation Date. The Liquidation Analysis projects that Class 4 Claims were estimated to be recoverable at 0% of the pro forma value.

4.      Other Secured Claims

- Class 1 consists of any Other Secured Claims against any Debtor. The Debtors estimate there will be no Allowed Class 1 Claims on the Liquidation Date.  If there were Allowed Class 1 Claims on the Liquidation Date, they would likely receive 100% recoveries.

5.      Administrative Claims, Priority Tax Claims, Other Priority Claims

- Class 2 consists of any Other Priority Claims against any Debtor. The Debtors estimate that there will be no Class 2 Claims on the Liquidation Date.

- With respect to certain unclassified claims, the Debtors estimate that there will be approximately $29.9 in Administrative Claims and $3.9 million in Priority Tax Claims on the Liquidation Date. The Liquidation Analysis projects that these Claims were estimated to be recoverable at 0% of the pro forma value.

6.      General Unsecured Claims

- General Unsecured Claims consists of Class 5, 6 and 7 Claims:

    o   Class 5 consists of any General Unsecured Claims against any Debtor. The Debtors estimate that there will be approximately $29.3 million in Class 5 Claims on the Liquidation Date. The Class 5 Claims estimate does not include any estimates for the settlement of litigation or contract rejection Claims.  If Claims arose from these types of actions, the recovery of Class 5 Claims would be further diluted.

    o   Class 6 consists of any Debtor Intercompany Claims.   The Debtors estimate that there will be approximately $10.2 million Class 6 Claims on the Liquidation Date.

- o Class 7 consists of any Non-Debtor Intercompany Claims. The Debtors estimate that there will not be any Class 7 Claims on the Liquidation Date.

- The Debtors estimate that there will be approximately $39.5 million in Class 5, 6, and 7 Claims on the Liquidation Date. The Liquidation Analysis projects that Class 5, 6, and 7 Claims were estimated to be recoverable at 0% of the pro forma value.

7.   <u>Equity Interests</u>

- Equity Interests consists of Class 8, 9, and 10 Interests:

  - o Class 8 consists of Interests in Debtors other than Holdings GP and Holdings. The Debtors estimate that there will be approximately $407.1 million of Class 8 Interests on the Liquidation Date.

  - o Class 9 consists of Interests in Holdings GP and Holdings. For the avoidance of doubt, Class 9 Interests include, but are not limited to, the Holdings Interests and the Holdings Preferred Interests. The Debtors estimate that there will be approximately $223.7 million of Class 9 Interests on the Liquidation Date.

  - o Class 10 consists of any Section 510(b) Claims against any Debtor. The Debtors are not aware of any valid Class 10 Claims and believe that no such Class 10 Claims exist.

- The Debtors estimate that there will be approximately $630.8 million in Class 8, 9, and 10 Interests on the Liquidation Date. The Liquidation Analysis projects that Class 8, 9, and 10 Interests were estimated to be recoverable at 0% of the pro forma value.

**EXHIBIT D TO THE DISCLOSURE STATEMENT**

UNAUDITED VALUATION ANALYSIS

## EXHIBIT D TO THE DISCLOSURE STATEMENT

## UNAUDITED VALUATION ANALYSIS

At the Debtors' request, Houlihan Lokey performed this Valuation Analysis of the Reorganized Debtors.  Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Houlihan Lokey's view, as of March 9, 2016, was that the estimated going concern enterprise value from operations of the Reorganized Debtors would be in a range between approximately $329 million and approximately $404 million, with a midpoint of approximately $366 million.  This implied enterprise value estimate reflected the estimated value of the assets and businesses of the Debtors as used as part of an integrated going concern and pro forma for the transactions contemplated under the Plan.  While the Assumed Effective Date is August 31, 2016, in Houlihan Lokey's view, there would be no material difference between Houlihan Lokey's estimated going concern enterprise value of the Reorganized Debtors as of April 30, 2016 and as of the Assumed Effective Date.  Houlihan Lokey's views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Houlihan Lokey as of the date of its analysis, namely March 9, 2016.  It should be understood that, although subsequent developments may affect Houlihan Lokey's views, Houlihan Lokey does not have any obligation to update, revise or reaffirm its estimate.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in this Disclosure Statement.

Houlihan Lokey's analysis is based, at the Debtors' direction, on a number of assumptions, including, among others, that:  (a) the Debtors will be reorganized in accordance with the Plan which will be effective on or prior to August 31, 2016 (the "Assumed Effective Date"); (b) the Reorganized Debtors will achieve the results set forth in the financial projections provided to Houlihan Lokey by the Debtors for 2016 through 2019; (c) the Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this Disclosure Statement (in particular, the pro forma indebtedness of the Reorganized Debtors as of the Assumed Effective Date will not exceed $133 million); and (d) the Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the results set forth in the financial projections.  Houlihan Lokey makes no representation as to the achievability or reasonableness of such assumptions.  In addition, Houlihan Lokey assumed that there will be no material change in economic, market, and other conditions as of the Assumed Effective Date.

Houlihan Lokey assumed, at the Debtors' direction, that the financial projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors.  The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. *See* Disclosure Statement, Ex. B (Financial Projections).  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the financial projections and as a result, the actual enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

The estimated enterprise value in this section represents a hypothetical enterprise value of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan, based on consideration of certain valuation methodologies, as described below.  The estimated enterprise value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, its securities or its assets, which may be significantly higher or lower than the estimated enterprise value range herein.  The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Houlihan Lokey, among other things: (a) reviewed certain publicly available business and financial information relating to the Debtors and Reorganized Debtors that Houlihan Lokey deemed relevant; (b) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets, liabilities, and prospects of the Debtors and Reorganized Debtors, including the financial projections, furnished to Houlihan Lokey by the Debtors; (c) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (a) and (b) of this paragraph, as well as their views concerning the Debtors' and Reorganized Debtors' business and prospects before and after giving effect to the Plan; (d) reviewed publicly available financial and stock market data for certain other companies in lines of business that Houlihan Lokey deemed relevant; (e) reviewed the financial terms of certain transactions that Houlihan Lokey deemed relevant; (f) reviewed drafts of the Plan and related transactional documents; and (g) conducted such other financial studies and analyses and took into account such other information as Houlihan Lokey deemed appropriate.  In connection with its review, Houlihan Lokey did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Houlihan Lokey and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects.  In addition, at the Debtors' direction, Houlihan Lokey did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, or otherwise) of the Debtors or Reorganized Debtors, nor was Houlihan Lokey furnished with any such evaluation or appraisal. Houlihan Lokey also assumed, with the Debtors' consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Houlihan Lokey reviewed.

The estimated enterprise value in this section does not constitute a recommendation to any holder of a Claim or Interest as to how such person should vote or otherwise act with respect to the Plan.  Houlihan Lokey has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade (if at all) in the future.  The estimated enterprise value set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

<u>Valuation Methodologies</u>

In preparing its valuation, Houlihan Lokey performed a variety of financial analyses and considered a variety of factors.  The following is a brief summary of the material financial analyses considered by Houlihan Lokey, which consisted of (a) a discounted cash flow analysis, (b) a selected publicly traded companies analysis, and (c) a selected transactions analysis.  This summary does not purport to be a complete description of the analyses performed and factors considered by Houlihan Lokey.  The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.  The following valuations analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusions as to enterprise value.

A. ***Discounted Cash Flow Analysis.***  The discounted cash flow ("***DCF***") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Houlihan Lokey's DCF analysis used the Reorganized Debtors' projections of its debt-free, after-tax cash flows through December 31, 2019.  These cash flows were then discounted at a range of estimated weighted average costs of capital ranging from 12% to 14%, which were determined by reference to, among other things, the cost of debt of selected companies that are similar to the Reorganized Debtors in certain respects and the estimated cost of equity of selected publicly traded companies that are similar to the Reorganized Debtors in certain respects.  Houlihan Lokey's DCF analysis also included an estimate of the value of the Reorganized Debtors for the period beyond December 31, 2019, known as the terminal value.  The terminal value was derived by applying a multiple to the Reorganized Debtors' terminal year EBITDA.  The discounted cash flow analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

B. ***Selected Publicly Traded Companies Analysis.***  The selected publicly traded companies analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors, including, for example, comparable lines of business, exposure to commodity price fluctuations, business risks, growth prospects, market presence, geography, maturity of business, local market dynamics, diversification, and size and scale of operations.  Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public market and adding the aggregate debt.  Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, most commonly EBITDA.

C. ***Selected Transactions Analysis.***  The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly

3

disclosed merger and acquisition transactions that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors.   In connection with this analysis, Houlihan Lokey focused on relevant transactions announced over the past 18 months.   Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction.   Such enterprise values for operating businesses are commonly expressed as multiples of various measures of financial and operating statistics, including EBITDA.

<u>Valuation Considerations</u>

As a result of the foregoing, the estimated enterprise value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein.   Accordingly, none of the Debtors, Houlihan Lokey, or any other party assumes responsibility for the accuracy of such estimated enterprise value.   Depending on the actual financial results of the Debtors or changes in the financial markets, the enterprise value of the Reorganized Debtors as of the Assumed Effective Date may differ from the estimated enterprise value set forth herein.   In addition, the market prices, to the extent there is a market, of the Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.